# Supplemental Defendants' Appendix Volume 42

# DA26128 - DA26354

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION<br><br>This document relates to:<br><br>ALL CASES | MDL Docket No. 1869<br>Misc. No. 07-489 (PLF/AK/JMF)<br><br>**FILED UNDER SEAL** |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

Page

INTRODUCTION AND SUMMARY OF ARGUMENT ..........1

PART I: THE NEW LEGAL STANDARDS ..........11

A. Question 1: *Behrend* And The D.C. Circuit Require That Aggregate Proof Offered To Justify Class Certification Must Provide A Reliable Means Of Adjudicating The Claims Of All Class Members In One Stroke ..........13

1. A Model Is Not A Reliable Method For Establishing Classwide Injury Unless It Can Withstand Robust Testing ..........15

2. False Positives—Findings Of Injury Where None Ought To Exist—Are Disqualifying (Question 2) ..........16

3. Economic Models Must Fully And Reliably Resolve Disputed Issues For All Class Members ..........17

B. Question 3: "Widespread" Injury Fails To Support Class Certification ..........19

C. Question 4: *Behrend* Establishes That In Class Actions There Must Be A "Requisite Commonality Of Damages" ..........23

PART II: THE RAUSSER MODEL IS PLAGUED BY DISQUALIFYING FALSE POSITIVES ..........25

A. Relevant Factual Background ..........25

1. Class Period Fuel Surcharge Formulas Did Not Yield More Revenue Than The Competitive, Pre-Class Formulas ..........25

2. The Rausser Model Is Designed To Find "Damages" Whenever Fuel Costs Rise ..........32

3. The Fixed Fuel Coefficient Guarantees "Structural Breaks" ..........37

B. Dr. Rausser's Model Produces False Positive Findings Of Injury That Render His Model Unreliable ..........39

C. Dr. Rausser's Purported "Audit" Of Legacy Shipments Does Nothing To Explain Or Justify The False Positives ..........45

1. Prior To *Behrend*, Plaintiffs Freely Admitted That Dr. Rausser's Model Shows That "Legacy" Shippers Were Injured ..........46

2. Dr. Rausser's "Audit" For "Clean" Legacies Cannot Salvage The Damages Model ....................50

3. Plaintiffs' Fallback Position—That Legacy Damages Arise From An Inability To Renegotiate Binding Contracts—Fails....................55

PART III: COMMON PROOF CANNOT BE USED TO ESTABLISH HARM FROM INCREASED FUEL SURCHARGE COVERAGE....................58

A. The Coverage Data Demonstrates That Coverage And Enforcement Was Widespread Before The "Conspiracy" And Did Not Materially Accelerate During The Class Period....................60

B. Plaintiffs Cannot Prove By Common Evidence That *Every* Class Member Paid Fuel Surcharges Because Of The Alleged Conspiracy....................63

PART IV: THE CLASS CONTAINS THOUSANDS OF UNINJURED SHIPPERS, PRECLUDING A FINDING OF COMMON IMPACT....................66

A. Plaintiffs' Own Damages Model Finds That Thousands Of Class Members Were Uninjured....................67

B. Many Shippers Could Not Have Been Injured By The Conspiracy Plaintiffs Theorize....................70

PART V: THE RAUSSER MODEL IS INCAPABLE OF REDUCING THE DETERMINATION OF DAMAGES INTO A VIRTUALLY MECHANICAL TASK....................73

A. Plaintiffs Have No Method Of Measuring Individualized Damages....................73

B. Dr. Rausser's Model Is Not Capable Of Reliably Estimating Damages....................75

CONCLUSION....................80

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Am. Express Co. v. Italian Colors Rest.*,
133 S. Ct. 2304 (2013) ........ 12, 25

*Am. Honda Motor Co. v. Allen*,
600 F.3d 813 (7th Cir. 2010) ........ 14

*Amchem Products, Inc. v. Windsor*,
521 U.S. 591 (1997) ........ 12, 22, 69

*Amgen Inc. v. Conn. Retirement Plans and Trust Funds*,
133 S. Ct. 1184 (2013) ........ 19

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 13

*Babineau v. Fed. Express Corp.*,
576 F.3d 1183 (11th Cir. 2009) ........ 18

*Bell Atl. Corp. v. AT&T Corp.*,
339 F.3d 294 (5th Cir. 2003) ........ 18, 23, 75

*Bigelow v. RKO Radio Pictures, Inc.*,
327 U.S. 251 (1946) ........ 57

*Comcast Corp. v. Behrend*,
133 S. Ct. 1426 (2013) ........ *passim*

*Daubert v. Merrell Dow Pharmaceuticals*,
509 U.S. 579 (1993) ........ 14, 15

*Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*,
773 F.2d 1506 (9th Cir. 1985) ........ 57

*Gen. Tel. Co. of the Sw. v. Falcon*,
457 U.S. 147 (1982) ........ 3

*In re Hydrogen Peroxide Antitrust Litig.*,
552 F.3d 305 (3d Cir. 2008) ........ 22, 23, 25

*In re Live Concert Antitrust Litig.*,
863 F. Supp. 2d 966 (C.D. Cal. 2012) ........ 18

*In re New Motor Vehicles Canadian Export Antitrust Litig.*,
522 F.3d 6 (1st Cir. 2008) ........ 22

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
725 F.3d 244 (D.C. Cir. 2013) ........................................ *passim*

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
287 F.R.D. 1 (D.D.C. 2012) ........................................ *passim*

*Kohen v. Pac. Inv. Mgmt. Co.*,
571 F.3d 672 (7th Cir. 2009) ........................................ 11, 20, 22, 71

*McCarthy v. Kleindienst*,
741 F.2d 1406 (D.C. Cir. 1984) ........................................ 18

*McLaughlin v. Am. Tobacco Co.*,
522 F.3d 215 (2d Cir. 2008) ........................................ 17, 21

*Meister v. Med. Eng'g Corp.*,
267 F.3d 1123 (D.C. Cir. 2001) ........................................ 15

*Mims v. Stewart Title Guar. Co.*,
590 F.3d 298 (5th Cir. 2009) ........................................ 11, 20, 22, 71

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
259 F.3d 154 (3d Cir. 2001) ........................................ 18

*Ortiz v. Fibreboard Corp.*,
527 U.S. 815 (1999) ........................................ 12

*Sandwich Chef of Tex., Inc. v. Reliance Nat'l Indem. Ins. Co.*,
319 F.3d 205 (5th Cir. 2003) ........................................ 23

*Sher v. Raytheon Co.*,
419 F. App'x 887 (11th Cir. 2011) ........................................ 14

*United Food Mart, Inc. v. Motiva Enters., LLC*,
404 F. Supp. 2d 1344 (S.D. Fla. 2005) ........................................ 15

*Vega v. T-Mobile USA, Inc.*,
564 F.3d 1256 (11th Cir. 2009) ........................................ 18

*Wal-Mart Stores, Inc. v. Dukes*,
131 S. Ct. 2541 (2011) ........................................ *passim*

*Windham v. Am. Brands, Inc.*,
565 F.2d 59 (4th Cir. 1977) ........................................ 23, 25, 75

## STATUTES

15 U.S.C. § 15(a) .......... 21

28 U.S.C. § 2072 .......... 12

28 U.S.C. § 2072(b) .......... 12

42 U.S.C. § 2000e *et seq*. .......... 17, 19, 21

## OTHER AUTHORITIES

ABA Section of Antitrust Law, *Econometrics: Legal, Practical, and Technical Issues* (ABA Publishing 2005) .......... 17

Phillip E. Areeda and Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (4th ed. 2013) .......... 40

Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization* (4th ed. 2005) .......... 40

Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97 (2009) .......... 17, 18, 20, 65

Jeffrey R. Wooldridge, *Introductory Econometrics: A Modern Approach* (5th ed. 2012) .......... 76

## RULES

Fed. R. Civ. P. 23 .......... *passim*

Fed. R. Civ. P. 23(a) .......... 20, 21

Fed. R. Civ. P. 23(b)(3) .......... *passim*

Fed. R. Civ. P. 30(b)(6) .......... 49

## INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs' approach to class certification is equal parts denial and misdirection. They deny the changes in class certification law that led the D.C. Circuit to vacate this Court's prior order and direct this Court to "reconsider [class certification] in light of *Comcast Corp. v. Behrend*," 133 S. Ct. 1426 (2013), and its own opinion. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, No. 12-7085 (D.C. Cir. Sept. 19, 2013) (per curiam). They then try to limit the remand to an exercise in taxonomy about what constitutes a "legacy" shipment and dispute the *number* of them—as if that exercise somehow meets their burden under Rule 23 and *Behrend.* Plaintiffs do *nothing* to prove that they meet the new and more demanding standards for class certification. They never defend the Rausser model under the D.C. Circuit's "reliability" standard, never explain how they intend to prove causation and injury for *every* class member (now that the D.C. Circuit has held that "widespread" injury is insufficient), never rebut Defendants' expert's showing that under the Rausser model there are thousands of "uninjured" shippers included in the class, and do not produce or defend the long-promised estimates of individual shipper damages—an imperative after *Behrend.*

This approach is a clear default on Plaintiffs' burdens under the law. It is beyond reasonable debate that there must be a fresh analysis of class certification. The D.C. Circuit found that the legal standards and precedents underlying this Court's prior certification decision were "far more accommodating to class certification under Rule 23(b)(3)" than is appropriate after the 2013 *Behrend* decision. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 255 (D.C. Cir. 2013) ("*D.C. Cir. Op.*"). As Plaintiffs acknowledge, the changes in law are rooted in both *Behrend* and *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2546 (2011). Pls.' Supplemental Mem. of Law in Support of Mot. for Class Cert., Dec. 19, 2013 ("Pls.' Mem.") 8-11. Those cases treat class actions—including antitrust class actions—as "an exception to the

usual rule that litigation is conducted by and on behalf of the individual named parties only[,]" and Rule 23(b)(3) class actions as an "adventuresome innovation" to be used only when it is clear such an approach will not sacrifice substantive rights. *Behrend*, 133 S. Ct. at 1432 (citations and quotations omitted). The Supreme Court has made it clear that lower courts must consider not only class plaintiffs' proposed method of litigating a case—which they will always say constitutes "common proof"—but also any dissimilarities among class members that would impede classwide adjudication. And it is steadfast in its view that the right of the defense to raise legitimate individualized issues cannot be ignored: *Wal-Mart* holds that "a class cannot be certified on the premise that [the defendant] will not be entitled to litigate its . . . defenses to individual claims." *Wal-Mart*, 131 S. Ct. at 2546.

The D.C. Circuit vacated the prior class certification in light of these changes. It held that the "plausibility" standard applied to Dr. Rausser's work, and the "widespread" injury standard applied in assessing the predominance of common questions, were contrary to the new standards. *D.C. Cir. Op.*, 725 F.3d at 252-55. It further held that if Dr. Rausser's model generates "false positives," it would "shred" Plaintiffs' case for certification. *Id.* at 252-53. Plaintiffs argued the mandate was narrow, but this Court did not agree. The Court directed Plaintiffs and Defendants to address four broad issues, and warned Plaintiffs that if all they intended to say was that "nothing has changed, then I think we've got a problem." Ex. 1, Scope of Remand Hr'g Tr. 36:6-7, Oct. 15, 2013.[1]

Yet that is essentially what Plaintiffs are now arguing. The unstated premise of Plaintiffs' renewed motion is that the Court's prior findings—even though made under a legal framework that has been disapproved—will support class certification under the proper standards

[1] All exhibit references are to the Declaration of Timothy O'Mara, filed concurrently herewith.

as long as Plaintiffs can come up with some reason to believe that legacy shipments "would have been affected by the coordination among the Defendants." Supplemental Expert Report of Gordon Rausser, Ph.D., Dec. 19, 2013 ("Rausser Suppl. Rep.") 7.

This myopic approach is not consistent with the D.C. Circuit's mandate. The Court's duty is to carry out the remand in full, not merely to address Plaintiffs' one cherry-picked issue. The Court has acknowledged this unequivocally, stating at the hearing on the scope of the remand that it wants to consider all that is needed "to get it right." Ex. 1, Scope of Remand Hr'g Tr. 7:1-3, 40:12-13, Oct. 15, 2013. Furthermore, class certification may always be reconsidered in "light of subsequent developments in the litigation." *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160 (1982). The analytical work bearing on class certification in this case has advanced substantially since the class certification proceedings three-and-a-half years ago and is now focused not on *promises* of common proof that Dr. Rausser might develop, but his *actual proposed trial testimony*.[2] Plaintiffs do not get a free pass on the class certification implications of Dr. Rausser's proposed trial testimony, or Defendants' responses to it.

Plaintiffs' efforts to explain away the false positives—and, remarkably, to deny that there could even be a "false" finding of injury in this case—are baseless. They require changing the very nature of the alleged conspiracy, which is directly contrary to *Behrend*.

*Behrend* and the D.C. Circuit decision hold that a plaintiff's injury and damages model "must be consistent with its liability case." *Behrend*, 133 S. Ct. at 1433 (citation and quotations omitted); *D.C. Cir. Op.*, 725 F.3d at 253 ("Predicating class certification on a model divorced from the plaintiffs' theory of liability, the [Supreme] Court held, indicates a failure to conduct

---

[2] At this point, Dr. Rausser has submitted five expert reports, including the most recent report in this remand proceeding. Only Dr. Rausser's first two reports were part of the record when the Court ruled on Plaintiffs' initial motion for class certification.

the rigorous analysis demanded by Rule 23."). Accordingly, "[t]he first step in a damages study is the translation of the *legal theory of the harmful event* into an analysis of the economic impact *of that event*." *Behrend*, 133. S. Ct. 1435 (emphasis in original) (citation omitted).

There is no doubt that if one proceeds, as *Behrend* requires, from Plaintiffs' long-stated liability theory, Dr. Rausser's damages methodology finds positive damages "where none could exist." *D.C. Cir. Op.*, 725 F.3d at 252. That liability theory—the foundation of this Court's class certification decision—has always been about the widespread imposition of allegedly conspiratorial fuel surcharges in July 2003 that were "more aggressive" than previous surcharges, *i.e.*, the surcharge formulas "yielded more revenue" at a given cost of fuel than prior surcharges. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 287 F.R.D. 1, 46, 48-49 (D.D.C. 2012) ("*Class Cert. Op.*"). Plaintiffs and the Court likened this to a new and more aggressive "tax, increasing the total price of shipping by a set percentage." *Id.* at 14. This Court was very clear in its class certification order that "the claim in this case is not a conspiracy to impose *any* fuel surcharge; rather, plaintiffs claim that defendant[s] conspired to increase total prices by widespread application and enforcement of *coordinated, and aggressive, fuel surcharges*." *Id.* at 55 (emphasis in original) (quotations omitted); *see also id.* at 48.[3]

The D.C. Circuit thus reasoned that shipments subject to *pre-conspiracy pricing* should not generate damages findings. *D.C. Cir. Op.*, 725 F.3d at 252. Such findings are as a matter of law "false positives" that preclude class certification. *Id.* This is the logic underlying Dr. Rausser's pre-*Behrend* sworn testimony that "a shipper couldn't have been injured by the conspiracy if it was merely paying a fuel surcharge by virtue of a price authority that it entered

[3] The Court echoed the position articulated by Plaintiffs' counsel at the class certification hearing: "[T]he claim of the plaintiffs is not as to *all* fuel surcharges; it's only as to that coordinated *standardized* fuel surcharge *formula* that was collusively imposed by the defendants." Ex. 2, M. Hausfeld Arg., Hr'g Tr. 308:15-20, Oct. 7, 2010 (emphasis added).

prior to the conspiracy," and for excluding such "legacy" shipments from the class definition. Ex. 3, Rausser Dep. 275:1-16, Sept. 24, 2010.

The problem for Plaintiffs—which the false positives inquiry exposed—is that Dr. Rausser's damages findings have nothing to do with "more aggressive" fuel surcharge formulas. There is nothing in Dr. Rausser's model that can distinguish between competitively adopted fuel surcharges and "*coordinated, and aggressive, fuel surcharges.*" *Class Cert. Op.*, 287 F.R.D. at 55 (emphasis in original) (quotations omitted). Indeed, Dr. Rausser now claims that "whether there's more or less earnings power" due to changes in fuel surcharge formulas is "not relevant" to his assessment of injury and damages. Ex. 4, Rausser Dep. 52:23-53:5, 69:3-12, 76:22-77:8, Mar. 4, 2014.[4] An entirely different logic is driving Dr. Rausser's model, and as soon as one understands what that is and how irrelevant fuel surcharges are to it, it becomes clear that the model will "detect[] injury where none could exist" and generate damages findings altogether "divorced from the plaintiffs' theory of liability." *D.C. Cir. Op.*, 725 F.3d at 252-53.

Plaintiffs no longer want to ground their case in "more aggressive" fuel surcharges for good reason: in fact, the allegedly conspiratorial surcharge formulas do not materially "yield more revenue" at the Class Period fuel prices—and certainly not across the board (as Plaintiffs' theory requires). Some of the most significant fuel surcharge formulas in effect during the Class Period *never changed at all*, and some were *lowered*. For example, BNSF's public intermodal formula was unchanged from 2001 to well after the Class Period, and UP actually reduced its public intermodal formula—twice. *Infra* Part II:A.1. Furthermore, at Class Period fuel prices,

---

[4] The same disconnect exists with respect to "coverage": Plaintiffs' liability theory emphasizes an allegedly collusive "goal of 100 percent coverage" during the Class Period, in contrast to the pre-Class Period when, Plaintiffs allege, there was minimal coverage or enforcement of fuel surcharges. But rate-based fuel surcharge coverage had reached approximately 65% on new contracts *before the conspiracy.* Dr. Rausser has not modeled coverage and cannot predict who accepted surcharges because of the conspiracy. *Infra* Part III:B.

the pre-"conspiracy" and Class Period public carload surcharge formulas (the primary focus of Plaintiffs' arguments) generate *essentially the same revenues.* The difference in earning power for any Defendant—when there is a difference—is on the order of *one percent*, which Dr. Rausser himself characterized as "approximately the same." Ex. 4, Rausser Dep. 36:5-10, Mar. 4, 2014. It is therefore mathematically impossible for Dr. Rausser to devise a methodology that will produce billions of dollars in damages to class members without also showing damages to shippers with admittedly competitive fuel surcharge provisions. The two groups are too alike.

Dr. Rausser therefore does not measure damages with any regard for the incremental earning power of "more aggressive" fuel surcharges. Nor do "more aggressive" fuel surcharges have anything to do with the vaunted "structural break." Instead, Dr. Rausser generates both with a modeling trick that converts legitimate fuel cost recovery into "damages."

Perhaps the most important fact in this case is that the price of diesel fuel during the Class Period was essentially *double* the average price before the Class Period—and at times more than double. Declaration of Joseph Kalt, Mar. 31, 2014 ("Kalt Decl.") ¶ 47, Fig. 6.[5] As a result, Defendants' fuel expense grew from an average of 9.7% of overall operating expenses during the pre-Class Period to an average of 17.9% of operating expenses (and peaking at much higher levels) during the Class Period. *Id.* at ¶ 48, Fig. 7. Dr. Rausser admits that with or without fuel surcharges Defendants would have recovered those higher costs by passing them through to shippers. Yet Dr. Rausser's damages estimates are generated by assuming that the "proper" relationship between a railroad's rates and its fuel costs, *i.e.*, how much rates should increase when fuel prices rise, *never changes* even when fuel prices increase two or even three

---

[5] Dr. Joseph Kalt has taught economics at Harvard since 1978, among his many credentials. Dr. Kalt submitted a report on liability and damages on behalf of all Defendants at the merits phase. His declaration here substantially builds off of that work.

times. As we demonstrate below, this assumption (which is hard-wired into Dr. Rausser's damages model as a constant fuel price coefficient) mathematically generates "damages" if Defendants simply recover their higher fuel costs. Recovering higher fuel costs also leads to what Dr. Rausser calls the "structural break," and if one tests the structural break—as the D.C. Circuit suggested, but Dr. Rausser refuses to do—Dr. Rausser's model yields a structural break at nearly any date tested. The constant fuel price coefficient assumption also guarantees that Dr. Rausser's model will find damages *irrespective of what changes occurred with respect to fuel surcharge formulas*. A model that does not allow ordinary fuel cost recovery is bound to produce false positives, and the Rausser model does exactly that.

Plaintiffs cannot honestly argue otherwise. Dr. Rausser's damages methodology has always generated "overcharges" and "damages" for shipments *he* excluded from the class because *he* concluded they were subject to pre-"conspiracy" contracts. *See* Kalt Decl. ¶¶ 35-38. Plaintiffs never argued otherwise prior to *Behrend*. To the contrary, when, during the prior class certification proceedings, Defendants' expert pointed this out, Dr. Rausser *confirmed it*, quibbling only with the *amount* of the overcharge. And now, numerous tests confirm it again, in many different ways. False positives are evident on:

- Shipments subject to fuel surcharge formulas that were *exactly the same* before and during the Class Period. *Id.* at ¶¶ 37-38, Fig. 2.
- Shipments subject to fuel surcharge formulas that were *reduced* during the Class Period. *Id.*
- Shipments that *occurred in the three years before* the alleged start of the conspiracy. *Id.* at ¶¶ 41-42, Fig. 5.

In fact, if we replace the rates paid in the Class Period with rates merely equal to the Defendants' variable costs—in other words, if we remove all *profit* and therefore all *overcharge potential* from the rates—the false positives persist. *Id.* at ¶¶ 61-64, Fig. 11.

Plaintiffs' featured argument—Dr. Rausser's supposedly "painstaking" audit of his own prior work identifying legacy shipments—does nothing to cure this problem, and is really just a misdirection play. Dr. Rausser now contends that over 50% of the shipments *he* previously classified as legacies are not really legacy shipments, either because they had "self-adjusting or adjustable" fuel surcharge provisions (what Dr. Rausser calls "Category 1") or surcharge provisions adopted during the alleged conspiracy (what Dr. Rausser calls "Category 2"). Rausser Suppl. Rep. 37-38. That means Dr. Rausser is now contending his previous legacy work contained *more than 15 million errors*. His latest work is riddled with errors as well, but most importantly *it has nothing to do* with any change to the fuel surcharge formulas that might explain the false positives. Dr. Rausser made no effort to verify that the contracts he now claims were not truly "legacy" (because they were adjusted or adopted during the Class Period) resulted in *higher* fuel surcharges than the shippers agreed to in the pre-Class Period. He testified that he could think of no reason to do that. Ex. 4, Rausser Dep. 126:20-128:4, 132:4-25, Mar. 4, 2014. In fact, he admitted at his deposition that he transferred entire categories of shipments to his non-legacy categories even where fuel surcharge adjustments during the Class Period had *no impact* or even *reduced* pre-Class Period surcharge formulas. This legacy audit offers no useful information on the issues that concerned the D.C. Circuit.

But it is worse than that. Plaintiffs and Dr. Rausser are also now denying the possibility of false positives during the Class Period by, for the first time, arguing that "the [alleged] conspiracy raised all-in rates for <u>*all*</u> *shippers with rate-based FSCs*, including any 'legacy' contracts for which the FSC formulas were set before formation of the conspiracy and did not change during the conspiracy." Pls.' Mem. 28 (emphasis added). The need for this argument is clear: Dr. Rausser could not figure out a way to assign *all* of the shipments he previously

identified as legacy to his new non-legacy categories, and his model continues to find substantial "overcharges" on legacy shipments. Kalt Decl. ¶ 35, Fig. 1. Since it is the fact of false positives, not their precise number, that demonstrates the unreliability of the model and "shred[s] the plaintiffs' case for certification," *D.C. Cir. Op.*, 725 F.3d at 252, Dr. Rausser and Plaintiffs needed a second argument to deal with undisputed legacy shipments.

The result, quite simply, is that Plaintiffs have taken the fuel surcharges out of *In re Rail Freight Fuel Surcharge Antitrust Litigation.* With no other way to explain the false positives, Plaintiffs have abandoned the cornerstones of their prior case—(1) that the "conspiratorial" fuel surcharge formulas were "more aggressive" than preexisting formulas; (2) that class members would not have paid these "more aggressive" surcharges absent the alleged conspiracy; and (3) that a "structural break" proves both the alleged conspiracy and its common impact. Dr. Rausser now contends that whether the Class Period fuel surcharges had greater earning power than the pre-class fuel surcharges is "not relevant" to this case (Ex. 4, Rausser Dep. 52:23-53:5, Mar. 4, 2014); the vaunted structural break is all but gone, mentioned *one time* in Plaintiffs' entire brief (in a footnote); and somehow even shippers whose fuel surcharge formulas did not change, changed in immaterial ways, or were even reduced are harmed.

Plaintiffs cannot fundamentally rewrite their theory of liability to evade the D.C. Circuit's holding. The rule of *Behrend* is that a plaintiff's injury and damages model "must be consistent with its liability case," *Behrend*, 133 S. Ct. at 1433 (citation and quotations omitted), and the D.C. Circuit has squarely held that false positives *in relation to* Plaintiffs' "more aggressive" fuel surcharges theory "shred" the case for class certification. *D.C. Cir. Op.*, 725 F.3d at 252. One cannot reverse the logic and conform the liability theory to whatever the model finds.

Even if reimagining the conspiracy were permissible, the case for class certification without a more aggressive fuel surcharge that acts as a type-marker for an injured shipper is far different than the case Plaintiffs presented in 2010. This Court's prior analysis depended on a stark contrast between (a) a pre-conspiracy marketplace in which fuel surcharges were moderated by competition, and (b) one in which allegedly virtually every class member became subject to new, more aggressive, supracompetitive fuel surcharges. We disagree that even under those facts, class certification was appropriate, but if that stark transformation is *not* there, which it is not, Plaintiffs' case collapses entirely.

The focus on false positives required by *Behrend* and the D.C. Circuit opinion has unraveled Plaintiffs' case. Under the standards adopted by the Supreme Court in *Behrend* and *Wal-Mart*, and by the D.C. Circuit in this very case, class certification must be denied.

* * *

**Part I** of this memorandum addresses the legal standards for class certification after the D.C. Circuit decision, *Wal-Mart*, and *Behrend.* We debunk Plaintiffs' argument that nothing has really changed, and address the legal questions propounded in the Court's October 16, 2013 Order (ECF No. 691).

**Part II** addresses the false positives question comprehensively. We show that the false positives are admitted, verified, and "shred" the case for class certification.

**Part III** addresses Plaintiffs' theory of injury via increasing surcharge "coverage." We show that there was no dramatic change in fuel surcharge coverage levels at the time of the alleged conspiracy; that Plaintiffs have no common proof of coverage; and Dr. Rausser has not developed a model that even purports to address coverage. As such, there is no longer any

tenable argument that whether particular individual shippers paid a fuel surcharge *because of* the alleged conspiracy can be resolved for all class members in "one stroke."

**Part IV** addresses common impact, in particular the significance of "uninjured" class members. Defendants show that even under Dr. Rausser's flawed methodology (*i.e.*, accepting his model as is with no adjustments), 2,679 class shippers (16.7% of the class)—including one of the named Plaintiffs—have no damages on any shipment, and 4,550 class shippers (28.3% of the class)—including three of the named Plaintiffs—have zero or negative net "damages" on their shipments. Kalt Decl. ¶¶ 73-74, Fig. 13. These findings are understated (since they are the product of a model rigged to find damages) but nonetheless dispositive under the D.C. Circuit decision.

Finally, **Part V** addresses the damages implications of *Behrend*. Plaintiffs have declined to produce damage estimates for individual class members, a default on their burden under *Behrend*. Plaintiffs could not meet that burden anyway, because in the circumstances of this case damages analysis is highly individualized.

## PART I: THE NEW LEGAL STANDARDS

This Court asked the parties to address four issues concerning whether *Behrend* and/or the D.C. Circuit's opinion: (1) "establish a more demanding standard for evaluating expert proof of classwide injury than the standard previously applied by this Court;" (2) make false positives disqualifying; (3) reject the widespread injury rule of *Mims v. Stewart Title Guar. Co.*, 590 F.3d 298 (5th Cir. 2009), and *Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672 (7th Cir. 2009); and (4) establish any new principles concerning "individualized damages determinations" in class certification analysis. Oct. 16, 2013 Order at 2-3. The short answer to all four questions is yes; *Behrend* and the D.C. Circuit's opinion reflect an important shift in how courts must conduct a

class certification analysis. That change is part of a broader trend in class certification law evident not only in those decisions, but also in *Wal-Mart* and other recent cases.

In its recent decisions, the Supreme Court has emphasized that class certification is not meant to be the norm, including in antitrust cases. *See Behrend*, 133 S. Ct. at 1432 ("The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'") (citation omitted); *Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2310 (2013) (antitrust case: "Rule [23] imposes stringent requirements for certification that in practice exclude most claims."). It has narrowed the fundamental concept of a "common question," holding in *Wal-Mart* that a question is "common" only if it is "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 131 S. Ct. at 2551. It has emphasized that to justify class treatment, classwide litigation must be able to "resolve" the common issues, and resolve them for *everyone*—all class members and all defendants—without altering anyone's burdens under the governing law and, critically, without prejudicing the defendants' right to advance individualized defenses. *Id.* at 2561 ("[A] class cannot be certified on the premise that [defendants] will not be entitled to litigate [their] statutory defenses to individual claims.").[6] If litigation by common proof cannot accomplish that goal, there is no possible basis for saying common questions predominate. *Id.*

---

[6] This has become a common refrain in Supreme Court class certification cases, and is grounded in the Rules Enabling Act, which "forbids interpreting Rule 23 to 'abridge, enlarge or modify any substantive right[.]'" *Wal-Mart*, 131 S. Ct. at 2561 (quoting 28 U.S.C. § 2072(b)); *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 845 (1999). The Court has even reiterated the point in a post-*Behrend* antitrust case, noting that "the antitrust laws do not guarantee an affordable procedural path to the vindication of every claim" and that any presumption that class action procedures must be available in antitrust cases likely "would be an 'abridg[ment]' or 'modif[ication]' of a 'substantive right' forbidden to the Rules[.]" *Am. Express*, 133 S. Ct. at 2309-10 (quoting 28 U.S.C. § 2072(b)).

The Court has also addressed what is expected of expert proofs offered in support of class certification. Plaintiffs can always use seemingly sophisticated mathematical tools to model the aggregate experience of even the most diverse class, and assert that those aggregate proofs are appropriate. Class certification standards had evolved to tolerate a broad range of quality in such proofs, as well as the imprecision that results when one generalizes about class members rather than studying individual circumstances. The Supreme Court and the D.C. Circuit have now forcefully reasserted a profoundly different perspective—aggregate proofs of liability, injury, and even damages must be subjected to rigorous scrutiny to make sure that aggregation does not ignore critical evidence, that the proposed expert proof fits the liability theory, that it meets accepted professional standards, that its reliability has been tested, and that it obviates the need for individualized evidence at trial.

### A. Question 1: *Behrend* And The D.C. Circuit Require That Aggregate Proof Offered To Justify Class Certification Must Provide A Reliable Means Of Adjudicating The Claims Of All Class Members In One Stroke

Prior to *Behrend*, some courts held that to satisfy Rule 23 proposed common proof need only be a "plausible" method of proving a fact. *Class Cert. Op.*, 287 F.R.D. at 26 (relying on Third Circuit *Behrend* decision). Plausibility has always been a controversial rubric. It is essentially a pleading standard[7] and permits class certification even when a model has evident flaws. In application it also focused exclusively on whether *plaintiffs* had a "plausible" way to prove *their* case through common evidence (such as a "workable" regression), with little or no regard to whether the defendants had individualized rebuttals that they were entitled to present.

*Behrend* makes clear that Rule 23 is not a "mere pleading standard" but requires the moving party to demonstrate that the Rule's requirements are "*in fact*" satisfied, and that

---

[7] *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face'") (citation omitted).

certification is proper only if "the trial court is satisfied, after a rigorous analysis, that [Rule 23's] prerequisites . . . have been satisfied." 133 S. Ct. at 1432 (emphasis in original; citations omitted). The D.C. Circuit cited this Court's reliance on the Third Circuit's plausibility standard as the primary example of "case law . . . far more accommodating to class certification" than is appropriate after *Behrend*, and held that "Rule 23 not only authorizes a hard look at the soundness of statistical models that purport to show predominance—the rule commands it." *D.C. Cir. Op.*, 725 F.3d at 255.[8]

The D.C. Circuit decision holds that a class certification model must be evaluated for "soundness" and must be shown to be a "reliable means" of proving what it purports to prove. *Id.* at 252-53, 255. But what is the difference between "plausible" and "reliable" or "sound?" We believe that in addition to basic admissibility standards (*i.e.*, *Daubert*),[9] the new standard—"reliable"—embraces at least three important features.

---

[8] Plaintiffs suggest that *Behrend* holds that a "model must 'plausibly' show a common theory of impact[.]" Pls.' Mem. 10 n.9 (citing *Behrend*, 133 S. Ct. at 1435 n.6). The citation is to a footnote, which Plaintiffs badly misread. The Court was making the point that even if the model offered by Dr. James McClave (one of Plaintiffs' experts in this case) only studied effects from "the deterrence of overbuilding, it still would not have established the requisite commonality of damages unless it plausibly showed that the extent of overbuilding (absent deterrence) would have been the same in all counties, or that the extent is irrelevant to effect upon ability to charge supra-competitive prices." *Behrend*, 133 S. Ct. at 1435 n.6. This is simply an observation that the McClave model assumed, implausibly, that the deterrence of overbuilding hurt all class members alike. It is not an endorsement of a "plausibility" standard, as is made clear by the D.C. Circuit's subsequent opinion interpreting *Behrend*.

[9] *Daubert v. Merrell Dow Pharmaceuticals* and its progeny establish "a standard of evidentiary reliability." 509 U.S. 579, 590 (1993). Although the Supreme Court has not settled the issue, it makes no sense to think that evidence which fails under the considerable body of *Daubert* reliability law can be the "reliable" common proof the D.C. Circuit requires to justify class certification. *See Am. Honda Motor Co. v. Allen*, 600 F.3d 813 (7th Cir. 2010) (requiring *Daubert* analysis); *Sher v. Raytheon Co.*, 419 F. App'x 887 (11th Cir. 2011) (same). At the oral argument in *Behrend*, five Justices (Kagan, Kennedy, Alito, Scalia and Sotomayor) questioned why it made any difference whether a *Daubert* motion was filed if it was agreed that the district court had to find the expert proof reliable. Ex. 5, Tr. of Oral Argument at 25:20-26:8, 28:2-20, 29:6-24, 30:8-31:5, 31:11-16, *Comcast Corp. v. Behrend*, 133 S. Ct. 1426

### 1. A Model Is Not A Reliable Method For Establishing Classwide Injury Unless It Can Withstand Robust Testing

At a very basic level, the difference between a "plausibility" standard and a "reliability" standard is the difference between *potential* value and *proven* value; between what a plaintiff claims is "workable" and what actually "works." That means the model's predictive powers must be *validated by testing*. *Daubert*, 509 U.S. at 593 ("Ordinarily, a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested."); *see also id.* at 593 ("'the scientific status of a theory is its falsifiability, or refutability, or testability'") (citation omitted); *cf. Meister v. Med. Eng'g Corp.*, 267 F.3d 1123, 1127 (D.C. Cir. 2001) (expert testimony "must be supported by appropriate validation"); *United Food Mart, Inc. v. Motiva Enters., LLC*, 404 F. Supp. 2d 1344, 1348-50 (S.D. Fla. 2005) (excluding expert's opinion regarding the relevant geographic market because it was based on an assumption that was not tested).

The D.C. Circuit specifically criticized Dr. Rausser for not testing his work, in particular the previously all-important "structural break." *D.C. Cir. Op.*, 725 F.3d at 254 (suggesting that Plaintiffs "rerun[] both [Rausser] models from an earlier start date"). Indeed, the false positives issue is an object lesson in what happens to a supposedly "plausible" model when tested. It is therefore unacceptable that Dr. Rausser refuses to test either the structural break or his model's propensity towards false positives. Untested, his work is unreliable as a matter of law.

---

(2013) (No. 11-864). As Justice Sotomayor put it, "The problem everyone's having is – I think – [] why do you need *Daubert* to point out that something is not probative or unreliable?" *Id.* at 50:24-51:1. Defendants agree with this reasoning, and therefore do not intend to make a *Daubert* motion at this time. We reserve all rights to do so should this case proceed to trial.

### 2. False Positives—Findings Of Injury Where None Ought To Exist—Are Disqualifying (Question 2)

The D.C. Circuit held that if a model "purports to quantify the injury in fact to all class members[,]" but "the same methodology also detects injury where none could exist"—*i.e.*, the model generates false positives—then "there exists no reliable means of proving classwide injury in fact." *D.C. Cir. Op.*, 725 F.3d at 252-53. Indeed, "[i]f accurate, this critique [of the Rausser model] would shred the plaintiffs' case for certification." *Id.* at 252.

This clear-cut rule—the answer to the Court's Question 2—was derived from *Behrend*, where the Supreme Court held that "at the class-certification stage (as at trial), any model supporting a 'plaintiff's damages case must be consistent with its liability case,'" and a "model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to th[e] theory" of anticompetitive injury. 133 S. Ct. at 1433. A "methodology that identifies damages that are not the result of the wrong[,]" the Supreme Court held, cannot satisfy Rule 23(b)(3). *Id.* at 1434. This is not a question of class definition, such that one can solve a false positives problem by changing the contours of the class. A model that predicts damages where it should not cannot be trusted as proof of *anything*, and certainly does not suffice as proof of whether cognizable, classwide antitrust injury has occurred. *See id.* at 1434-35; *D.C. Cir. Op.*, 725 F.3d at 254 ("As things stand, we have no way of knowing the overcharges the damages model calculates for class members is any more accurate than the obviously false estimates it produces for legacy shippers.").

Plaintiffs agree that these holdings are "not controversial." Pls.' Mem. 2 ("plaintiffs have never disagreed" that "there would be something wrong with a model that shows damages for shippers that could not have been injured"). They contend, however, that the debate over false positives is really a debate over the proper "benchmark" for what prices would have been in the

"but for" world, and as such presents a jury issue. *See id.* at 38-40. The D.C. Circuit decision unquestionably forecloses this argument. The court held that false positives "shred" the case for class certification, and that what a class certification model shows presents an issue of law. *D.C. Cir. Op.*, 725 F.3d at 252-53. And Defendants' experts are not just quibbling with the facts underlying Dr. Rausser's model. They have illustrated that Dr. Rausser's model is fundamentally unreliable because—even on its own terms—it assigns injury in multiple scenarios where no injury could exist.

### 3. Economic Models Must Fully And Reliably Resolve Disputed Issues For All Class Members

A reliable model also must capture the full panoply of facts that bear on the issues it addresses and that could be decisive if the class members' claims were tried individually. As Professor Nagareda notes, "the real concern about aggregate proof in class certification lies in its threat 'to conform the law to the proof.'" Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 104 (2009) (hereinafter "Nagareda"), quoting *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 220 (2d Cir. 2008). This was the Supreme Court's concern in *Behrend*, 133 S. Ct. at 1435 n.6, where the damages model failed to account for the geographic effects of "overbuilding," and in *Wal-Mart*, 131 S. Ct. at 2551, where the disparate-impact study fell short of addressing all relevant Title VII considerations. It was also the basis for the Court's separate holding in *Wal-Mart* rejecting a proposed "Trial by Formula," where the formulas left out so much important detail that basing decisions on them would have prejudiced the defendant's right to assert individualized defenses. 131 S. Ct. at 2561. The Supreme Court is unwilling to allow the plaintiffs' proposed common proof to constrain the range of proof otherwise permissible, viewing that as a violation of the Rules Enabling Act. *Id.*

The concern arises because "[i]t is always possible to perform a regression with the price as the dependent variable and with a variety of independent variables." *ABA Section Of Antitrust Law, Econometrics: Legal, Practical, And Technical Issues* 221 (ABA Publishing 2005). "[T]his does not mean, however, that impact can be shown with common proof, or that damages can be calculated in a formulaic manner." *Id.* The Court must rigorously scrutinize the regression, which "presupposes—at least as a matter of economic or statistical methodology—the aggregate unit whose legitimacy the court is to determine," in order to assess whether it justifies limiting the proofs in the lawsuit to competing aggregate proofs. *Nagareda*, 84 N.Y.U. L. Rev. at 103. That is clearly not justified when a model obscures important differences among class members, such as through the excessive use of averages. *See, e.g.*, *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 307 (5th Cir. 2003). It is clearly not when the model fails to consider important factors bearing on price. *See, e.g.*, *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 972 (C.D. Cal. 2012). And it clearly cannot be done "on the premise that [defendants] will not be entitled to litigate . . . defenses to individual claims." *Wal-Mart*, 131 S. Ct. at 2561.[10] A court may limit the dispute to a battle of aggregate proofs only upon a finding that the model so reliably and comprehensively captures the underlying facts relevant to each class member's claim that individualized evidence can be excluded as irrelevant or repetitive under the Rules of Evidence.

There are cases where this is possible because the underlying substantive law makes the key issues "common," such as when the fraud-on-the-market doctrine dictates a classwide

[10] Prior decisions have often come to the same conclusion. *See, e.g.*, *McCarthy v. Kleindienst*, 741 F.2d 1406, 1413-15 & n.9 (D.C. Cir. 1984) (holding that certification was properly denied because defendants were entitled to rebut plaintiffs' proposed common proof with individualized evidence); *Babineau v. Fed. Express Corp.*, 576 F.3d 1183, 1191-94 (11th Cir. 2009) (same); *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1277 (11th Cir. 2009) (same); *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 191-92 (3d Cir. 2001) ("actual injury cannot be presumed, and defendants have the right to raise individual defenses against each class member").

presumption of reliance in securities cases. *See Amgen Inc. v. Conn. Retirement Plans and Trust Funds*, 133 S. Ct. 1184 (2013); Nagareda, 84 N.Y.U. L. Rev. at 116-17. Or it may be clear from the facts, such as in the prototypical antitrust case where every purchaser bought the same fungible product at the same uniform, market-wide price, and the factors bearing on injury and damages are simple and mechanical. But the crucial point, for present purposes, is that Plaintiffs' ability to construct a "plausible" or "workable" multiple regression analysis *does not* establish that the underlying issues are common in the legally relevant sense. Only if the model *succeeds* in obviating the need for voluminous, individualized rebuttal (by rendering such proof irrelevant and repetitive) can it be said to facilitate classwide resolution. *Wal-Mart*, 131 S. Ct. at 2555 (rejecting Title VII regression model that did not obviate defendants' rebuttal that its employment decisions were gender-neutral and performance based). One cannot say that where, as here, the facts disclose complexity (a) that the model cannot capture, and (b) that Defendants would be entitled to litigate if the cases were tried separately.

This is an issue of law for the court alone. *Behrend* specifically holds that when an economic model is offered to prove Rule 23 criteria, what the model proves is a question of law. *Behrend*, 133 S. Ct. at 1433 n.5 ("while the data contained within an econometric model may well be 'questions of fact' in the relevant sense, what those data prove is no more a question of fact than what our opinions hold"). A "reliability" analysis proceeds with none of the deference to the jury that the "plausible" or "workable" formulations imply.

**B. Question 3: "Widespread" Injury Fails To Support Class Certification**

Throughout its class certification opinion, this Court answered Defendants' evidence that the circumstances of individual class members relevant to causation, injury, and damages varied, often dramatically, by stating that Plaintiffs' evidence plausibly demonstrated "widespread" injury within the class and that exceptions appeared to be "rare," "outliers" or "anomalies."

*Class Cert. Op.*, 287 F.R.D. at 28, 50, 52, 57, 58, 60, 61, 64. The Court relied on the Fifth and Seventh Circuit opinions in *Mims* and *Kohen* for this approach, specifically the proposition that "inability to show injury as to a few does not defeat class certification where the plaintiffs can show widespread injury to the class." *Id.* at 39-40 (citations and quotations omitted).

The D.C. Circuit has now specifically disapproved *Mims* and *Kohen*, and ruled unambiguously and repeatedly that it "expect[s] the common evidence to show all class members suffered *some* injury." *D.C. Cir. Op.*, 725 F.3d at 252-55 (emphasis in original); *see also id.* at 252 ("The plaintiffs must also show that they can prove, through common evidence, that all class members were in fact injured by the alleged conspiracy."). The answer to the Court's question "[w]hether . . . the D.C. Circuit's remand decision" rejects *Mims* and *Kohen* is thus clear.

To understand the implications of this ruling (the other part of Question 3), one must return to *Wal-Mart*, which was the principal authority upon which Defendants relied in urging rejection of the *Mims/Kohen* "widespread injury" rule.[11] *Wal-Mart* reverses a tendency in the law to construe the phrase "common question," which appears in both Rules 23(a) and 23(b)(3), as if the issue is whether class members have enough in common to warrant certification. The Supreme Court endorsed Professor Nagareda's observations that "'[w]hat matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation[,]'" and that "'[d]issimilarities within the proposed class are what have the potential to impede the generation of common answers.'" *Wal-Mart*, 131 S. Ct. at 2551 (quoting Nagareda, 84 N.Y.U. L. Rev. at 132 (emphasis in original)). The Supreme Court held a question is "common" only if "in one stroke" the judge or jury can "resolve an issue that is central to the

[11] Plaintiffs make too much out of the fact that *Behrend* does not address this issue. *See* Pls.' Mem. 56-57. Defendants never claimed otherwise.

validity of each one of the claims[.]" *Id.* The class before it failed under this standard because, notwithstanding an expert's statistical evidence of supposed widespread discriminatory impact, classwide proof could not generate a "common answer to the crucial question *why was I* [any class member] *disfavored*" by Wal-Mart's policies. *Wal-Mart*, 131 S. Ct. at 2552 (emphasis in original). *Wal-Mart* makes clear that where there is a gap between what the common proof can establish (widespread injury) and what a plaintiff must prove (injury to each individual), that proof fails to establish a common question.

In this antitrust case, just as in the Title VII action in *Wal-Mart*, Plaintiffs must prove individual injury to "business or property." 15 U.S.C. § 15(a). This Court appropriately referred to individual injury as "the central issue" in the case. *Class Cert. Op.*, 287 F.R.D. at 36. The antitrust plaintiff cannot survive by proving only that he or she is in a class of persons who collectively experienced fuel surcharges becoming more "widespread," or "uniform," or less negotiable, or even "more aggressive." Each class member must have suffered demonstrable and quantifiable injury-in-fact *or else it has no claim*. Proof of "widespread injury" fails to meet this standard because it leaves open whether any individual was in the allegedly injured majority or the uninjured minority—which one must answer as many times as there are members in the class, even if the uninjured group is small. *See Wal-Mart*, 131 S. Ct. at 2551, 2555. If the issue is ignored—for example, by dismissing some class members as "anomalies"—the court effectively modifies substantive antitrust law, allowing the "anomalous" class members to share in a recovery they could not obtain alone. This is improper. "Rule 23 is not a one-way ratchet, empowering a judge to conform the law to the proof." *McLaughlin*, 522 F.3d at 220.

This analysis applies with even more force to Rule 23(b)(3)'s concept of predominance. *Behrend* teaches that "[i]f anything, Rule 23(b)(3)'s predominance criterion is even more

demanding than Rule 23(a)." 133 S. Ct. at 1432. It is meant to "test[] whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S.at 623. The presence of altogether uninjured class members signals that irrespective of whatever issues might be common, the litigation is still going to devolve into individualized inquiries about who was injured, who was not, and what are the damages for those who were.

Plaintiffs nevertheless argue that "[a]fter *Behrend*, the law remains clear—the presence of a few uninjured class members does not preclude certification." Pls.' Mem. 57. But every case they cite is an out-of-circuit district court case, many of which cite *Mims* or *Kohen*. The D.C. Circuit decision controls. Plaintiffs also try to limit the import of the D.C. Circuit's discussion of *Mims* and *Kohen* to the issue of whether "Rule 23 requires 'a hard look' at 'statistical models that purport to show predominance.'" *Id.* at 58. That is wishful thinking. Neither *Mims* nor *Kohen* has anything to do with that issue, and in all events the D.C. Circuit *quoted* the proposition that it deemed *incorrect*: that "'[c]lass certification is not precluded simply because a class may include persons who have not been injured by the defendant's conduct.'" *D.C. Cir. Op.*, 725 F.3d at 255 (quoting *Mims*, 590 F.3d at 308).[12]

Plaintiffs argue that it would be unfair or "distort[] the meaning of predominance" to permit the possibility of a single uninjured shipper to "vitiate the class-action device" for "a Class of roughly 30,000 shippers[.]" Pls.' Mem. 58. That is nothing but a straw man. There are *thousands* of uninjured class members in this case—even according to Dr. Rausser's rigged model. Furthermore, it is Plaintiffs who are distorting the meaning of predominance. Rule 23(b)(3) does not ask district courts whether class members with viable claims predominate over

[12] Plaintiffs' feigned shock is also hard to credit, because the D.C. Circuit decision was far from the first to articulate these principles. *See, e.g.*, *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 28 (1st Cir. 2008) (requiring that "each member of the class was in fact injured"); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008).

class members with no viable claim, or whether the perceived policy virtues of certifying a class predominate over accuracy and procedural justice in individual cases. It asks whether common issues will predominate over individualized issues *in the presentation of evidence* at a trial where the defendants' right to contest all relevant issues is fully preserved.[13] If proving that certain class members were uninjured cannot be accomplished except by individualized inquiry, then "the class action device" is not appropriate.

### C. Question 4: *Behrend* Establishes That In Class Actions There Must Be A "Requisite Commonality Of Damages"

Long before *Wal-Mart* and *Behrend*, a substantial number of cases held that where calculating damages "requires separate mini-trial[s] of an overwhelming large number of individual claims, . . . the staggering problems of logistics thus created make the damage aspect of [the] case predominate, and render the case unmanageable as a class action." *Windham v. Am. Brands, Inc.*, 565 F.2d 59, 68 (4th Cir. 1977) (collecting cases) (citations and quotations omitted); *Bell Atl. Corp.*, 339 F.3d at 306-07. This Court acknowledged this rule. *Class Cert. Op.*, 287 F.R.D. at 71 ("To be sure, however, '[c]omplex and individualized questions of damages . . . weigh against finding predominance.'") (citation omitted).

*Behrend* embraces this position, requiring that plaintiffs in large antitrust class actions like this one "establish that damages are susceptible of measurement across the entire class[.]" 133 S. Ct. at 1433. *Behrend* reversed a class certification decision where plaintiffs' economic proof did not meet that test. *Id.* The Court clarified that predominance is a "demanding" inquiry

---

[13] In assessing predominance, the "critical need is to determine how the case will be tried." Fed. R. Civ. P. 23 advisory committee's note on 2003 Amendments; *see also Sandwich Chef of Tex., Inc. v. Reliance Nat'l Indem. Ins. Co.*, 319 F.3d 205, 218 (5th Cir. 2003) (Rule 23(b)(3) requires the court to "consider how a trial on the merits would be conducted") (overruled on unrelated grounds); *Hydrogen Peroxide*, 552 F.3d at 311 ("a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate") (citations and quotations omitted).

and explained that plaintiffs "[could not] show Rule 23(b)(3) predominance" without a "common methodology" because in a case with so many class members and different damage "permutations," "[q]uestions of individual damage calculations" would "*inevitably* overwhelm questions common to the class." *Id.* at 1432-35 (emphasis added); *see also id.* at 1435 n.6 (referring to "requisite commonality of damages").

Plaintiffs say that *Behrend* "made no law" because it was merely "holding plaintiffs" to their concession that damages had to be measurable through common proof, and that "nothing in *Behrend* suggests that individualized damage calculations preclude class certification." Pls.' Mem. 63. They are dodging the issue. This has nothing to do with "precision," but instead whether the normal damages rules apply to class certification decisions, and if so whether complexity in adjudicating damages claims can preclude class certification. The Supreme Court's answers were yes and yes. The entire analysis in *Behrend* is about the sufficiency of the McClave study *as a damages study*, and the Supreme Court's reversal of class certification confirms that the inability to make "individualized damages calculations" *according to the normal rules* precludes certification. One of the Supreme Court's criticisms of the McClave damages study was that it potentially yielded wrong damages estimates for individual class members who lived in different places or were subject to different practices or market forces. *Behrend*, 133 S. Ct. at 1434-35. The Court specifically noted the potential damages "permutations" among "2 million subscribers," and held that this complexity would preclude certification if the damages proof could not properly account for it. *Id.*

We note this Court's concern, stated at the Scope of Remand Hearing, that if damages count in the class action analysis, class certification could become impossible. We do not think that is what *Behrend* portends. First, there are clearly cases where both impact and damages are

capable of formulaic determination and a defendant loses nothing if it is unable to contest damages plaintiff-by-plaintiff, *i.e.*, where the damages calculation is "virtually a mechanical task, capable of mathematical or formula calculation[.]" *Windham*, 565 F.2d at 68 (citations and quotations omitted). Second, there will be cases where any required individualized damages inquiries would not "inevitably overwhelm questions common to the class." *Behrend*, 133 S. Ct. at 1433. *Behrend* allows for both of those categories of cases to proceed as class actions. But it plainly does not permit courts to disregard the need to calculate individual damages, and to do so under the same standards that would apply in individual trials, when undertaking the "demanding" predominance inquiry. Many antitrust actions will be too large and complex to satisfy the standards announced in *Behrend*, but the Supreme Court has been emphatic that there is no presumption favoring certification—even in antitrust cases. *Am. Express*, 133 S. Ct. at 2309-10; *Hydrogen Peroxide*, 552 F.3d at 313.

## PART II: THE RAUSSER MODEL IS PLAGUED BY DISQUALIFYING FALSE POSITIVES

Our discussion of false positives proceeds in three steps. We first set the stage by reviewing the record evidence about the allegedly "more aggressive" Class Period fuel surcharge formulas, how the Rausser model actually works, and what really produces the so-called "structural break" and "damages." We then present the abundant and incontestable evidence that the Rausser model generates findings of injury inconsistent with Plaintiffs' liability theory (*i.e.*, false positives). Lastly, we address Dr. Rausser's new "audit" of legacy shipments.

### A. Relevant Factual Background

#### 1. Class Period Fuel Surcharge Formulas Did Not Yield More Revenue Than The Competitive, Pre-Class Formulas

Plaintiffs' core allegation in this case is that there was "a conspiratorial agreement to impose supracompetitive fuel surcharges[.]" *Class Cert. Op.*, 287 F.R.D. at 44. The Court's

prior analysis therefore distinguished preexisting fuel surcharge formulas, which Plaintiffs concede were unilaterally adopted and applied, from the allegedly "new, standardized, [and] more aggressive fuel surcharges" that Plaintiffs claimed were the product of the alleged conspiracy. *Id.* at 47.[14] A pervasive theme of the Court's decision was that the new "fuel surcharges that defendants put in place in the spring of 2003 were of a different breed[,]" and by design "yielded more revenue" at a given fuel price than prior formulas. *Id.* at 46, 48.[15]

To be direct, Plaintiffs misled the Court with respect to whether the allegedly conspiratorial fuel surcharges were "more aggressive," in particular the notion that they led to "billions of dollars of additional profits during the . . . conspiracy." *Id.* at 12 (quotations omitted). That is simply not true. There are two basic reasons for this. First, some of the allegedly collusive formulas were in fact adopted years before the alleged conspiracy and *did not change at all during the Class Period.* Second, the changes made to other formulas—which Dr. Rausser claims were the result of the alleged conspiracy—turned out to be almost completely irrelevant because the adjustments did *not* "yield more revenue" at Class Period fuel prices.

***Intermodal Surcharges:*** We start with fuel surcharge formulas for intermodal shipments—the largest commodity group for Defendants as a whole and for which Plaintiffs

---

14 *See also id.* at 96 ("This case . . . is not about fuel surcharges generally, but rather about aggressive and standardized fuel surcharges tied to base rates."), 101 ("the claim in this case is not a conspiracy to impose *any* fuel surcharge; rather, plaintiffs claim that defendant[s] conspired to increase total prices 'by widespread application and enforcement of *coordinated, and aggressive, fuel surcharges.*'") (emphasis in original).

15 There is a "coverage" dimension to Plaintiffs' case as well, *i.e.*, Plaintiffs allege that Defendants agreed to impose these new, "more aggressive" fuel surcharge formulas on all class members, without exception. *Class Cert. Op.*, 287 F.R.D. at 45. This aspect of Plaintiffs' theory fails as well. *Infra* Part III. Further, this Court's prior coverage analysis depended on "uniform" application of fuel surcharge formulas that "yielded more revenue" than competitive, pre-class formulas. *Class Cert. Op.*, 287 F.R.D. at 48. Thus, even Plaintiffs' coverage theory was fundamentally founded upon "aggressive" changes to the surcharge *formulas* themselves.

seek $872.4 million in damages. Kalt Decl. ¶ 98 n.142. Plaintiffs' allegations about "more aggressive" fuel surcharge formulas that "yielded more revenue" are unfounded with respect to intermodal traffic.

BNSF is illustrative. BNSF announced its published intermodal FSC formula in March 2000 and modified this formula only once prior to the alleged Class Period—in 2001. As Dr. Rausser has admitted, BNSF's published intermodal surcharge formula remained the same from 2001 until well after the end of the Class Period. Ex. 6, Rausser Dep. 394:20-395:7, Mar. 5, 2014. Consequently, shippers who paid BNSF's published intermodal surcharge during the Class Period indisputably paid fuel surcharge rates derived from a competitively adopted formula. Dr. Rausser's model would nevertheless award them damages totaling $522 million. Kalt Decl. ¶ 98 n.142; *see also* Ex. 7, Expert Report of Janusz A. Ordover, Ph.D., Jan. 22, 2013 ("Ordover Merits Rep.") ¶¶ 127-28 & Fig. 35. And this is not just a BNSF issue. NS *did not change* its domestic intermodal formula, and *UP actually lowered* its intermodal formula by 3.9%. Kalt Decl. ¶ 97 & n.140, Appx. C, Fig. C.II.22. Only CSXI raised its published formula, though not until 19 months after Plaintiffs claim the alleged conspiracy began, and not nearly enough to explain the alleged damages. *Id.*[16]

***Carload Surcharges:*** The published carload formulas also did not materially "yield more revenue" during the Class Period. Plaintiffs' theory regarding published carload surcharge formulas focuses on reductions in the "trigger prices"—*i.e.*, the minimum fuel prices at which fuel surcharges are first applied. These reductions created some *potential* for the formulas to be "more aggressive" *if* fuel prices were between the new (lower) and old (higher) trigger prices

[16] CSXT did not provide intermodal service during the Class Period. This was provided by CSX Intermodal, which was a separate company from CSXT during the Class Period and is not a named Defendant in this case. By definition, CSX Intermodal customers are not class members. *Class Cert. Op.*, 287 F.R.D. at 12-13.

during the Class Period. But that potential was *not* realized. Fuel prices measured in highway-diesel fuel (HDF) were above the previous HDF trigger prices for the entire Class Period; and fuel prices measured in WTI were above the previous WTI trigger prices for all but six days in 2003 when the WTI index dropped briefly below $28. *Id.* at ¶ 96; Ex. 12, Expert Report of Joseph P. Kalt, Ph.D. (Corrected), Mar. 1, 2013 ("Kalt Merits Rep.") Fig. IV-5A.

Consider the BNSF published carload formula. The 2003 BNSF "conspiratorial" published carload fuel surcharge formula had only one difference from the prior, concededly competitive 2001 BNSF published carload formula—it lowered its trigger price from $1.30 to a $1.25 HDF. Ex. 4, Rausser Dep. 60:8-61:8, 62:12-63:3, Mar. 4, 2014; Ex. 12, Kalt Merits Rep. Fig. IV-1B. Under the 2003 formula, when fuel prices were at or above the old trigger price of $1.30 HDF, shippers continued to pay *the exact same* fuel surcharge percentages as they had since 2001. Ex. 4, Rausser Dep. 62:12-63:3. Fuel prices never dropped below $1.30 HDF during the Class Period. Consequently, BNSF's 2003 trigger price adjustment had *no impact* on the surcharge percentages shippers paid under that formula during the Class Period. Kalt Decl. ¶¶ 96-97, Fig. 17. Dr. Rausser admitted this in his merits report: The "different thresholds used by UP and BNSF were not relevant to fuel surcharge amounts during the Class Period, because the indices were above all threshold values for the entire Class Period." Ex. 8, Expert Report of Gordon Rausser, Ph.D., Oct. 15, 2012 ("Rausser Merits Rep.") 119. Similarly, Dr. Rausser admitted in his recent deposition that "above $1.30 [the pre-class trigger price] the mathematical earning power of the BNSF carload public fuel surcharge is *exactly the same* as the immediately preceding pre-conspiracy fuel surcharge[.]" Ex. 4, Rausser Dep. 62:12-63:3, Mar. 4, 2014 (emphasis added); *see also id.* at 27:14-19 (if the price of fuel is above the old, pre-class trigger price, then the change in the trigger price alone "doesn't cause injury").

The BNSF facts are exceptionally clear because there was *zero* change in the public carload fuel surcharge formula's earning power given Class Period fuel prices. However, the other Defendants' Class Period public carload fuel surcharge formulas did not materially "yield more revenue" either. It is a simple and objective process to apply the legacy and class formulas to the 2003-2008 fuel prices, and compare the surcharge rates (and revenue) generated by the two sets of formulas. As Figure 17 shows, the adoption of the allegedly collusive carload formulas led to *lower* surcharge rates for UP, *no change* for BNSF, and only slightly higher rates, on average, for CSXT and NS (1.4% and 1.5%, respectively).[17] Kalt. Decl. ¶ 97, Fig. 17. The average increase in earning power for all Defendants between the pre-"conspiracy" and the allegedly collusive public carload formulas is only 0.1%. *Id.* at ¶ 98, Fig. 18.

\\\\

[17] The slightly higher rates for CSXT and NS were a function of using (i) slightly smaller fuel price increments and (ii) monthly average oil prices. It was not the result of lowering the trigger price or increasing the "slope" of the surcharges. For every $5 change in fuel price, the pre-class and class formulas generate the same fuel surcharge (above the pre-class trigger).

Figure 17
**Were Conspiracy FSCs More Onerous?**
**Pre-"Conspiracy" v. "Conspiracy" Published Carload FSCs**




Dr. Rausser admitted at deposition that between July 2003 and June 2006, the NS class formula raised less than 1% more revenue than its legacy formula would have—a difference so small that Dr. Rausser characterized the revenue generated by the two formulas as "approximately the same." Ex. 4, Rausser Dep. 35:5-37:5, Mar. 4, 2014.[18]

[18] The work of Defendants' individual experts confirms these findings. For example, Dr. Carlton calculated the impact of the class formulas on UP's surcharge revenue relative to the impact the legacy formulas would have had on the same class shipments if they had remained in place. Ex. 9, Corrected Expert Report of Dennis W. Carlton, Ph.D., Feb. 6, 2013 ("Carlton Merits Rep.") ¶¶ 112-18. Carload shippers in the class paid 0.7% *less* in surcharges under the "conspiracy" formulas than they would have under UP's legacy formula. *Id.* at ¶ 116. Similarly, intermodal shippers paid 4.6% *less*. *Id.* Only coal shippers paid more (5.3%). *Id.* Despite the fact that UP's class formulas resulted in net *savings* to shippers of over $96

Dr. Kalt also demonstrates that the Class Period fuel surcharge formulas did not have greater earning power by comparing (a) Defendants' actual surcharge rates on local carload traffic, with (b) the surcharge rates that would have applied to this traffic if the competitive, pre-"conspiracy" published carload surcharge provisions had been applied during the Class Period. Kalt Decl. ¶¶ 99-100. As the chart below shows, the admittedly competitive, pre-class surcharge rates for local carload traffic are actually *higher* than the allegedly collusive surcharge rates. *Id.*

**Defendants' Actual v. But-For FSCs Rates**

| Railroad | Actual Class FSC Rate | Pre-"Conspiracy" FSC Rate |
|---|---|---|
| BNSF | 15.9% | 16.2% |
| CSXT | 11.9% | 14.9% |
| NS | 9.8% | 10.1% |
| UP | 14.1% | 16.3% |
| **Total** | **12.5%** | **14.1%** |

Lacking any empirical evidence to support their claim that supposedly collusive adjustments to the competitively adopted fuel surcharge formulas caused the formulas to "yield more revenue," Plaintiffs will no doubt cite contemporaneous documents in which employees at some of the railroads used the phrase "more aggressive" to describe contemporaneous views about their own or another railroad's new carload surcharge formulas. Some railroad employees had this view because the prevailing projection at the time—which Dr. Rausser confirmed in his merits report—was that oil prices would *not* rise precipitously, but would rather remain in the $20-28 range. Ex. 8, Rausser Merits Rep. 61 n.137 (citing both external sources and internal Defendant documents). Had oil prices remained in that range, the new published surcharge

million, Dr. Rausser's merits model says that those same reduced surcharges somehow generate an 18.2% "overcharge" attributable to the alleged conspiracy. *Id.* at ¶ 118.

formulas would have generated more revenue because they would have been triggered at times when the old formulas would not have been. But that is not how history unfolded. In the real world, oil prices escalated to $40 per barrel by July 2004 and continued an upward trajectory until they peaked at $145 per barrel in June 2008. The changes to the trigger prices in the Class Period public fuel surcharge formulas were rendered irrelevant.[19]

How can a damages model estimate billions of dollars of overcharge damages for shippers whose surcharge formulas were the same or "approximately the same" as preexisting, competitive surcharge formulas? The answer is that the Rausser model is rigged.

### 2. The Rausser Model Is Designed To Find "Damages" Whenever Fuel Costs Rise

Dr. Rausser's regression model is overwhelmingly driven by a single number—his fuel price coefficient—which purportedly captures how much freight rates should change (*i.e.,* would change under competitive conditions) for a given *percentage* increase in fuel prices (*e.g.*, 10%). Critically, Dr. Rausser *estimates* this fuel price coefficient using low fuel prices, or by averaging

[19] The Defendants' fuel surcharges were also not "standardized," as Plaintiffs have falsely asserted. For example, BNSF and UP—but not CSXT or NS—adopted coal fuel surcharge formulas (each substantially different). Ex. 12, Kalt Merits Rep. Fig. IV-1C. BNSF announced a mileage-based fuel surcharge formula in 2005. *Id.* at ¶ 202. Moreover, each of the railroads privately negotiated distinct fuel surcharges during the Class Period that can no longer be dismissed as inconsequential "anomalies." Nearly 17% of BNSF's revenue from unregulated traffic, including business with American Honda, UPS, OOCL, CMA-CGM, and ExxonMobil, paid distinct, privately negotiated fuel surcharges. Ex. 7, Ordover Merits Rep. ¶ 83; Ex. 16, Expert Reply Report of Gordon Rausser, Ph.D., Aug. 27, 2010 ("Rausser Class Cert. Reply Rep.") 52-53, Table 12; Ex. 26, BNSF-0337916-918 (Honda); Ex. 27, BNSF-0581954 (UPS); Ex. 28, BNSF-0800349-353 (OOCL); Ex. 29, BNSF-0800664-665 (CMA-CGM); Ex. 30, BNSF-FSC 001713-740 at -713, -727 (Exxon). *See also* Ex. 10, Corrected Expert Report of Dr. John H. Johnson, IV, Feb. 15, 2013 ("Johnson Rep.") ¶¶ 174-93 (discussing numerous examples of privately-negotiated non-standard fuel surcharges paid by CSXT and CSXI customers during the Class Period); Ex. 31, Corrected Expert Report of Barry C. Harris Ph.D., Mar. 22, 2013 ("Harris Rep.") ¶¶ 114-18, Table A-2 (demonstrating that NS created dozens of non-"standard" carload fuel surcharges during the Class Period that were lower or less "onerous" than the competitive pre-conspiracy FSC).

low and high fuel prices, and then *applies* this same fuel price coefficient to the Class Period with its unprecedented, high fuel prices. He justifies this approach by contending that the fuel price coefficient should be *constant* across all fuel prices. This assumption that the relationship between fuel prices and freight rates should remain constant is the key feature of Dr. Rausser's entire analysis. This is what produces the "structural break" and hard-wires in "damages" whenever fuel prices rise faster than other costs. We need to explain this in some detail, as this is also key to understanding the false positives.

In his merits report, Dr. Rausser purported to measure how rail rates responded to increases in fuel costs (*i.e.*, he calculated a "fuel price coefficient") using transaction data from the three-and-a-half year period immediately prior to the start of the alleged conspiracy.[20] Using this January 2000 through June 2003 data, Dr. Rausser calculated a fuel price coefficient of 0.024. According to Dr. Rausser, this means a 10% change in diesel fuel prices should on average result in a 0.24% increase in all-in rail rates. Dr. Rausser then used this coefficient to predict "but for" prices for *the entire Class Period*. In other words, he purported to calculate what the "but for" prices during the Class Period would have been by mathematically instructing his model to assume that there would be a 0.24% increase in rates for every 10% increase in fuel costs—*no matter how high fuel prices climbed, or how big a portion of Defendants' total costs fuel became*. Dr. Rausser claimed that any actual rate higher than the projected "but for" prices proves injury, damages, and even collusion.

In their merits reports, Defendants' experts demonstrated that Dr. Rausser's 0.024 fuel price coefficient is an unrealistically low benchmark, largely because it was derived entirely

[20] The fuel price coefficient is supposed to measure the "elasticity" of freight rates with respect to fuel prices (*i.e.*, the degree to which freight rates change as fuel prices change).

from 2000-June 2003 data, when fuel prices were much lower than during the Class Period.[21] *E.g.*, Ex. 9, Carlton Merits Rep. ¶ 145. Applying this coefficient, the large increases in fuel prices during the Class Period would have basically no effect on rail rates and would not have allowed the railroads to come even close to recovering their actual fuel costs. *See id.* In his reply report, Dr. Rausser was forced to admit that "the non-collusive relationship between fuel prices and freight rates was higher than suggested in my [original merits] damage model . . . ." Ex. 11, Expert Reply Report of Gordon Rausser, Ph.D., June 12, 2013 ("Rausser Merits Reply Rep.") 245. In short, the cornerstone of his entire injury and damages model was wrong.

Dr. Rausser therefore constructed a second damages model that uses (actually, misuses) STB variable cost data from 1999 to 2008 to estimate the *average* effect of fuel cost increases on total variable costs (not rates). Using this 10-year period, Dr. Rausser calculates an average fuel price coefficient of 0.103, meaning in Dr. Rausser's new STB-adjusted model, a 10% change in diesel price translates into a 1.03% change in total variable costs at all times. *Id.* at 247. Dr. Rausser uses this result to adjust his damages model based on the assumption that, but for the alleged conspiracy, freight rates would increase at the same rate as total variable costs. The net effect is simply that Dr. Rausser recalculates his fuel price coefficient, raising it to 0.103—three times higher than his original coefficient.

Of course, since the *average* sensitivity of rates to fuel costs over a ten-year period is—by definition—lower than the *peak* sensitivity that coincides with the Class Period (when fuel

[21] From July 2003 through their peak in mid-2008, fuel prices rose by over 200%. Kalt Decl. ¶ 47 n.72. As a result, the average price per gallon of diesel from 2003 to 2008 was nearly double the average price per gallon from 1999 to 2003. *Id.* at ¶ 47, Fig. 6. The impact on the WTI index (which is listed in price per barrel, not per gallon) was even more dramatic. The price of oil fluctuated around $25 per barrel between 1999-2002, but reached over $135 per barrel in the summer of 2008. Ex. 12, Kalt Merits Rep. Fig. IV-5A. As a result, the average price of oil per barrel from 2003 to mid-2008 was nearly 2.3 times higher than the average price per barrel from 1999 to 2002. Kalt Decl. ¶ 47 n.72

prices were much higher), this is another way of applying an artificially low coefficient to the Class Period. And that is what Dr. Rausser does. In a series of steps, Dr. Rausser plugs his new fuel price coefficient into his damages model, reducing his estimate of damages somewhat, but still generating a figure of $7.88 billion. *Id.* at 251 n.741 & Table 105.[22]

The key feature and methodological flaw of the model remains exactly the same: it continues to use a *constant* fuel price coefficient (now 0.103) to represent the predicted amount of fuel recovery at all times, irrespective of whether diesel fuel costs $1.00 or $3.00 per gallon. As Dr. Rausser testified, "[t]he .103 coefficient never changes." Ex. 6, Rausser Dep. 459:11-460:3, Mar. 5, 2014.

Here is why it is wrong to use a *constant* fuel price coefficient based in whole (original model) or part (STB-adjusted model) on the low fuel prices of the pre-Class Period to predict rail rates during the Class Period, when fuel prices were much higher. As a matter of basic mathematics, whenever fuel costs become a larger percentage of a railroad's total costs than they have been previously, rail rates must increase by a greater percentage amount in response to rising fuel prices *simply to allow for dollar-for-dollar recovery of fuel costs*. A simple example illustrates why this is true.

Assume that at a time when diesel costs $1.00/gallon the fuel costs for shipping a commodity over a route are $10, non-fuel costs are $80, and after taking a $10 margin the railroad charges $100; thus fuel makes up 10.0% of the freight rate ($10 out of $100) and 11.1% of total costs ($10 out of $90). If fuel costs rise by 10% to $11 (an increase of $1), one would expect Dr. Rausser's model to allow railroads to recover this increased cost; indeed, Dr. Rausser concedes that his but-for world should allow for full cost recovery. *See* Ex. 13, Rausser Dep.

---

[22] The purported overcharge rate falls from 13.4% of the but-for all-in rates using his original damages model to 9.8% using his STB-adjusted model. Kalt Decl. ¶¶ 3, 30 & n.41.

31:8-22, Dec. 11, 2012.[23] Dr. Rausser's most recent 0.103 fuel coefficient predicts that the 10% change in fuel cost will cause a 1.03% increase in all-in rates, resulting in a new all-in rate of $101.03. That is more than the $1 increased fuel cost, so, however flawed it may be, the 0.103 fuel coefficient at least allows full cost recovery at this fuel cost level.

Now assume that at a later time fuel prices are $3.00/gallon. Fuel costs for the same route are now $30.00. If the non-fuel costs are still $80.00 and the railroad still adds a $10.00 margin, total costs are $110 and the rate is $120. Note that in this later period fuel makes up a much higher percentage of the total costs (27.3%, or $30 out of $110) and of the rate (25%, or $30 out of $120) than in the earlier period. If fuel prices then rise again by 10%, to $33 for the same route, one would again expect an all-in rate to rise at least to $123 just to allow the railroads to recover this $3 (10% of $30) in increased fuel costs. *Dr. Rausser's methodology does not produce such a rate*. It can't, because Dr. Rausser insists on applying a fuel price coefficient (0.103) that is largely a product of the lower fuel prices in the earlier period. When applied to the starting rate in this example ($120), the model predicts a 1.03% rate increase leading to a new all-in rate of $121.24—which allows for recovery of only $1.24 out of the $3 in increased fuel costs. Dr. Rausser treats any rate higher than $121.24 as evidence of injury and "damages"—even though a $123 rate is needed just to allow the railroad to recover its higher fuel costs.

Mathematically, Dr. Rausser's fixed fuel price coefficient will *always* generate a predicted all-in rate that is too low to permit fuel cost recovery for any period in which fuel costs are a higher percentage of a railroad's total variable costs than they were in the period used to

[23] *See also* Ex. 2, M. Hausfeld Arg., Hr'g Tr. 309:13-18, Oct. 7, 2010 ("Yeah, fuel costs were going up. They were going nuts. No one here in this litigation or anywhere else has said that a company cannot recover its legitimate increase in costs.").

estimate the coefficient. Dr. Kalt calculates that over the entire Class Period, 33.4% of fuel cost changes become "damages" under Dr. Rausser's model, and at the end of the Class Period, when fuel prices peaked, the Rausser model converts approximately 50% of Defendants' fuel cost increases into "damages." Kalt Decl. ¶ 53, Fig. 9.

The relevant economic literature confirms that the relationship between fuel prices and variable costs (or rail rates) is dynamic (not fixed). In fact, in his merits report Dr. Rausser cites and relies on several economists that studied the railroad industry and had to account for this in their work—*not one of those* economists modeled the industry with a constant relationship between changes in fuel prices and variable costs (or rail rates). *Id.* at ¶ 54, Fig. 10. Rather, each of these experts has allowed the relationship between fuel prices and variable costs to change in response to higher fuel costs. In fact, Dr. McClave—Plaintiffs' second expert—testified that this dynamic relationship is "just math," and concedes that "you would have more to pass through" to the rate when fuel prices are high than when they are low. Ex. 14, McClave Dep. 35:1-40:14, Feb. 26, 2014.

### 3. The Fixed Fuel Coefficient Guarantees "Structural Breaks"

Dr. Rausser's fixed fuel price coefficient drives his finding of a "structural break" in the relationship between fuel prices and freight rates. Dr. Rausser introduces the alleged "structural break" by stating: "*In the absence of an intervening event*, such as an agreement among the Defendants as alleged by Plaintiffs, the historical relationship between freight rates and fuel prices would generally be expected to continue." Ex. 8, Rausser Merits Rep. 7 (emphasis added). What Dr. Rausser fails to acknowledge is that it is normal and completely consistent with pricing in competitive markets for fluctuations in fuel costs to cause the relationship between fuel costs and freight rates to shift. It must shift simply to allow for dollar-for-dollar recovery of fuel costs. Fuel cost changes can thus be an "intervening event" that changes "the

historical relationship between freight rates and fuel prices." The coefficient will be higher in a high fuel price period than it was in a low fuel price period, and higher in a high fuel price period than in high and low price periods averaged together. This is "just math," as Dr. McClave conceded. Ex. 14, McClave Dep. 35:1-40:14, Feb. 26, 2014. Even Dr. Rausser admitted at his deposition that "the levels of the fuel prices during the class period" altered the relationship between fuel costs and freight rates. Ex. 15, Rausser Dep. 431:18-432:19, Dec. 18, 2012.

Accordingly, when one instructs the model to assume arbitrarily that the fuel coefficient should be constant (regardless of fuel prices), it will find a "structural break" *whenever fuel prices rise faster than other costs*.[24] That is readily confirmed by testing the structural break, as the D.C. Circuit suggested, by replicating Dr. Rausser's analysis with different presumed start dates for the alleged "conspiracy." As Kalt Figures 4-5 show, at any date in the January 2001 to July 2007 period, one can find a structural break. Kalt Decl. ¶¶ 40-42, Figs. 4-5. This includes dates that long precede the alleged conspiracy. *Id.* Again, this is because the dramatic increase in fuel costs that the railroads experienced *dictates* as a simple matter of arithmetic that the relationship between freight rates and fuel prices *must change* as fuel costs change.

Since Dr. Rausser's model is essentially designed to convert fuel cost increases into damages, it is unsurprising that the model finds "damages" for legacy shipments. Dr. Rausser is

---

[24] The structural break is also the product of another design feature of Dr. Rausser's model. Dr. Rausser restricts the data in his "conspiracy" period to transactions subject to triggered rate-based FSCs, while his pre-"conspiracy" benchmark includes all traffic (which is a mixture of traffic moving under FSCs that were triggered, traffic moving under FSCs that were not triggered, and traffic without any FSCs at all). Since fuel surcharges by design make rates more responsive to fuel costs, this data construction guarantees "structural breaks" (as well as findings of impact and damages) simply by comparing (a) a group of shipments that all have triggered FSCs, to (b) a group of shipments where FSCs were infrequently triggered. Ex. 12, Kalt Merits Rep. ¶¶ 530-32.

simply predicting but-for prices that do not allow for normal cost recovery, necessarily generating "damages" for virtually all shippers.

### B. Dr. Rausser's Model Produces False Positive Findings Of Injury That Render His Model Unreliable

As a direct result of the methodological flaws discussed above, Dr. Rausser's model generates a host of false positives, *i.e.*, findings of injury or damages where—according to Plaintiffs' liability theory—"none could exist." *D.C. Cir. Op.*, 725 F.3d at 252. We show this by first addressing legacy shipments, and then analyzing alternative tests for false positives.

*False Positives on Legacy Shipments*: We begin with the group of legacy shipments that Dr. Rausser identified before his post-*Behrend* about-face, in particular legacies identified in his merits report. Dr. Kalt used Dr. Rausser's STB-adjusted model to test that traffic and found a false positive average overcharge of 9.7%. Kalt Decl. ¶ 35, Fig. 1. That is essentially the same average overcharge as Dr. Rausser calculates for the class.

Does Dr. Rausser's "audit" of the legacies change the result? Not in any way that matters under the D.C. Circuit's decision. Even if we accept, for the sake of argument, that there is some shred of merit to Dr. Rausser's effort to de-designate legacies, it is still possible to analyze large segments of traffic that Dr. Rausser previously identified as "legacy" shipments that indisputably qualify as shipments "where [no injury] could exist." *D.C. Cir. Op.*, 725 F.3d at 252. Dr. Kalt isolated categories of legacy shipments accounting for approximately $6.3 billion in Class Period freight revenues as to which there either was (a) no change or "adjustment" to the fuel surcharge during the Class Period, or (b) if there was a change, it did not result in increased earning power. Kalt Decl. ¶ 38, Fig. 2. Dr. Rausser's STB-adjusted model generates false positive average overcharges in *eight out of the thirteen* test cases. *Id.* For example, using BNSF intermodal shipments subject to the public intermodal surcharge formula—where the surcharge formula *did*

*not change at all*—produces an overcharge of 10.9%. *Id.* Similarly, using BNSF carload shipments subject to the public carload surcharge formula—where the surcharge rates were the same as those under the pre-class public surcharge formula—produces an overcharge of 10.8%. *Id.* Likewise, using UP intermodal shipments—where the surcharge formula actually *declined*—produces an overcharge of 24.9%. *Id.* Under the D.C. Circuit order, each of these findings mandates that class certification be denied. *See D.C. Cir. Op.*, 725 F.3d at 252.

We can also confirm the false positives while avoiding altogether the debate over what is and is not a "true" legacy. Numerous additional tests—completely unrelated to legacy shipments—confirm findings of injury "where none could exist." *Id.* We turn to those now.

Dr. Rausser's Model Generates Damages On Shipments Occurring Entirely Before Any Collusion Is Alleged. The first such test focuses on shipments that occurred entirely *before the conspiracy* was allegedly formed, when, Dr. Rausser has admitted, the rates charged "could not be attributed to the alleged conspiracy." Ex. 11, Rausser Merits Reply Rep. 222; *see also* Ex. 4, Rausser Dep. 137:23-138:7, Mar. 4, 2014 (testifying that there is "fundamentally" "no reason to think that the all-in rates that were charged to shippers prior to March 2003 should have any impact from the conspiracy"). It is beyond dispute that if Dr. Rausser's model generates "damages" for shipments that occurred prior to the alleged conspiracy (and any purported "formation" period), the model produces "damages" where none can exist.

Dr. Kalt designed a test for this that hypothesizes 12 different "conspiracy" start dates in the pre-Class Period—when no one claims there was conspiracy—and tests for the "structural breaks" that Dr. Rausser claims prove conspiracy and common impact. *In every instance* the Rausser model finds statistically significant "structural breaks" and overcharges, ranging from

2.3% to 7.5%. Kalt Decl. Fig. 5.[25] This is a false positive trifecta, finding conspiracy, impact, and overcharges where none could exist.

*Dr. Rausser's Model Generates Damages For Shipments Hypothetically Priced At Variable Cost*. Another way to test Dr. Rausser's model is to ask what happens when shippers are presumed to have paid rail rates merely equal to the Defendants' variable costs, rather than what they actually paid in the real world. In antitrust economics, prices equal to variable costs are frequently used as a proxy for competitive pricing.[26] If the Rausser model generates damages when rail rates just equal variable costs, it is generating false positives.

Dr. Kalt conducted this test. He used variable cost data calculated by the STB that Dr. Rausser used in his STB-adjusted model—the model that Dr. Rausser testified "contains real signals about the relationship between fuel prices and variable cost," and consequently is "a more reliable way to compute both class-wide and individual damages." Ex. 6, Rausser Dep. 441:22-442:20, Mar. 5, 2014; *see also* Ex. 11, Rausser Merits Reply Rep. 245-51. Using these data, Dr. Kalt replaced the actual freight rates the railroads charged with an estimate of the railroads' average variable costs. He then applied Dr. Rausser's STB-adjusted model and finds

[25] In his merits reply report, Dr. Rausser reports that he finds no overcharges when his model is run on the pre-Class Period. Ex. 11, Rausser Merits Reply Rep. 229 & Table 92. This is highly misleading. To obtain these results, Dr. Rausser fundamentally alters the methodology that he otherwise uses to allegedly show damages by changing what traffic he includes in the control and test periods. Kalt Decl. ¶ 42 n.65. By contrast, Dr. Kalt's pre-class overcharges reported above use the exact methodology that Dr. Rausser applies when he purports to calculate class damages. *Id.*

[26] *See, e.g.*, P. Areeda and H. Hovenkamp, Antitrust Law: *An Analysis of Antitrust Principles and Their Application* ¶ 740 (4th ed. 2013); Carlton & Perloff, *Modern Industrial Organization* 63 (4th ed. 2005). In fact, to remain in business over the long run, firms must also recover their fixed costs and their cost of capital, and therefore must price above their variable costs. Thus, the variable cost proxy used in this test implies rates lower than true competitive pricing.

positive weekly overcharges for more than 33% of shipments. Kalt Decl. Fig. 11. A model that generates overcharges in these circumstances is unreliable.

*Dr. Rausser's Model Generates Damages For Many Shippers That Exceed The Total Fuel Surcharges That They Paid*. Plaintiffs claim overcharges were baked into Class Period fuel surcharges, and Dr. Rausser admits that any conspiracy to elevate base rates would fail. Ex. 8, Rausser Merits Rep. at 52 n.94. Therefore, any damages must come solely from fuel surcharge revenues. If Dr. Rausser's model predicts damages that *exceed* the fuel surcharges that individual class shippers actually paid, it is surely finding damages "divorced from the plaintiffs' theory of liability." *D.C. Cir. Op.*, 725 F.3d at 253.

As Dr. Kalt's analysis shows, Dr. Rausser's STB-adjusted model generates "damages" that are in excess of the total fuel surcharge payments for 4,573 shippers (*i.e.*, 31% of class members) and over 1.2 million shipments in the class (*i.e.*, 29% of all class shipments). Kalt Decl. ¶ 80, Appx. C, Figs. C.II.6 - 7. Not only does this false positive apply to thousands of class shipments, it also encompasses the majority of the total damages. Dr. Rausser's STB-adjusted model attributes 61.3% of the total class damages to shipments for which the alleged damages exceed the fuel surcharges that they paid. *Id.*

*Applying Legacy Formulas to Class Period Shipments Produces False Positives*: It is also possible to test the Rausser model for false positives using the legacy *formulas*. Fundamentally, one gives Class Period shipments the benefit of "fuel surcharge formulae that predated the later [allegedly conspiratorial] changes." *D.C. Cir. Op.*, 725 F.3d at 248. If "repriced" in that manner, and the shipments still show damages under the Rausser model, then the model is clearly measuring something other than injury from allegedly "more aggressive" fuel surcharges.

Dr. Kalt has run this test for all Defendants using local carload traffic. He used the admittedly competitive, public fuel surcharge formulas, applied those formulas to local carload class shipments, and calculated the but-for revenue that these legacy formulas would have generated had they been applied on this class traffic. In other words, he simply replaced (a) the fuel surcharge payments generated by the allegedly collusive class formulas with (b) fuel surcharge payments calculated using the admittedly competitive pre-class formulas. He then applied Dr. Rausser's STB-adjusted model to these hypothetical shipments. Again, the false positives are unequivocal. Dr. Rausser's model finds over $644 million in damages for these class shipments when the legacy formulas are applied. Notably, Dr. Rausser's model finds these damages even though, as shown in Figure 3 below, the class shippers' actual surcharge payments were *lower* than they would have been under the competitive, pre-"conspiracy" surcharge formulas. Kalt Decl. ¶ 39, Fig. 3.

Figure 3
**The STB Model Finds "Damages" When Actual Class Carload FSCs Are Replaced With FSCs Calculated Using Pre-"Conspiracy" Published Formulas**

| Railroad | Actual Class FSC Rate | Pre-"Conspiracy" FSC Rate | Difference (Actual - Pre-"Conspiracy") | Prof. Rausser's "Damages" under Pre-"Conspiracy" FSCs |
|---|---|---|---|---|
| BNSF | 15.9% | 16.2% | -$4,287,689 | $100,004,394 |
| CSXT | 11.9% | 14.9% | -$54,856,110 | $159,769,134 |
| NS | 9.8% | 10.1% | -$8,349,801 | $141,613,395 |
| UP | 14.1% | 16.3% | -$66,007,315 | $243,167,054 |
| **Total** | **12.5%** | **14.1%** | **-$133,500,915** | **$644,553,978** |

Kalt Figure 18, below, is a striking illustration of this false positive. It compares the STB-adjusted model's weekly overcharge for carload traffic (the black line) to the difference in

the legacy and class public carload surcharge rates (the orange line). It is clear that "more aggressive" fuel surcharges are *not* driving these damages.

Figure 18
**Prof. Rausser's Model Finds Massive Overcharges Even When "Conspiracy" FSCs Are Not Materially Different From Pre-"Conspiracy" FSCs**




In fact, the Rausser model is completely indifferent to whether anyone became subject to more aggressive fuel surcharges on account of some conspiracy. Plaintiffs' rhetoric about new surcharges "different [] in design" and "more aggressive" than pre-Class Period formulas, *see, e.g.*, Pls.' Class Cert. Mot. 9-10, Mar. 18, 2010; Pls.' Class Cert. Reply Br. 7, Aug. 27, 2010, is not incorporated into the Rausser model in any way, shape or form. This is why he now claims that the relative earning power of the competitive, pre-class formulas versus the allegedly collusive formulas is *irrelevant*. Ex. 4, Rausser Dep. 52:23-53:5, 69:3-12, 76:22-77:8, Mar. 4, 2014. It was certainly relevant to the Court in its class certification decision.

And we know why Plaintiffs have done an about face on this issue—because, as we have shown, at Class Period fuel prices the average increase in earning power for all Defendants between the admittedly competitive and the allegedly collusive public carload formulas is only 0.1%, Kalt Decl. ¶ 98, Fig. 18. Adopting the allegedly collusive public carload formulas actually led to *lower* surcharge rates for UP, *no* change for BNSF, and only slightly higher rates for NS and CSXT. *Supra* Part II:A.1; Kalt Decl. ¶ 97, Fig. 17. Dr. Rausser conceded at his deposition that "it's hard to imagine" that "a 1 percent increase in the fuel surcharge . . . is [] going to be able to increase the total collection by 10 percent," Ex. 4, Rausser Dep. 48:23-49:11, Mar. 4, 2014,[27] so it is certainly not going to generate a weekly average "overcharge" of 12.4%, Kalt Decl. ¶ 98. Dr. Rausser therefore jettisoned the constraint of "more aggressive" fuel surcharges from his model, creating one that by design finds damages where, by the logic of Plaintiffs' liability theory, none should exist. That is flatly and indisputably prohibited by the D.C. Circuit decision.

### C. Dr. Rausser's Purported "Audit" Of Legacy Shipments Does Nothing To Explain Or Justify The False Positives

Plaintiffs *admitted* to the false positives before *Behrend* made that admission inconvenient. *See* Ex. 16, Rausser Class Cert. Reply Rep. 99 n.227. They excluded legacy shipments from the class definition because "as a matter of logic" such shipments should not have been impacted by the alleged conspiracy. Ex. 3, Rausser Dep. 275:1-20, Sept. 24, 2010. But since *Behrend*, Plaintiffs have done an about face and now contend that overcharges are expected on all traffic, including legacy traffic. Rausser Suppl. Rep. *passim*. The first attempt—

[27] *See also id.* at 46:22-47:3 (conceding that a fuel surcharge that has 1% more earning power cannot lead to a 10% increase in revenues), 48:23-49:2 ("[Q.] Assume that we have a new fuel surcharge with 1% increase in its earning power. Mathematically can that produce a 10% increase in the all-in prices? A. It would be very, very difficult . . . .").

their argument that legacy contracts entered between March and June 2003 may have been impacted by the alleged conspiracy—was shot down by the D.C. Circuit, which pointed out that it created an untenable contradiction with Plaintiffs' "structural break" theory. *D.C. Cir. Op.*, 725 F.3d at 254-55. The D.C. Circuit also specifically held that if Plaintiffs persist in this line of argument, it is *Plaintiffs' burden*—not Defendants'—to (a) "adduce specific evidence" that the model does not produce false positives when applied to legacy shipments, and (b) reconcile any such evidence with their own theory of collusion. *Id.* at 254.[28]

This apparently explains the two arguments that dominate Plaintiffs' most recent papers: *first*, that Dr. Rausser's audit of legacy data purportedly shows that many of the contracts that generate the false positives are not in fact legacy contracts, and *second*, that the alleged conspiracy harmed all legacy shippers by eliminating their ability to get waivers or otherwise negotiate price concessions off of binding, pre-class contracts containing fuel surcharge provisions. We address these in turn.

#### 1. Prior To *Behrend*, Plaintiffs Freely Admitted That Dr. Rausser's Model Shows That "Legacy" Shippers Were Injured

We begin with some history that puts Plaintiffs' arguments in perspective, in particular Plaintiffs' suggestion that Defendants misled the D.C. Circuit by identifying an overly inclusive set of legacy contracts. Not true. The false positives issue arose in this case because *Dr. Rausser* identified a set of legacy shipments in his original class certification report, purportedly to ensure that "unaffected" shippers were not included in the class. *See* Ex. 17, Corrected Expert Report of Gordon Rausser, Ph.D., May 27, 2010 ("Rausser Class Cert. Rep.")

[28] *See also id.* ("[Plaintiffs] misapprehend *their burden*. It is not enough to submit a questionable model whose unsubstantiated claims cannot be refuted through *a priori* analysis. Otherwise, 'at the class-certification stage *any* method of measurement is acceptable so long as it can be applied classwide, no matter how arbitrary the measurements may be.'") (first emphasis added) (citation omitted).

120-21. Defendants' expert tested those shipments, revealing the false positives. Ex. 18, Expert Report of Robert D. Willig, June 30, 2010 ("Willig Class Opp. Rep.") ¶¶ 267-68 & Fig. 45. Then, *Dr. Rausser's own work confirmed that his model generated damages on those legacy shipments*. Ex. 16, Rausser Class Cert. Reply Rep. 98-99. In other words, Dr. Rausser conceded his model produced overcharges on legacy shipments. *Id.* Then *Behrend* came along, making this a fatal admission.

Identifying legacies became an issue in this case because Plaintiffs' motion for class certification expressly excluded from the proposed class "all entities . . . that paid a Fuel Surcharge directly to any of the Defendants solely pursuant to a railroad-shipper contract that was (i) entered before July 1, 2003, and (ii) provided for a stand-alone Fuel Surcharge to be paid under a predetermined formula specifically set forth in the contract." Pls.' Class Cert. Mot. 1 n.1. This was not some "conservative" choice as Plaintiffs now claim; Plaintiffs' stated reasoning at the time was that "*legacy contracts [] protected customers for some time from the collusive Fuel Surcharges*." *Id.* at 74 (emphasis added). Dr. Rausser likewise testified that shipments subject to legacy contracts were excluded from the class "as a matter of logic" because those shippers could not have been injured. Ex. 3, Rausser Dep. 275:1-20, Sept. 24, 2010.

Consequently, in his opening class certification report, Dr. Rausser acknowledged that he would have to identify and "remove legacy contracts from a Class-wide damage analysis" in order to "ensure that th[e] damage methodology provides an accurate estimate of the Class-wide overcharge[.]" Ex. 17, Rausser Class Cert. Rep. 120-21. This turned out to be complicated because the Defendants' data systems were not designed to track "legacies." The first time Dr. Rausser tried to identify legacies, in his opening class certification report, he complained that

he did not have all the data to do so properly, and therefore he would temporarily use "an approximate method" to "account for legacy contracts." *Id.* at 121 (first quotation); Pls.' Class Cert. Mot. 74 (second quotation). Nevertheless, Dr. Rausser identified what he said were legacy shipments.

In opposition, Defendants' expert (Dr. Willig) tested the "approximate" set of legacies that Dr. Rausser had identified, and found that Dr. Rausser's damage model yielded an overcharge of 16.8% for the shipments in that set. Ex. 18, Willig Class Opp. Rep. ¶¶ 267-68 & Fig. 45. Dr. Rausser responded to this in his class certification reply report, claiming that new information "enabled me to improve my method for identifying those shipments associated with [legacy] contracts in order to exclude them from the Class designation in the model." Ex. 16, Rausser Class Cert. Reply Rep. 93 & n.212 (emphasis added); *see also id.* at 99. For the most part, the documents and data that Dr. Rausser referred to, and used to identify legacy contracts, were produced in response to Plaintiffs' Interrogatory No. 1. That interrogatory does not ask Defendants to identify legacy contracts or shipments. Rather, it calls for the identification of all contracts entered into before July 1, 2003 that provided for any fuel surcharge to be applied during "any portion" of the Class Period. *See* Ex. 19, Pls.' First Set Interrogs. to UP, Interrog. No. 1, May 11, 2010. BNSF, UP, and CSX produced data and documents in response to this request; NS referred Plaintiffs to its prior data productions. This was simply *information* of varying relevance to identifying what we now call legacy shipments.[29]

[29] Given the scope of Interrogatory 1, Defendants' responses properly included most of the categories of contracts that Dr. Rausser now claims are not "true" legacies, including (a) contracts with effective dates between March and July 2003, (b) contracts with FSC terms that changed between March and July 2003, and (c) pre-July 2003 contracts that included self-adjusting FSC provisions. These are not newly-discovered types of contracts.

With this information, Dr. Rausser purportedly improved what he expressly acknowledged was *his* method ("my method") for identifying legacies that needed to be removed from class damage calculations, tested this refined set of legacy shipments himself—*and still found overcharges* (equal to 11.9%). Ex. 16, Rausser Class Cert. Reply Rep. 93 & n.212, 99 n.227. In other words, Dr. Rausser's response to Dr. Willig was not that once one cleaned up the legacies, the findings of damages went away; it was "that, although *the damage model does estimate a positive overcharge for these shipments*, the amount of that overcharge is statistically significantly *lower* than the overcharge for shipments in the Class." *Id.* at 98-99 (first emphasis added). Dr. Rausser's own class certification work thus confirmed that his model generated findings of damages where they should not be found.

Dr. Rausser made a further adjustment to his identification of legacies when he presented his proposed trial testimony. Indeed, he fundamentally changed his method for identifying legacy shipments for NS. Ex. 12, Kalt Merits Rep. ¶¶ 510-11.[30] Dr. Rausser said and gave every indication at that time that he had thoroughly scrubbed the legacy data. So Dr. Kalt took Dr. Rausser's "identified [] group of legacy contracts," and used those contracts to test Dr. Rausser's model for false positives using a variety of different analyses. *Id.* at ¶ 255; *see also id.* at ¶¶ 514-18. In every instance, Dr. Rausser's model produced false positives. *Id.*

[30] This effort had the effect of drastically reducing the number of legacy shipments and drastically increasing the number of class shipments, even though NS had previously provided discovery, including Rule 30(b)(6) testimony, indicating its data was not suited for the task of reliably identifying legacy shipments. *See id.* Dr. Rausser admitted that he never tested the accuracy of the new method in comparison to his original, Ex. 15, Rausser Dep. 394:8-395:11, Dec. 18, 2012, and has acknowledged that his modified methodology underestimates the volume of NS legacy shipments, Ex. 6, Rausser Dep. 522:21-524:14, Mar. 5, 2014. *See also* Ex. 20, Suppl. Resp. and Objections of NS to Pls.' First Set of Interrogs., Suppl. Response to Interrog. No. 1, Apr. 25, 2013.

It so happened that by the time Dr. Rausser responded to Dr. Kalt's legacy analysis on June 12, 2013, *Behrend* had been decided. This changed everything for Plaintiffs, especially since Defendants were already arguing to the D.C. Circuit that Dr. Rausser's model improperly "predicts substantial damages for shippers who could not have been injured by the alleged conspiracy." Pet'rs Opening Br. 58. Yet even then Dr. Rausser *did not deny* that his model generated billions of dollars in damages on shipments he had identified as legacies; he never has, and does not now. Rausser Suppl. Rep. 20 ("positive overcharges . . . [on] legacy contracts" are "not surprising"). Rather, Dr. Rausser and Plaintiffs argued that legacy overcharges are not "true" false positives—the story we have been hearing from Plaintiffs ever since.

### 2. Dr. Rausser's "Audit" For "Clean" Legacies Cannot Salvage The Damages Model

Dr. Rausser claims that many contracts being used to test his model are not "clean" legacies because they (a) have "self-adjusting" fuel surcharge provisions (his "Category 1"), (b) contain a fuel surcharge formula that was actually created during the alleged conspiracy (his "Category 2"), or (c) were entered during the Class Period or as the conspiracy allegedly took shape between March and July 2003. Rausser Suppl. Rep. 37-38. Based on these arguments, Dr. Rausser claims that 81.86% of the shipments *he previously identified as legacies* (and for which he has any fuel surcharge information) are incorrectly categorized. *Id.* at 39, 74. This is over 15 million shipments he now says he incorrectly categorized, and there are over 10 million more shipments that he says he does not know how to categorize any longer. *Id.* at 37-39.

Dr. Rausser's analysis is superficial and contrived. He does not analyze contracts to reach his conclusions, but rather interrogatory responses and data fields that he does not understand or is misusing. Worse, his argument is exceptionally misleading in that it implies—without even considering, let alone proving—that Class Period changes to legacy contracts

explain the findings of legacy damages. This turns out to be yet another example of analytical work by Dr. Rausser that *has nothing to do* with more aggressive fuel surcharges.

*Excluded Data Leads to Misleading Claims:* First, let us be clear about what this "audit" actually means, because Dr. Rausser misrepresents it. As he presents percentages of shipments allegedly misclassified as legacies, Dr. Rausser obscures the fact that he simply ignores 10.4 million of the roughly 29.3 million shipments that he previously identified as legacies. He decided upon closer examination that he did not have sufficient data to tell whether they were or were not "clean" legacies. *See* Rausser Suppl. Rep. 37 & n.124; Ex. 4, Rausser Dep. 98:5-23, 100:5-12, 107:3-109:19, Mar. 4, 2014. Accordingly, his conclusions about which shipments are not "clean" legacies—reported simply as percentages of "legacy shipments" or "legacy shipper-price authorities"—are actually based on just two-thirds of the total legacy shipments that he previously identified. Ex. 4, Rausser Dep. 112:7-17, Mar. 4, 2014.

This wholesale data dump is typical of his "painstaking" audit. For example, Dr. Rausser excluded nearly all BNSF intermodal traffic—which accounts for 68% of all legacy shipments previously identified for BNSF—from his legacy classification exercise. *Id.* at 243:19-244:7, 244:24-245:2; Rausser Suppl. Rep. 45 & n.160. The BNSF intermodal shipments subject to the public intermodal formula are unequivocally "clean" legacies: Dr. Rausser squarely admits that BNSF's public intermodal formula *remained unchanged* from 2001 through the Class Period. Ex. 6, Rausser Dep. 394:20-395:24, Mar. 5, 2014 ("It is the same as in the pre-class period.").[31]

---

[31] Dr. Rausser says he excluded the BNSF intermodal shipments from his legacy analysis because they were not listed on BNSF "Revenue Price Management System" spreadsheets produced in discovery. But since the BNSF public intermodal formula *remained unchanged from 2001 forward*, there is no question that intermodal shipments subject to that formula fall squarely within the legacy ambit, regardless of what is or is not listed on the spreadsheets.

*Meaningless Adjustments:* Dr. Rausser is supposedly conducting this exercise to show that overcharges are to be expected on some legacy shipments because during the Class Period the shipper lost the benefit of its pre-class, competitive surcharge formula when a contract was amended or otherwise updated with a new fuel surcharge formula during the Class Period. The rationale for Dr. Rausser's categorization of legacies is that these contracts and shipments would have been impacted by the alleged conspiracy in one way or another. Rausser Suppl. Rep. at 39; Ex. 4, Rausser Dep. 127:12-132:25, 158:14-159:4, 160:23-161:9, Mar. 4, 2014; Ex. 6, Rausser Dep. 324:25-325:19, Mar. 5, 2014. But some of the most significant changes he makes to his identification of legacies are based on so-called "self-adjusting" surcharge formulas that *did not change* or formula changes that *actually lowered the fuel surcharge.*

The changes to UP's intermodal surcharge formula are a perfect example. UP's "Standard Intermodal Fuel Surcharge" was adopted in 2000. During the alleged conspiracy, the formula was changed twice to decrease the "fuel weight" component of the formula, first from 20% to 18.5% in the Spring of 2005, and then to 16.5% in the Fall of 2006. Ex. 9, Carlton Merits Rep. ¶¶ 108, 114 n.121, Appx. B (documenting evolution of intermodal formulas). Both of those changes lowered the surcharge percentage the formula produced, and therefore *reduced* the amount of the surcharge relative to the original calculation. *Id.*[32] Dr. Rausser previously conceded that the only adjustments to UP's intermodal formula "'had the effect of *reducing the fuel surcharge*.'" Ex. 11, Rausser Merits Reply Rep. 172 (citation omitted) (emphasis in original); *see also id.* ("UP made changes to its intermodal formula to reduce the FSC rates that it produced.").

[32] UP also made occasional ad-hoc adjustments that further lowered the charge produced by the standard formula in order to meet specific competition from BNSF and truckers. *Id.*

However, in his supplemental report, one of Dr. Rausser's primary methods for excluding UP shipments from the "clean" legacy category is to exclude those same intermodal shipments. Rausser Suppl. Rep. 51-52, n.174, Table 13. He puts these shipments in his "self-adjusting or adjustable" category, presumably because the fuel weight was not hard-coded into the contract (and thus is subject to adjustment). That's true. But obviously, if the Class Period adjustments *reduce* the fuel surcharge, as Dr. Rausser previously admitted, that makes the damages model's findings of overcharges *harder* to explain. The "self-adjusting" surcharge argument only makes sense if the adjustment actually raised the surcharge rate.

At his deposition, Dr. Rausser admitted to numerous cases where he reclassified formulas as "non-legacy" fuel surcharges in the absence of any evidence of increased fuel surcharge rates. In addition to the UP intermodal surcharge, this included:

- BNSF published carload surcharge: 88% of the BNSF reclassifications were because BNSF had a "self-adjusting" carload fuel surcharge in its "rules book"—even though Dr. Rausser admitted that the only formula change, to the trigger price, had no effect in the Class Period. Ex. 4, Rausser Dep. 62:12-63:3, Mar. 4, 2014.
- UP's "FMC/Fuel 60 Published Days" surcharge: Dr. Rausser admitted that he reclassified this as non-legacy even though the changes (a higher strike price and a longer period during which fuel costs must exceed a threshold) were to the shippers' benefit. *Id.* at 240:4-242:2.
- CSXT "Fuel Surcharge 23.01 @ .3 Slope" surcharge: The *name* of this surcharge reveals that it has a flatter "slope" than CSXT's published carload surcharge (the surcharge increment is 0.3% rather than 0.4%, and thus this formula is *less* "aggressive"), yet Dr. Rausser reclassified all traffic under this surcharge as "Category 2." *Id.* at 259:20-260:20.

Similarly, he assigned *44* NS fuel surcharges to Category 2 without once trying to determine whether the purported Category 2 event led to higher fuel surcharges. *Id.* at 260:22-261:13. As Dr. Rausser's own workpapers demonstrate, several of these formulas were facially less onerous

than the competitive pre-class carload formula. *See id.* at Ex. 1 (workpapers summarizing FSCs in Categories 1 and 2).

These were not accidents or oversights. Dr. Rausser admitted repeatedly that in performing his legacy audit, he made no attempt—zero—to determine whether the "self-adjustment" (or other allegedly disqualifying event) had any impact on the fuel surcharge formulas. *Id.* at 132:4-25, 239:24-25 ("You don't find that in my report anywhere. I haven't done that analysis.").

The false positives inquiry does not turn on some hyper-technical requirement that the "legacy" formula was set in stone; rather, the relevant question is whether the model "detects injury where none could exist." *D.C. Cir. Op.*, 725 F.3d at 252. Dr. Rausser has provided an analysis with no useful information on that question.

*Blurring the Conspiracy Start Date*: Dr. Rausser also argues in his supplemental report that shipments under contracts entered between March and June 2003, just prior to the start of the Class Period, should not be regarded as "clean" legacies because injury is to be expected in this "formative" stage of the alleged conspiracy. Here, he is simply walking away from his prior, unequivocal testimony that the "anticompetitive consequences [of the alleged conspiracy] began in July of 2003." Ex. 13, Rausser Dep. 12:22-13:7, Dec. 11, 2012. This argument also flies in the face of Dr. Rausser's testimony that the allegedly collusive surcharge formulas were not implemented until June 2003. *See id.* at 59:5-21 (testifying that "CSX didn't implement their [allegedly collusive fuel surcharge] program . . . until June. UP didn't actually implement theirs until June. BNSF . . . didn't implement until June.").

As the D.C. Circuit made abundantly clear, the March-June 2003 "tainted" legacy argument "runs directly counter" to the "crux of the plaintiffs' own evidence of collusion—that

there was a 'structural break' at the start of the Class Period[.]" *D.C. Cir. Op.*, 725 F.3d at 254-55. Furthermore, Dr. Rausser expressly states in his supplemental report that in this "formative" period Defendants could *not* obtain the fuel surcharges they wanted *due to competition*. Rausser Suppl. Rep. 13-14. It makes no sense that without the supposedly "more aggressive" fuel surcharges that were the *sine qua non* of this alleged conspiracy, the Defendants were able to—categorically—raise prices in all contracts entered into during this "formative" period.

In any case, Dr. Rausser's argument that "clean" legacies would pre-date March 1, 2003 does not cure the legacy shipment false positives. Dr. Kalt tested Dr. Rausser's model using a legacy benchmark that was limited to the period before March 1, 2003 (and thus pre-dates the alleged "formative stages" of the conspiracy), and the conclusion remains exactly the same. The legacy false positive is 10.2%—higher than Dr. Rausser's calculated overcharge for class shipments. Kalt Decl. Fig. 1.

### 3. Plaintiffs' Fallback Position—That Legacy Damages Arise From An Inability To Renegotiate Binding Contracts—Fails

Since Dr. Rausser has not moved—and cannot move—all shipments out of the legacy category, and his audit still leaves billions of dollars of uncontested legacies, Plaintiffs offer a sweeping backup argument intended to cover all other legacy shipments. Plaintiffs and Dr. Rausser argue that the damages generated by Dr. Rausser's model for these legacy shipments are correct (not false) because all legacy shippers were actually injured. Ex. 4, Rausser Dep. 157:17-161:9, Mar. 4, 2014; Ex. 6, Rausser Dep. 324:25-325:19, Mar. 5, 2014. Getting a straight answer to how that could have happened has proven impossible, but supposedly it is because, in the absence of the alleged conspiracy, each and every legacy shipper would have been able "during the Class Period to negotiate [its] way out of" the fuel surcharges that they had contractually agreed to pay previously. Ex. 11, Rausser Merits Reply Rep. 220; *see also id.*

(legacy shippers "lost the ability to mitigate these costs through re-negotiation").[33] The audacity of this argument cannot be overstated: Plaintiffs are trying to define away the concept of false positives for legacy shipments during the Class Period—and thereby circumvent the D.C. Circuit's *holding* that positive damages on legacy shipments preclude class certification. This would also render the legacy exclusion in the class definition—a concept Plaintiffs defined and used from the early stages of this case—meaningless. This theory is wholly implausible and violates the basic rules of estimating antitrust damages.

First, it makes no sense that shippers would have been systematically able to negotiate their way out of binding fuel surcharge provisions *as fuel costs skyrocketed*—the precise circumstances under which one would expect contractual commitments to pay surcharges to be enforced. *See* Kalt Decl. ¶ 118. We will assume for the sake of argument that some might have pulled this off. But to explain away the findings of injury across legacy shippers generally, Plaintiffs must be able to show that this apparent disregard for contractual obligations was ubiquitous, and everyone would have succeeded in either eliminating or reducing their fuel surcharge obligations. Other than Dr. Rausser's *ipse dixit,* Plaintiffs do not offer any proof of such an extremely unlikely outcome. Notably, Dr. Rausser's regression model does not, and cannot, provide any empirical support for this theory. Dr. Rausser repeatedly testified that his model provides no insight into which shippers would have renegotiated their contracts, when it would have happened, or by how much such reductions would have reduced all-in rates. Ex. 6, Rausser Dep. 399:25-401:20, Mar. 5, 2014. Ultimately, determining which shippers would have

---

[33] To underscore just how dramatically Plaintiffs and Dr. Rausser have altered their theory of liability, Dr. Rausser testified that as a result of this alleged inability to renegotiate binding pre-class contracts, he would expect "damages" even in the case of a category of shippers for whom the applicable surcharge rate declined during the Class Period. Ex. 4, Rausser Dep. 158:14-159:4, Mar. 4, 2014.

been able to reduce or avoid already existing fuel surcharge obligations, and on which shipments, is an inherently individualized inquiry.

At most, Plaintiffs point out that in the pre-Class Period a very small portion of fuel surcharges that were triggered were "waived" or uncollected. *See, e.g.*, Ex. 11, Rausser Merits Reply Rep. 190. Dr. Rausser examined the data for NS, and, according to *his analysis*, the amount of revenue covered by surcharge waivers or smaller price concessions in the pre-Class Period was only 2.9% of the total surcharges billed. Ex. 11, Rausser Merits Reply Rep. 190, Table 80. In other words, as Dr. Rausser was forced to admit in his deposition, those "theoretically billable" NS pre-class fuel surcharges were actually billed and collected 97.1% of the time that they were triggered. Ex. 4, Rausser Dep. 191:7-192:16, Mar. 4, 2014 ("Q. So that means that they collected the other 97.1 percent; right? A. Yes."). And as Dr. Kalt notes, there was no radical change in NS collections in the Class Period. Kalt Decl. ¶ 112. Furthermore, Dr. Rausser admitted that he has no data to quantify the degree to which "waivers" (or other price concessions) varied across shipper size, commodity, route, etc. in the pre-Class Period. Ex. 4, Rausser Dep. 197:2-200:15, Mar. 4, 2014. Thus, he has no ability to assess the impact of those conditions on a shipper's ability to get a "waiver" of FSC payments in a competitive environment.

In all events, antitrust law does not permit damages claims to be based on better prices, terms, and conditions than were available in the competitive market. *See Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946) (noting that antitrust damages should be measured by "comparison of profits, prices and values as affected by the conspiracy, with what they would have been in its absence under freely competitive conditions"); *Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*, 773 F.2d 1506, 1511 (9th Cir. 1985) ("In economic terms, the amount of

damages is the difference between what the plaintiff could have made in a hypothetical free economic market and what the plaintiff actually made in spite of the anticompetitive activities."). The legacy contracts, including their fuel surcharge provisions, were the product of competition. Even if we presume—without any evidence whatsoever—that some pre-class shippers could have found "a better deal . . . elsewhere" (Pls.' Mem. 28), the deals they made—and which the data show were enforced according to their terms at least 97.1% of the time—are entirely unaffected by the alleged anticompetitive conduct. *See, e.g.*, Ex. 4, Rausser Dep. 142:9-143:4, Mar. 4, 2014 (admitting that "there's no reason to doubt" that shippers that "were under contract from a prior nonconspiratorial period" were paying "a competitive price . . . at the beginning of the conspiracy"). Thus, any showing of injury and damages on shipments subject to those contracts is a false positive.

* * *

Neither the facts nor the law related to false positives is the least bit contestable. The D.C. Circuit held that "[i]f accurate, this critique [of Rausser's model] would shred the plaintiffs' case for certification." *D.C. Cir. Op.*, 725 F.3d at 252. The critique is accurate.

## PART III: COMMON PROOF CANNOT BE USED TO ESTABLISH HARM FROM INCREASED FUEL SURCHARGE COVERAGE

We now turn to the other element of Plaintiffs' conspiracy theory, purported "universal" fuel surcharge coverage, and the key causation issues in this case, which are whether particular class members would have agreed to a surcharge provision even without a purported conspiracy, what surcharge they would have paid, and when they would have paid it.

Previously, the Court recognized that "[i]f plaintiffs['] . . . alleged injury would have been caused by independent, non-conspiratorial forces, then no causal link exists between the alleged antitrust violation and the injury. And if individualized inquiry is necessary to make

such a determination on causation, then plaintiffs will have failed to show that common questions predominate as to injury-in-fact." *Class Cert. Op.*, 287 F.R.D. at 43. The Court nonetheless concluded that individualized inquiry would be unnecessary because the new "more aggressive" surcharges were "non-negotiable," "each defendant enforced policies ensuring across-the-board, uniform application of their new fuel surcharge program," and "any deviations from the standard fuel surcharge program were rare and without consequence for purposes of determining injury-in-fact with common evidence." *Id.* at 50-51. The Court's conclusion seemed to be that if the alleged conspiracy changed the market from one in which surcharges were both *low and rarely applied and enforced* into one in which they were *high and almost universally applied and enforced*, a few "rare" "deviations" from universal coverage were not an obstacle to certification. *Id.* at 52.

The record has since evolved, and the picture is just not that black and white. First, basic math proves that public Class Period formulas *were not* more aggressive than the pre-Class Period formulas at the fuel prices that existed during the Class Period. *Supra* Part II:A.1. Second, the new expert work establishes conclusively that (i) rate-based fuel surcharges were already common before early 2003, (ii) pre-Class Period fuel surcharges were almost always paid when they were triggered, (iii) there was no spike in coverage after the onset of the theorized conspiracy, and (iv) Defendants did not achieve "across-the-board" surcharge coverage during the Class Period. Some Defendants did not even come close to 100% coverage during the Class Period, proving that many shippers retained the power to resist surcharges. Moreover, fuel surcharges are commonplace in many industries; they were used by other railroads and trucking companies before and during the Class Period; and they were becoming more common during the alleged conspiracy. Kalt Decl. ¶ 117, Fig. 24; Ex. 12, Kalt Merits Rep. Fig. IV-6A.

Ultimately, the real picture depicted by the data is one in which each Defendant achieved varying degrees of success in negotiating fuel surcharges both before and during the Class Period. And, because there is no one-size-fits-all answer for why some shippers accepted surcharge obligations and others did not, Plaintiffs face an insurmountable hurdle in establishing with common evidence that the adoption of any FSC was *caused* by the alleged conspiracy.

### A. The Coverage Data Demonstrates That Coverage And Enforcement Was Widespread Before The "Conspiracy" And Did Not Materially Accelerate During The Class Period

The current expert record demonstrates that Plaintiffs' theory that the market switched from "sporadic" coverage to near-"universal" coverage is not true.

Looking first at the pre-Class Period, there is no doubt that rate-based fuel surcharges, which Plaintiffs concede were "uncoordinated" and "implemented by the individual Defendants unilaterally[,]" Pls.' Class Cert. Mot. 9, were in widespread use before the alleged conspiracy. The named Plaintiffs, for example, all paid rate-based surcharges before July 2003, and some did so on 100% of their traffic. Ex. 12, Kalt Merits Rep. ¶¶ 153-54 & Fig. IV-8A. This Court was unpersuaded by an analysis of surcharge prevalence prepared by Dr. Willig, because it did not account for whether a shipper paid surcharges on just one shipment or all of them. *Class Cert. Op.*, 287 F.R.D. at 51-52. Dr. Kalt has prepared an analysis that resolves the Court's objection, and it reveals that each Defendant had 30% to nearly 50% or more of its revenue base subject to rate-based surcharges prior to the commencement of the Class Period. Kalt Decl. Fig. 20; *see also* Ex. 12, Kalt Merits Rep. Fig. IV-9A - D. By April 2001, shippers paid rate-based fuel surcharges on approximately 25% of CSXT's revenue. *Id.* That number rose to approximately 35% in February of 2003, before Plaintiffs allege any supposedly conspiratorial acts. *Id.* Similarly, NS's share of revenue on which shippers paid rate-based fuel surcharges was approximately 25% in July 2001, and rose to approximately 40% in February 2003. *Id.* UP's

coverage increased from approximately 20% in November 2002 to more than 30% by the end of February 2003. *Id.* Similarly, by the end of 2002, BNSF had rate-based fuel surcharges in contracts covering almost 30% of its gross revenue. *Id.*

These data also refute Plaintiffs' contention that prior to the Class Period "defendants experienced increasing pushback to their FSC programs" such that collusion was necessary "[t]o overcome shipper resistance[.]" Pls.' Mem. 35-38. Of course there is always going to be some "shipper resistance" to anything that might raise prices, but what the data actually show is that in the period leading up to either March 2003 (when the conspiracy formation period allegedly began) or July 2003 (when the conspiracy allegedly was implemented), Defendants' rate-based fuel surcharges had already achieved substantial coverage and were spreading rapidly. Ex. 12, Kalt Merits Rep. ¶¶ 146-68; Ex. 9, Carlton Merits Rep. ¶¶ 88-102. The use of such surcharges had sky-rocketed from roughly 20% in Spring 2002 to more than 60% a year later. Figure 21, which examines how often fuel surcharge formulas were included in new contracts, further illustrates the point. For Defendants collectively, more than two-thirds of *new* contracts entered just prior to March 2003 (before the first challenged communication) contained a rate-based surcharge formula. Kalt Decl. ¶ 105, Fig. 21.[34] Across the board, the data refute Plaintiffs'

[34] Dr. Rausser obtains a much lower pre-class coverage figure by three techniques. First, he uses November 2002 as his measuring point. This approach is inherently misleading because it discounts the growth in surcharge coverage before the alleged start of the conspiracy. For example, UP adopted its first public carload fuel surcharge—which Dr. Rausser concedes was independently adopted (Ex. 8, Rausser Merits Rep. 55)—in December 2002. The first challenged communication was not until March 2003. One cannot ignore the coverage UP (or others) achieved prior to this time. Second, Dr. Rausser excludes all legacy transactions with rate-based fuel surcharges from his coverage numbers, and thereby significantly overstates the increase in coverage between 2002 and 2007. Ex. 12, Kalt Merits Rep. ¶¶ 243-44 & Figs. IV-19A - 19D. Finally, he calculates the percentage of all existing contracts that contain fuel surcharge provisions. However, because many contracts have long terms, it takes time for new fuel surcharge policies to affect actual transactions. Thus, the better measure, which

contention that in the pre-Class Period competition was creating some "brick wall" of opposition to adding fuel surcharges to new contracts. Dr. Rausser conceded this fact at his deposition. Ex. 15, Rausser Dep. 353:21-354:7, Dec. 18, 2012.

Moving to the other side of the equation, Class Period coverage, the data show that while surcharge coverage clearly increased—in this and other transportation industries subject to rising fuel prices—no Defendant came close to achieving universal coverage. Kalt Decl. ¶¶ 106-07, Figs. 20-21. A significant portion of Defendants' revenue never became subject to rate-based surcharges (see the "white space" in Kalt Decl. Fig. 20). Kalt Decl. ¶ 104, Fig. 20. For example, on a revenue basis, CSXT and CSXI never achieved more than 63% coverage combined, and BNSF never more than 67%. *See* Ex. 11, Rausser Merits Reply Rep. Figs. 66-69. In other words, even when rate-based fuel surcharge usage was at its absolute peak for those railroads, approximately 37% and 33% of their respective revenues did not pay one. *Id.*; *see also* Kalt Decl. Fig. 20. Dr. Rausser does not dispute these data. Ex. 4, Rausser Dep. 293:4-12, Mar. 4, 2014. The conclusion is the same if one examines new price authorities entered during the Class Period—there is a substantial shortfall between the alleged goal of "universal" coverage and the surcharge adoption rate the Defendants actually achieved. Kalt Decl. Fig. 20.

The data also prove that there was no significant spike in coverage at the start of the alleged conspiracy, as one would expect if a conspiracy was necessary to overcome shipper resistance to fuel surcharges. As Kalt Figure 21 shows, the use of surcharges in new contracts did not jump at all in July 2003 (it was basically flat for the next several months), and grew only modestly in the next few years. Kalt Decl. Fig. 21. The only spike in coverage occurred *before* March 2003. Statistically, the data show no material acceleration in coverage subsequent to July

Dr. Kalt uses, looks at the portion of *newly contracted business* which had a rate-based fuel surcharge.

2003.[35] Ex. 12, Kalt Merits Rep. ¶¶ 146-68; Ex. 9, Carlton Merits Rep. ¶¶ 88-102.

In short, the pre-existing and rapidly expanding use of rate-based fuel surcharges immediately before the Class Period, coupled with (i) the unilateral incentives to use such surcharges, (ii) the lack of any sudden or statistically measurable increase in their usage after the start of the alleged conspiracy, (iii) their widespread use in other industries (and by other, non-defendant railroads), (iv) their pre-class use by the named Plaintiffs, and (v) their continued use today, all point to the conclusion that many class members would have paid rate-based fuel surcharges regardless of any alleged conspiracy.

### B. Plaintiffs Cannot Prove By Common Evidence That *Every* Class Member Paid Fuel Surcharges Because Of The Alleged Conspiracy

The coverage data tee up a legal issue, which is whether coverage (or the coverage aspect of causation) is a common issue under Rule 23 and *Wal-Mart*. Clearly it is not.

First, Plaintiffs do not have any genuine "common proof" of coverage. Dr. Rausser has *no* model to deal with the issue at all. He has admitted that "certain fuel surcharges would have been charged by the defendants during the class period absent a conspiracy[,]" including "the same kinds of fuel surcharges that were charged prior to the class period[,]" which included "standardized" "rate-based" surcharges. Ex. 3, Rausser Dep. 119:3-120:2, Sept. 24, 2010. He concedes that shippers that paid fuel surcharges before the Class Period would have likely

---

[35] In fact, regression analyses performed by Dr. Carlton—both on total shipments covered and new contracts covered—show that for UP the rate of coverage actually declined during the Class Period relative to the pre-Class Period. Ex. 9, Carlton Merits Rep. ¶ 97 ("The growth in rate-based fuel surcharge coverage spikes in December 2002; falls back to a level indistinguishable from the pre-December 2002 level after March 2003; *actually falls below the pre-December 2002 trend after July 2003*; and then declines further as rate-based fuel surcharges declined following the shift to mileage-based fuel surcharges after April 2007.") (emphasis in original); *see also* Ex. 12, Kalt Merits Rep. ¶¶ 156-60.

continued to pay them during the Class Period.[36] And he concedes that some shippers would have paid them for the first time during the Class Period.[37] But he concedes that he has "never developed a model to predict coverage" of surcharges absent a conspiracy.[38] His model addresses damages, but apparently just presumes that coverage but-for the alleged conspiracy "is the same as . . . what actually took place in the actual world, it's just at a different price." Ex. 6, Rausser Dep. 410:2-23, 412:14-413:7, Mar. 5, 2014. Thus, his model is *not* a common method for predicting increases in coverage, and cannot "translat[e]" Plaintiffs' coverage theory into any assessment of the supposed impact on class members. *Behrend*, 133 S. Ct. at 1435.

Indeed, because Dr. Rausser presumes the same coverage in his but-for world as in the actual world, he is proceeding as if the alleged conspiracy *did not cause* any shipper to pay a fuel surcharge. He further acknowledges that he has no idea why any shipper did or did not pay a fuel surcharge during the Class Period because he has never analyzed that question—even though that is the critical question Plaintiffs must answer to prove up their claim that the alleged conspiracy *caused* shippers to pay fuel surcharges that they would not have paid absent collusion. *Supra* n.38. Thus, Plaintiffs lack any evidence—much less common proof—that the "alleged injury would [not] have been caused by independent, non-conspiratorial forces," which

---

36 Ex. 6, Rausser Dep. 336:1-16, Mar. 5, 2014 (Dr. Rausser would "expect that they will just continue [during the Class Period] with the same terms"); Ex. 21, Rausser Dep. 287:9-288:4, June 3, 2010; Ex. 3, Rausser Dep. 116:19-117:5, 119:9-120:2, Sept. 24, 2010.

37 Ex. 21, Rausser Dep. 94:20-95:5, June 3, 2010 (Q: "Are there some class members who paid a fuel surcharge for the first time after July 2003 who would have paid a fuel surcharge anyhow absent the alleged conspiracy?" A: "[Y]es."); Ex. 3, Rausser Dep. 117:6-119:8, 120:3-121:6, Sept. 24, 2010.

38 Ex. 4, Rausser Dep. 263:8-17, Mar. 4, 2014; *see also* Ex. 16, Rausser Class Cert. Reply Rep. 84-85 (conceding his model cannot answer why any shipper paid fuel surcharges); Ex. 3, Rausser Dep. 293:16-295:11, Sept. 24, 2010 (he has "no information on what were the factors that caused some shippers to have fuel surcharges whereas other[s] did not").

means as a matter of law that "no causal link exists between the alleged antitrust violation and the injury." *Class Cert. Op.*, 287 F.R.D. at 43.

We recognize that Plaintiffs claim to have common proof in the form of their narrative that the Defendants *sought* universal coverage. But even if we presume that this narrative constitutes common proof of liability (and we do not agree that it does, because each Defendant had an obvious unilateral incentive to seek to expand coverage), it does nothing to resolve the individualized causation issues facing shippers who want to link their adoption of a surcharge to the alleged conspiracy. Defendants are still entitled to say, "But wait, you had agreed to the same surcharge six months earlier." Or, "Two-thirds of our customers had already agreed to this before any alleged conspiracy; you would have too." Or, "One third of our customers never agreed to it; you did not have to." Thousands of class members accepted surcharge provisions (such as the public carload and intermodal surcharge formulas) during the Class Period that were very similar to the ones they accepted prior to the alleged conspiracy. Some shippers, like International Paper and Chevron Phillips Chemical, negotiated highly individualized surcharge formulas (*e.g.*, a higher trigger price and a fuel surcharge percentage cap as low as 2%). Ex. 10, Johnson Rep. ¶ 188; Ex. 6, Rausser Dep. 532:23-536:7, Mar. 5, 2014; Ex. 4, Rausser Dep. at Ex. 1, Mar. 4, 2014; Ex. 22, NS_003043436-452 at -451. And there are other shippers who don't care about fuel surcharges because they can pass on the costs. It is clear that individualized evidence about causation would not be irrelevant or repetitive, and that Defendants are entitled to present it.

Plaintiffs cannot ask the Court to solve the coverage problem by ruling again (as it did in the original class certification opinion) that "rare" "deviations" from universal coverage would be "without consequence for purposes of determining injury-in-fact with common evidence." *Class Cert. Op.*, 287 F.R.D. at 50-52. The point is now moot anyway because the new expert analysis

shows that shippers without surcharges were not rare or "deviations." But even if they were, the Court's prior reasoning was an application of the *Mims/Kohen* standard that is no longer good law in this Circuit. After *Wal-Mart* and the D.C. Circuit decision, "deviations" cannot be dismissed as "without consequence" because *they are the object of the analysis*, revealing the "[d]issimilarities within the proposed class [that] have the potential to impede the generation of common answers." *Wal-Mart*, 131 S. Ct. at 2551 (quoting Nagareda, 84 N.Y.U. L. Rev. at 132).

And in all events, dismissing uncovered shipments as mere "deviations" does nothing to prove that those shippers who *were* covered—class members—were covered *because of* the conspiracy. The reality of this case is that under concededly competitive conditions, some shippers but not others were willing to accept fuel surcharge obligations, and that under allegedly conspiratorial conditions, some shippers but not others were not. The existence of such profound "dissimilarities" is completely inconsistent with classwide adjudication.

**PART IV: THE CLASS CONTAINS THOUSANDS OF UNINJURED SHIPPERS, PRECLUDING A FINDING OF COMMON IMPACT**

Something is deeply wrong when Plaintiffs' own "common proof" generates not only thousands of disqualifying false positives, but also thousands of "negative damages"—meaning that the predicted but-for, supposedly competitive price is *higher* than what the shipper actually paid. But Dr. Rausser's model does just that, which means that even if we were to accept the model as reliable despite the methodological flaws which generate false positives, Plaintiffs fail to meet their burden to show "that all class members were in fact injured by the alleged conspiracy." *D.C. Cir. Op.*, 725 F.3d at 252.

Additionally, beyond the failures of the model itself, the record now shows that *thousands* of class members never experienced higher fuel surcharge levels, obtained reductions in their base rates, or otherwise escaped the alleged effects of "standardized" fuel surcharges.

On this record, there can be no legitimate finding that "all" (or even "virtually all") shippers paid higher rates because of the allegedly "more aggressive," "standardized" fuel surcharges.

### A. Plaintiffs' Own Damages Model Finds That Thousands Of Class Members Were Uninjured

Dr. Rausser only reports *average weekly* or what he calls "*classwide*" overcharges for the Defendants. Even to this date, with his trial proofs supposedly disclosed, he has never revealed individual class member damages calculations. He *promised* such calculations repeatedly, but he never delivered on those promises.

Nonetheless, in testimony after the submission of his merits report in 2012, he described a method one would use to run his model separately for individual shippers, producing individualized rather than average damages estimates. Ex. 15, Rausser Dep. 436:2-437:16, Dec. 18, 2012. If one implements that approach using Dr. Rausser's STB-adjusted model:

- 4,550 shippers, or 28.3% of the putative class members (including three of the proposed class representatives), have zero "damages" in the aggregate. Kalt Decl. ¶ 74, Figs. 13, 16. In other words, the model indicates that at least 4,550 putative class members actually paid the same or less in the aggregate for their class transactions than the model predicts they should have paid in a competitive but-for world.

- 1.9 million class shipments—*36% of all class shipments*—were actually priced at or below Dr. Rausser's estimate of competitive but-for rates. Kalt Decl. Fig. 13.

- 2,679 class shippers, comprising 16.7% of all class shippers, have negative overcharges on *all* of their shipments. *Id.*

- DustPro, one of the named Plaintiffs, has negative overcharges on *all* of its shipments, and two other named Plaintiffs have net negative damages. *Id.* at Fig. 16.

If it seems odd that Dr. Rausser's model finds that approximately 48% of the putative class (over 7,600 shippers) had a mix of shipments with and without damages (Kalt Decl. ¶ 74, n.103) and that another 17% (2,679 shippers) had only negative damages (*id.*), it should: there is

no way that should happen under the logic of Plaintiffs' case, in which "more aggressive" fuel surcharge formulas "yielded more revenue" by inflating the all-in rates on *all* class traffic. The model results reject, rather than validate, that hypothesis. The inescapable conclusion is that, contrary to Plaintiffs' many assurances, Dr. Rausser's model neither establishes nor is capable of establishing that all class members were injured, let alone that injury and damages are common issues that will stand or fall, "in one stroke" for the entire class.

Attempting to minimize Dr. Kalt's findings on negative damages, Plaintiffs brought in a new expert, Dr. James McClave (whose model the Supreme Court found not viable to meet plaintiffs' burden in *Behrend*). At the outset, Dr. McClave's analysis concedes that Dr. Rausser's model implies no injury to at least 8% of the class. Ex. 23, Expert Report of James T. McClave, Ph.D., June 12, 2013 ("McClave Rep.") 15. However, Dr. McClave argues that Dr. Rausser's model does in fact demonstrate "that all or virtually all customers were impacted by the alleged conspiracy[,]" *id.* at 17—*as long as you exclude 80% of the class, for which Dr. McClave admits Dr. Rausser's model cannot reliably assess injury or damages.*

Dr. McClave's argument, in short, is that Dr. Rausser's methodology cannot be trusted with regard to class members that had fewer than 30 transactions each in both the pre-class and Class Periods. *See id.* at 15-17; *see also* Ex. 6, Rausser Dep. 387:15-389:4, Mar. 5, 2014 (admitting that shippers with fewer than 20 observations are "subject to prediction errors"). So he chooses not to include these class members when "testing" the model's overall reliability for calculating *class member damages*. But this is hardly a detail. The excluded class members constitute *approximately 80% of class members* including three of the named Plaintiffs. Kalt Decl. ¶ 84 n.116. It is only after discarding most of the class that Dr. McClave can conclude "that all or virtually all" of the *remaining* class members (98% he claims) "have net positive

overcharges, and 100% have at least one impacted transaction." Ex. 23, McClave Rep. 16. What he means is that the Rausser model predicts positive damages for 98% *of less than 20% of the class*.

Dr. McClave appears to ask the Court to simply *assume* that the discarded 80% were injured—even though the model says that many of them were not. His argument is that because there is "increased random variability when the number of observations is this small, . . . these 'net negative' customers should not be assumed to be un-impacted by the conspiracy." *Id.* at 15; *see also* Pls.' Mem. 61 n.58 (arguing such "shippers are not appropriately categorized as uninjured"). But no one is entitled to *assume* anything about injury. The Plaintiffs' burden is to show they can *prove* it—for all class members—with reliable common proof. What Dr. McClave is saying is that Dr. Rausser's model is not capable of accurately identifying impact or calculating damages for shippers with fewer than 30 transactions in each of the class and pre-Class Periods. That's dispositive. There has never been a class certified based on proposed common proof that was admittedly worthless for over 80% of the putative class. It does not matter that—conveniently enough—Plaintiffs say the model is reliable for larger shippers. After *Wal-Mart* common proof must be able to "resolve an issue that is central to the validity *of each one of the claims* in one stroke." *Wal-Mart*, 131 S. Ct. at 2551 (emphasis added). If Dr. Rausser's model is unreliable for small shippers, injury does not qualify as a "common issue" and class certification must be denied.[39]

[39] It is more than a little ironic that Plaintiffs dismiss the implications of these results by claiming the problems concern only smaller class members. They are the ones that class-based litigation was designed to protect. *Amchem*, 521 U.S. at 617 (the core concern of the Federal Rules Advisory Committee was "people who individually would be without effective strength to bring their opponents into court"). The larger shippers—many of which have multi-million dollar damages claims according to Dr. Rausser—do not need a class action to protect their interests.

### B. Many Shippers Could Not Have Been Injured By The Conspiracy Plaintiffs Theorize

Independent of the model's plainly unreliable results, the largely undisputed facts establish that even if a conspiracy of the type Plaintiffs originally posited had existed, there are many class members who could not have been injured by it.

The most obvious cases are class members who indisputably were not subject to "more aggressive" fuel surcharges. For example, this would be true of shippers who before and during the Class Period purchased services pursuant to BNSF's published intermodal formula, which was adopted in 2000 and *never* changed from 2001 through the Class Period. *See, e.g.*, Ex. 12, Kalt Merits Rep. Fig. IV-14A. It would also be true of shippers who before and during the Class Period purchased services pursuant to (a) BNSF's published carload formula, which was changed in June 2003 only to lower the trigger price, but generated *exactly the same* surcharge rate as the pre-conspiracy surcharge formula (*id.* at Fig. IV-24A; Ex. 11, Rausser Merits Reply Rep. 153); (b) UP's published carload formula, where the change to the HDF index turned out to be favorable to shippers (Ex. 12, Kalt Merits Rep. Fig. IV-24D; Ex. 9, Carlton Merits Rep. ¶¶ 111-18); (c) UP's published intermodal formula, which as Dr. Rausser admitted was twice lowered during the Class Period (Ex. 11, Rausser Merits Reply Rep. 172); (d) NS's domestic intermodal formula, which did not change after April 2002 (*id.* at Fig. IV-1D); (e) NS's published carload surcharge formula prior to the first Class Period change in March 2004 (Ex. 12, Kalt Merits Rep. Figs. IV-1B, IV-24C); (f) CSXI's published intermodal formula prior to the only Class Period change in October 2004 (*id.* at Fig. IV-1D; Ex. 10, Johnson Rep. ¶¶ 99-100); and (g) NS's international intermodal formula, which did not change until August 2006 (Ex. 31, Harris Rep. ¶ 127).[40]

[40] Plaintiffs misleadingly argue that there is no need to examine the extent to which there might

The list of the likely uninjured hardly stops there. Dr. Rausser concedes that in the but-for world Defendants would have used "the same kinds of fuel surcharges that were charged prior to the class period[,]" including "standardized" "rate-based" surcharges. Ex. 3, Rausser Dep. 119:3-120:2, Sept. 24, 2010. Because many of those pre-class fuel surcharge formulas resulted in exactly the same or even more revenue than the allegedly collusive ones, a large portion of the class is uninjured. Kalt Decl. ¶ 98, Fig. 18. The predicted variance in actual and but-for rates under that assumption is 0.1% on average (for public carload formulas), and thus class members end up paying the same as they would have anyway. *Id.*

The data also make it impossible to dismiss the avoidance of injury by bargaining for price concessions. *Cf. Class Cert. Op.*, 287 F.R.D. at 27-28. In rejecting Defendants' argument that some shippers escaped "injury" by obtaining "contract concessions in the form of base rate discounts," the Court expressly relied on the supposedly "more aggressive, standardized fuel surcharge programs" which Plaintiffs claimed resulted in a 13.4% overcharge. *Id.* at 28, 72. Then, applying the now-rejected "widespread" injury standard in *Mims* and *Kohen,* the Court found that "there is no evidence of widespread discounting of base rates in exchange for application of fuel surcharges, and that any such discounting in the record is an anomaly that does not preclude a finding of predominance." *Id.* at 28.

---

be uninjured class members because the Court's earlier finding that Defendants' supposedly "standardized" Class Period fuel surcharges were applied to "all or virtually all class members" already answers that question. Pls.' Mem. 59 (citing *Class Cert. Op.*, 287 F.R.D. at 28). Contrary to Plaintiffs' assertion, the Court recognized that the mere fact of paying a rate-based fuel surcharge during the Class Period does not by itself result in injury. "[T]o prevail at the class certification stage," Plaintiffs must also "show by a preponderance of the evidence that common proof can be used to answer the question[] . . . whether payment of that fuel surcharge caused class members to pay more for shipping than they otherwise would have paid." *Class Cert. Op.*, 287 F.R.D. at 44.

Under the D.C. Circuit's standard, however, the Court's prior conclusion can no longer stand. That is, even "anomalous" discounting is enough to preclude a finding of predominance under the D.C. Circuit's decision requiring that "the common evidence [] show all class members suffered *some* injury." 725 F.3d at 252-55 (emphasis in original). But in addition, if—as we have established—the new surcharges were either the same as the pre-class ones or only trivially "more aggressive," it is impossible to dismiss categorically the ability of shippers to negotiate offsets. Even if we assume that it is difficult for shippers to obtain base rate discounts sufficient to offset new fuel surcharge provisions that lead to a 13.4% overcharge (such that those who succeed are "anomal[ies]"), the same cannot be said when shippers only need to obtain a 1% concession, or less, to fully negate the effects of the alleged conspiracy. At the very least, Defendants have a right in such circumstances to put on individualized injury defenses establishing that a shipper obtained a modest price concession leading to a competitive all-in rate. And allowing Defendants to exercise that right (as *Wal-Mart* requires) would render a class proceeding or trial unmanageable.

In fact, Dr. Kalt's new and more comprehensive analysis of the transaction data shows that base rates were frequently discounted during the Class Period, making it impossible to prove without individual analysis that such discounts did not fully offset any fuel surcharges paid. Approximately 35% of class shipments experienced a base rate *decrease* between March 2003 and March 2006, *after* controlling for all of the common factors that Dr. Rausser says explain rail prices. Kalt Decl. ¶ 81, Appx. C, Fig. C.III.4. Many of those shipments received base rate decreases of 15% or more, easily large enough to fully offset the Class Period fuel surcharges. *Id.* Nor is it surprising that so many class members would be able to negotiate significant base rate discounts given that the class includes many powerful companies with enormous bargaining

leverage, such as GM and Exxon, and the supply-and-demand realities that vary widely across geography and commodities. In fact, Dr. Kalt did an analysis of shippers' all-in rates comparing March 2003 and March 2006 rates for shipments having the same customer, commodity, route, car type, and interline status. After controlling for changes in economic conditions using Dr. Rausser's own model, Dr. Kalt found that 18% of the analyzed traffic had all-in rate decreases. *Id.* at ¶ 81.

In short, the Court's prior determination that uninjured shippers would be "anomalies" and could therefore be disregarded is no longer legally or factually supportable. There are indisputably substantial numbers of uninjured members of the proposed class—even according to Plaintiffs' biased damages study. Class certification must therefore be denied.

## PART V: THE RAUSSER MODEL IS INCAPABLE OF REDUCING THE DETERMINATION OF DAMAGES INTO A VIRTUALLY MECHANICAL TASK

We turn to *Behrend*'s requirement that the proponent of class certification "establish[] that damages are capable of measurement on a classwide basis." *Behrend*, 133 S. Ct. at 1433.

### A. Plaintiffs Have No Method Of Measuring Individualized Damages

When Defendants raised these issues during the first class certification proceeding, Plaintiffs answered with promises that the Rausser model would in time be capable of proving individualized damages, based not on averages but on each customer's transactions and individual "but-for" prices. *See, e.g.*, Pls.' Reply Mem. Addressing *Wal-Mart Stores, Inc. v. Dukes*, Sept. 1, 2011 11 (arguing that Dr. Rausser's "models are fully capable of determining individual impact and calculating individual damages"); Ex. 16, Rausser Class Cert. Reply Rep. 92 ("although I report the average percentage overcharge for each week of the Class Period, the damage model does not assume that all shippers paid the same overcharge. On the contrary, the

model can be used to calculate individual damages"); Ex. 17, Rausser Class Cert. Rep. 122-23; Ex. 3, Rausser Dep. 277:18-279:16, Sept. 24, 2010 (describing method).[41]

In certifying the class, the Court expressly relied on these promises, finding that Dr. Rausser's model "can be used to calculate individual damages." *Class Cert. Op.*, 287 F.R.D. at 71-72 (quoting Rausser Class Reply Rep. 92); *see also id.* at 72 ("the relationship between price drivers and freight rates calculated by the model . . . can be used to estimate the but-for price for each customer transaction").

But the promises were not kept. Dr. Rausser submitted his trial proofs *without any calculations of individualized damages.* Even his most recent submission, in the wake of *Behrend*, does not provide common proof of individualized damages. Dr. Rausser has claimed that he calculated individual damages for the class representatives (8 entities), but he has never disclosed those calculations. He declines to say how many total class members he has computed damages for, acknowledging only that it is fewer than 10% of the proposed class. Ex. 6, Rausser Dep. 373:24-374:1, Mar. 5, 2014. Regardless, the work has not been disclosed, even though the time for Dr. Rausser to disclose his full trial testimony has long passed.

This is a plain default after *Behrend.* The Supreme Court has instructed lower courts not to certify class actions unless and until common proof of damages survives "rigorous" scrutiny. *Behrend*, 133 S. Ct. at 1433. This Court is required to find that "damages are susceptible of measurement across the entire class," *id.*; that the common proof generates "just and reasonable" damages estimates, *id.* (criticizing the Third Circuit's "finding [that it was] unnecessary to decide 'whether the methodology [was] a just and reasonable inference or speculative'"); and that the

[41] Plaintiffs renewed these promises after class certification. Dr. Rausser repeatedly testified that he had a way to determine individualized damages with his model. Ex. 8, Rausser Merits Rep. 171; Ex. 15, Rausser Dep. 436:2-438:11, Dec. 18, 2012 (describing method and stating that "there would be a different but-for price [for each shipper], and that is computable").

common proof is robust enough to avoid "'labyrinthine individual calculations,'" *id.* at 1434. And it is crystal clear that *Behrend* is referring to measuring *individual* damages, not some aggregate classwide number that then gets distributed arbitrarily. The Court's concern about damages "permutations" among "2 million subscribers located in 16 counties" makes no sense otherwise. *Id.* at 1434-35. And *Wal-Mart* forbids such aggregate approaches, which it rejected as a "novel project." *Wal-Mart*, 131 S. Ct. at 2561. The Supreme Court has clearly sided with cases such as *Windham*, 565 F.2d at 68, and *Bell Atlantic Corp.*, 339 F.3d at 306-07, requiring plaintiffs to show that estimating damages is a virtually mechanical exercise.

That is impossible if Plaintiffs *fail to develop or produce individualized damages estimates.* The class cannot possibly be certified under these circumstances; it is, literally, a default on Plaintiffs' burden of proof.

**B. Dr. Rausser's Model Is Not Capable Of Reliably Estimating Damages**

At this point in the discussion we know that the Rausser model simultaneously generates thousands of false positives—damages where there should not be any—and thousands of findings that shippers who are supposed to be injured were not. It produces multi-million dollar damages claims when the shipper's surcharge rate decreased. It routinely produces damages estimates greater than fuel surcharge payments. It shows positive damages on some of a shipper's traffic and negative damages on other traffic. It generates a wildly varying range of damages estimates—which then get averaged together. It is no wonder Plaintiffs have chosen not to follow through on their promises to generate individual damages calculations.

This simply does not work after *Behrend.* The days are over when class plaintiffs could meet their burden by focusing only on the yes/no question of injury and essentially ignore the reasonable estimation of damages. *Behrend* confirmed that a model advanced in support of class certification must satisfactorily account for market forces that cause the effects of the unlawful

conduct to vary across geographic or other lines that fracture the class. *Behrend*, 133 S. Ct. at 1435 n.6 (noting that even if the damages model was limited to overbuilding, it still would fail unless it showed that the extent of overbuilding "would have been the same in all counties").

Dr. Rausser's model is simply not up to the task. It purports to be a one-size-fits-all solution for predicting the average overcharge every one of the 16,000 shippers in the class (Dr. Rausser's latest estimate) would have paid each week in the Class Period, in the absence of the alleged conspiracy. That is, using average weekly overcharges, the model purports to be as probative and accurate for predicting weekly but-for prices of a sole-served coal shipper as it is for General Motors, or a beverages shipper with trucking alternatives, or a shipper of hazardous materials, and so forth. Ostensibly this is accomplished through a regression analysis that appears complex (because it has hundreds of thousands of "dummy" variables) and reliable (because it generates a high R-squared). But separate and apart from the constant fuel price coefficient issue discussed earlier, the model is far too rudimentary to predict every class member's individual damages reliably.

The goal of a regression analysis is to predict the *expected* value of a dependent variable based on the *known* values of various independent variables. Dr. Rausser specifies regressions with rail rates (the original model) or variable costs (STB-adjusted model) as the dependent variables, in the latter case using predicted variable costs to predict but-for rates. In all versions the model has over 275,000 independent variables, *but virtually all of those are "dummy" variables and just five (including two more dummy variables) move with time*. Kalt Decl. ¶¶ 130-33, n.190. Only the variables that move with time can explain how rail rates, absent the alleged conspiracy, would be expected to change over time. *Id.* Yet these five variables have very little explanatory power themselves: an incremental R-squared of only 0.102, meaning that

only 10.2% of the variation in rail rates is explained by these factors. *Id.* Thus, the only variables Dr. Rausser relies on to explain changes in rail rates over time—a critical purpose of his damages model—actually explain only 10.2% of those changes. That is not nearly high enough to predict anything reliably. As Dr. Kalt explains, "[t]his very low incremental R-squared tells us that the model does a very poor job of explaining how actual rail rates change over time (which is the foundation for using a pre-Class Period benchmark), much less reliably predicting but-for rail rates." *Id.* at ¶ 133.

The purported "high" explanatory power of Dr. Rausser's regression (*i.e.*, the model's 0.90 R-squared) is the result of the over 275,000 dummy variables, which are known to generate misleadingly high R-squares. *See* J. Wooldridge, *Introductory Econometrics: A Modern Approach* (5th ed. 2012) at 488-489 ("The R-squared from the dummy variable regression is usually rather high. *** We should not get too excited about this…."). Dummy variables simply take the value 0 or 1 to indicate the absence or presence of a qualitative characteristic. They are used as devices to sort data into mutually exclusive categories (such as smoker/non-smoker). Here, for example, a dummy variable for a commodity or a route will be "1" if the shipment is of that commodity or moves on that route and "0" if it is not. Dr. Rausser uses over a million combinations of dummy variables to account for the *average* difference in rail rates across different kinds of traffic (*e.g.*, the average rate for "crushed stone" or "LA-to-Chicago"). But as averages that *ignore* time rather than vary with it, and are always either "1" or "0" (never any other value), they do not help explain how forces that change over time—in particular, changes in fuel prices over time—lead to changes in rail rates. Kalt Decl. ¶¶ 130-33. That is the critical question in estimating damages in this case, and the Rausser model cannot do that with even minimal accuracy.

Moreover, the Rausser model does not account at all for numerous factors that would obviously matter to measuring damages in many if not all individual cases. For example:

- Fuel Surcharges: Incredibly, there is nothing in Dr. Rausser's model that considers whether a shipper supposedly entitled to damages paid a fuel surcharge prior to the alleged conspiracy, and if so what it paid. The model makes no distinction between a shipper who had a fuel surcharge before the Class Period, and a shipper who outside the alleged conspiracy never paid a surcharge.

- Contract Terms: Confined to common proof, Dr. Rausser does not consider any contract terms that might bear on damages, including but not limited to customized fuel surcharge provisions.

- Non-Rail Competition: It is indisputable that at least a substantial portion of the traffic carried by railroads can be shipped by truck or other modes as well. There is nothing in Dr. Rausser's model that accounts for whether a Defendant was constrained in what it could charge because it would have lost business by imposing a higher surcharge.

- Rail Competition: Dr. Rausser's model does not account for whether the Defendant railroad has one or more competing railroads serving the shipper, or whether it is "sole-served." Nor does it account for competition from railroads not part of the alleged conspiracy that could have taken business from Defendants.

- Special Requirements: Dr. Rausser's model does not account for whether the shipment is time-sensitive, has a guaranteed service level, or has special handling requirements (for example, hazardous materials) that affect a shipper's negotiating power and pricing.

- Commodity or Route-Specific Demand Conditions: Dr. Rausser's model addresses the effect of changes in demand on rail pricing in an especially simplistic way, based on GDP and seasonality variables only. There is nothing in the model to account for increased demand for a particular commodity group or along a particular route.

Dr. Rausser will claim that these factors (and everything else that might matter) are inherently accounted for in his regressions by the interaction of his variables. But as Dr. Kalt explains, this could only be true if rates vary in exactly the same way for all commodities, routes and market conditions; otherwise the model "inevitably finds false positive damages and

purported evidence of conspiracy under numerous circumstances when none can exist, and it inevitably finds negative or no damages where Prof. Rausser's theories say it should only find positive damages." *Id.* at ¶¶ 124, 128. Remarkably, Dr. Rausser did not test or control for this. To the contrary, as presented, his damages model is hard-coded to assume as a matter of arithmetic that all routes, commodities, and shippers were impacted equally by changes in fuel price. *See id.* That "resolves" by a completely unreasonable and artificial assumption some of the most basic questions in this case. One should want to know whether, for example, fuel cost increases have the same effect on coal shippers in Maine as on apple shippers in California; or whether the fact that coal is extremely heavy and can't economically be shipped by trucks for long distances increases the impact of fuel price changes on rates; or whether the fact that apple shippers can use trucks decreases it. Dr. Rausser's model does not attempt to answer these questions; it *imposes* a one-size-fits-all answer that is nothing more than an *assertion* that common factors are adequate for estimating everyone's damages.

Dr. Kalt performed simple tests of this assumption and found—not surprisingly—that it is wrong. *Id.* at ¶ 127, Fig. 25.[42] When the model was no longer instructed to simply assume that the parameters (*e.g.*, supply and demand effects) are the same for all routes and commodities, over half the tested routes had "damages" parameters that were materially different from the parameter that Dr. Rausser indicates should apply to all of the tested routes. In fact, 27 of the 100 tested routes had negative overcharges, while 57 had positive overcharges (16 had insufficient data). *Id.*; Ex. 12, Kalt Merits Rep. ¶¶ 423-35 & Figs. VI-3A - 3C. This categorically proves that Dr. Rausser's assumption that changes in fuel price affect all routes

[42] *See also* Ex. 9, Carlton Merits Rep. ¶¶ 135-37 (the effect of fuel costs on rail rates "varies along the following dimensions: across the four Defendants, by type of shipment (carload, coal, or intermodal), by half-year . . . , by route length . . . , [and] by customer size").

equally is false, and that Dr. Rausser's methodology simply disregards dissimilarities among class members by homogenizing unlike experiences. This is specifically forbidden by *Wal-Mart*, 131 S. Ct. at 2561, and *Behrend*, 133 S. Ct. at 1435 n.6.

The class consists of thousands of shippers in a famously heterogeneous market that is a textbook example of "differential pricing." There are inevitably going to be individualized damages issues in that setting, and *Wal-Mart* makes it clear that "Trial by Formula" cannot deprive Defendants of the right to defend individual damages claims—dozens of which are for millions of dollars or more—with substantial, substantive individualized defenses. Imagine, for example, that General Motors were to bring its own case against UP and claim the $20 million implied by Dr. Rausser's model for UP traffic only. UP's first response would be that GM has a customized fuel surcharge formula that does not even look like the alleged conspiratorial formulas. Dating to 2001, it uses the WTI index (not the HDF index UP allegedly adopted through conspiracy), and specifies completely different triggers and slopes (a 2% surcharge at a trigger price of $37 with 2% increases for every $5 change in the WTI price), including a *negative* 2% surcharge at a WTI price of $15, with further reductions after that. Ex. 24, UPFSC0469677-711 at -710; Ex. 25, UPFSC0000079-102 at -085. UP would also likely mention that this is *General Motors,* whose bargaining power is hardly at the classwide average, particularly since trucks carry automobiles too. Plainly these factors (to name only three) have profound damages implications that would be fully considered in an individual trial. The Rausser model is blind to this—and a thousand variations on these facts in the case of other class members. It has no idea these kinds of facts even exist. The damages issues in this case have not been modeled and are too complex to model to the standards established in *Behrend.*

**CONCLUSION**

Plaintiffs' renewed motion for class certification should be denied.

Dated: March 31, 2014

Respectfully submitted,

/s/ Daniel M. Wall

Daniel M. Wall
Timothy L. O'Mara
Christopher Campbell
Connie Sardo
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 391-0600

J. Scott Ballenger (D.C. Bar No. 465252)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Telephone: (202) 637-2200

Tyrone R. Childress
David G. Meyer
JONES DAY
555 South Flower Street, 50th Floor
Los Angeles, CA 90071-2300
Telephone: (213) 489-3939

Alan M. Wiseman (D.C. Bar No. 187971)
Thomas A. Isaacson (D.C. Bar No. 376959)
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone: (202) 662-6000

*Attorneys for Defendant Union Pacific Railroad Company*

/s/ John M. Nannes

John M. Nannes (D.C. Bar No. 195966)
Tara L. Reinhart (D.C. Bar No. 462106)
Sean M. Tepe (D.C. Bar No. 1001323)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005
Telephone: (202) 371-7000

Saul P. Morgenstern
Jennifer B. Patterson
Amanda C. Croushore
KAYE SCHOLER LLP
425 Park Avenue
New York, NY 10022
Telephone: (212) 836-8000

Claudia R. Higgins (D.C. Bar No. 940288)
KAYE SCHOLER LLP
901 Fifteenth Street, NW
Washington, DC 20005
Telephone: (202) 682-3500

*Attorneys for Defendant Norfolk Southern Railway Co.*

/s/ Randy M. Mastro

Randy M. Mastro
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-4000

Theodore J. Boutros, Jr.
GIBSON, DUNN & CRUTCHER LP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000

Joshua H. Soven (D.C. Bar No. 436633)
Andrew S. Tulumello (D.C. Bar No. 468351)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 955-8500

Veronica S. Lewis
Robert C. Walters
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, TX 75201
Telephone: (214) 698-3100

Samuel M. Sipe, Jr. (D.C. Bar No. 256446)
Linda Stein (D.C. Bar No. 376217)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 429-3000

*Attorneys for Defendant BNSF Railway Company*

/s/ David D. Cross

Kent A. Gardiner (D.C. Bar No. 432081)
Kathryn D. Kirmayer (D.C. Bar No. 424699)
Shari Ross Lahlou (D.C. Bar No. 476630)
David D. Cross (D.C. Bar No. 490187)
Luke van Houwelingen (D.C. Bar No. 989950)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 624-2500

*Attorneys for Defendant CSX Transportation, Inc.*

## CERTIFICATE OF SERVICE

I, Daniel M. Wall, an attorney of record, certify that on March 31, 2014, I caused a true and correct copy of Defendants' Memorandum Of Law In Opposition To Plaintiffs' Renewed Motion For Class Certification; the Declaration of Timothy O'Mara in Support of Defendants' Memorandum Of Law In Opposition To Plaintiffs' Renewed Motion For Class Certification, and exhibits thereto; and the Declaration of Joseph P. Kalt, Ph.D. to be served by email on counsel for Plaintiffs.

/s/ Daniel M. Wall

DC\3168769

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION (NO. II)<br><br>This document relates to:<br>ALL CASES | MDL Docket No. 2925<br>Misc. No. 20-8 (BAH) |

**JOINT STATUS REPORT**

Pursuant to the Court's November 8, 2022 Minute Order, the parties respectfully submit this Joint Status Report "proposing a schedule for further proceedings, including any anticipated motions." 11/8/22 Minute Order (Paperless); *see also* 7/6/21 Mem. and Order 4-5, ECF No. 676; 1/31/23 Minute Order (Paperless) (instructing the parties "to continue filing Joint Status Reports every twelve weeks").

**I. Additional MDL II Actions**

Since the parties' October 6, 2023 Joint Status Report, ECF No. 933, no additional actions have been filed and identified as tag-along cases for potential consolidation with this MDL. Accordingly, the current number of cases in this MDL remains at 106.

**II. Status of EPIC Action**

On August 8, 2023, the Court entered a Minute Order setting forth the schedule for the completion of fact and expert discovery in *Environmental Protection & Improvement Company, LLC v. Union Pacific Railroad Company et al.* (the "EPIC Action"), No. 1:22-cv-2587 (BAH), ECF Nos. 23 & 24.[1] Consistent with the Court's Scheduling Order, the parties concluded fact

---

[1] BNSF Railway Company is not a defendant in the EPIC Action.

discovery in the EPIC Action on September 15, 2023, with the exception that EPIC agreed to revise certain responses and objections to Defendants' interrogatories in an attempt to address concerns raised by Defendants. EPIC served supplemental responses and objections to Defendants' interrogatories on October 4, 2023. Consistent with the Court's Scheduling Order, EPIC made expert disclosures on October 16, 2023. EPIC's expert is scheduled to be deposed on December 8, 2023.

Under the Court's Scheduling Order, Defendants' opposition expert disclosures are due December 11, 2023. Due to the limited time between December 8 and December 11, 2023, when Defendants' responsive expert disclosures are due, the parties agreed that Defendants can serve their opposition expert disclosures on December 13, 2023. The parties in the EPIC Action will file a stipulation and proposed order reflecting this brief extension, which will not delay the submission of the joint status report due in that case on December 22, 2023. The parties in the EPIC Action anticipate that their proposal for further proceedings in the EPIC Action will align with the schedule the Court orders in all other cases in this MDL.

### III. Status of MDL II Fact Discovery

Fact discovery ended on February 1, 2023, pursuant to the Court's November 8, 2022 Minute Order.[2] During fact discovery, Plaintiffs conducted a total of 31 depositions (twenty-four 30(b)(6) depositions and seven 30(b)(1) depositions). Defendants conducted a total of 342 depositions (twenty-four 30(b)(6) depositions and 318 30(b)(1) depositions).

---

[2] The parties have also stipulated that certain depositions may be taken after the close of fact discovery if those witnesses are relied upon by opposing parties in connection with expert reports, summary judgment, or trial. (Joint Stip. Re. Supp. Disclosures and Deferment of Witness Deps., ¶ 3, Nov. 22, 2021, Dkt. No. 751).

## IV. Status of MDL II Expert Discovery

In accord with the Court's November 8, 2022 Minute Order, Plaintiffs made expert disclosures in all actions in this MDL, with the exception of the EPIC Action, on March 1, 2023. *See* 11/8/22 Minute Order (Paperless). Plaintiffs' 5 experts served 61 reports, the vast majority of which Plaintiffs have indicated include materially identical economic opinions and methodologies. With one exception, Plaintiffs made each of their experts available for two-day depositions, and Defendants completed depositions of Plaintiffs' experts between June 12 and August 3, 2023.

Defendants served opposition expert reports from four joint experts and three individual Defendant experts on August 15, 2023, in accord with the Court's November 8, 2022 Order. *Id.* One of Defendants' experts, Avram Tucker, served a report totaling nearly 23,000 pages, including over 14,000 pages of Plaintiff-specific appendices purporting to describe the shipping experience and negotiating history of every one of the over 100 Plaintiffs.[3] With one exception, Defendants made each of their experts available for two-day depositions, and Plaintiffs completed depositions of Defendants' experts between October 12 and November 9, 2023.

Plaintiffs served reply expert reports for five experts on November 15, 2023, in accord with the Court's November 8, 2022 Order. *Id.* The parties are actively working to schedule depositions of Plaintiffs' experts and hope to have these depositions completed before the end of February 2024.

---

[3] As to Mr. Tucker, in light of the expansive nature of his report, in order to keep the deposition schedule manageable Plaintiffs agreed to proceed with the two-day deposition offered by Defendants. However, because that timeline will not allow for Plaintiffs to fully depose Mr. Tucker as to each of his over 100 Plaintiff-specific appendices, to the extent Mr. Tucker later is to testify at trial, Plaintiffs have reserved the right to seek further Plaintiff-specific depositions of Mr. Tucker prior to that trial testimony. Defendants have reserved their rights to oppose any such request.

## V. The Parties' Respective Scheduling Proposals for Further Proceedings

In the following sections, the parties provide their respective scheduling proposals for further proceedings, including any anticipated motions, for this MDL. The parties welcome an opportunity for a status conference to discuss further the remaining case schedule, should that be of use to the Court.

**Plaintiffs' Statement**

Now that expert discovery is complete (save for any rebuttal expert depositions), all that remains of MDL II is for the parties to brief any new summary judgment and *Daubert* motions not already pending in the MDL I court before Judge Friedman, after which this Court can remand individual cases to their respective transferor courts for trial and concentrate on a final pretrial process for actions remaining in this Court.

Judge Friedman's consideration in MDL I of the final phase of Defendants' § 10706 motion (which is now limited to a few dozen documents) and Defendants' motion for summary judgment on the issue of conspiracy (which is fully briefed, based on the same allegations of conspiracy as MDL II, and awaiting decision[4]) will inform any remaining summary judgment or *Daubert*

---

[4] By way of background, in MDL I, Defendants requested clarification from Judge Friedman that the summary judgment briefing be "limited to the question of whether an unlawful agreement existed," thereby "exclud[ing] injury- and causation- related issues." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, No. 1:07-mc-00489 (D.D.C.) ("MDL I"), ECF No. 1017, 4/21/2021 Defs.' Mot. to Clarify, at 2-3. Defendants had also made clear that plaintiff-specific expert work on injury (or impact) and damages was not needed for such conspiracy-related briefing. MDL I, ECF No. 1071, 1/11/2022 Order, at 3 (relying on Defendants' representation that they do not "believe that either the expert disclosures or any subsequent *Daubert* or damages-related summary judgment motions must be resolved before the Court resolves Defendants' Section 10706 Motion or any liability-related summary judgment motions."). Judge Friedman granted Defendants' request, ruling that the summary judgment briefing "shall be limited to the issue of whether the defendants conspired in violation of the antitrust laws." MDL I, ECF No. 1025, 5/7/2021 Order, at 3.

motions in this final phase of MDL II, as Plaintiffs pointed out in the October 6, 2023 Joint Status Report. ECF No. 933, 10/6/2023 Joint Status Report, at 17. Thus, Plaintiffs' proposed schedule is premised on timely decisions by Judge Friedman resolving Defendants' outstanding MDL I motions. The MDL II Plaintiffs recognize that, in ordering a further pretrial schedule in MDL II, this Court may wish to confer with Judge Friedman, especially as Judge Friedman has indicated that once he resolves the pending MDL I motions, "the matter would be transferred to Chief Judge Howell before whom related cases are pending." MDL I, ECF No. 1016, 3/30/2021 Order, at 2. The MDL I Plaintiffs will therefore provide Judge Friedman with a courtesy copy of this Joint Status Report.

Plaintiffs propose the following schedule, acknowledging that if Judge Friedman needs more time to resolve the motions pending in MDL I, this schedule may be modified accordingly. Plaintiffs are committed to moving these cases forward to resolution, with an eye toward a first wave of trials in late 2024 or early 2025.

| Date | Deadline |
|---|---|
| March 1, 2024[5] | Opening summary judgment and *Daubert* motions due on any common issues other than the existence of a conspiracy, which is fully briefed and pending determination by Judge Friedman in MDL I.[6] Judge Friedman's MDL I ruling for the MDL I Plaintiffs will resolve the issue of conspiracy for purposes of summary judgment in all MDL II cases.[7]<br><br>Opening summary judgment brief(s) shall each be collectively limited to 60 pages total for Defendants, and 60 pages total for Plaintiffs. Opening *Daubert* brief(s) shall be collectively limited to 25 pages per challenged expert total for Defendants, and 25 pages per challenged expert total for Plaintiffs. |
| May 31, 2024 | Oppositions to summary judgment and *Daubert* motions due.<br><br>Responsive summary judgment brief(s) shall each be collectively limited to 60 pages total for Defendants, and 60 pages total for Plaintiffs. Responsive *Daubert* briefs shall likewise be limited to 25 pages per challenged expert for each side. |
| July 15, 2024 | Replies in support of summary judgment and *Daubert* motions due.<br><br>Reply summary judgment brief(s) shall each be collectively limited to 30 pages total for Defendants, and 30 pages total for Plaintiffs. Reply *Daubert* briefs shall likewise be limited to 15 pages per challenged expert for each side. |

---

5 In the October 6, 2023 Joint Status Report, Plaintiffs proposed starting MDL II summary judgment and *Daubert* briefing on January 30, 2024, given that Defendants were ready to file their proposed motions by December 1, 2023. ECF No. 933, 10/6/2023 Joint Status Report, at 16. Plaintiffs remain prepared to do so. But Defendants have now raised concerns about completing summary judgment briefs while reviewing Plaintiffs' expert rebuttal reports (served on November 15, 2023) and conducting rebuttal depositions (currently being scheduled for January and early February). Plaintiffs have therefore added approximately one month to their proposed deadlines so that briefing does not begin until March 1.

6 The MDL I Plaintiffs will propose to Judge Friedman that, to the extent there are corresponding summary judgment or *Daubert* motions to be filed in MDL I, any such motions be filed on the same schedule as is set by this Court.

7 As discussed further below, to the extent not already decided by Judge Friedman in MDL I, additional common briefing could include briefing on Defendants' assertion that the conspiracy did not extend to intermodal shipments.

| Date | Deadline |
|---|---|
| August 1, 2024 | This Court to hold a case management conference on the following matters:<br><br>a. Judge Friedman's ruling on summary judgment as to conspiracy in MDL I;<br>b. To the extent it has not already occurred, the transfer of the five MDL I actions to the court in MDL II;<br>c. Completion of the MDL II pre-trial coordination of transferred actions on all common matters;<br>d. The status of any election by parties transferred into this MDL to return to their transferor jurisdictions, and/or submission of *Lexecon* waivers indicating agreement to remain in the District of Columbia for trial;<br>e. Identification of actions to proceed to trial in the District of Columbia;<br>f. Identification of the subset of cases to be tried in a first group; and<br>g. Setting (1) a trial date in late 2024 or early 2025 for the first wave of trials, subject to the Court's anticipated decisions on all pending summary judgment motions, and (2) deadlines for exchanges of witness and exhibit lists, and the filing of pre-trial motions and joint pre-trial statement. |

Plaintiffs' proposed schedule encompasses three important principles: efficiency, manageability, and finality.

**Efficiency**: Defendants propose the parties *rebrief* in MDL II summary judgment on conspiracy (what Defendants term their "*Matsushita* motion"), even though the MDL I parties briefed precisely that same issue at length in 2021, and Judge Friedman may issue a decision any day. Even if Judge Friedman does not issue opinions in the next few weeks or months, there is no need for that costly, time-consuming, and duplicative effort in MDL II, and Defendants' request for it here is contrary to their prior representations.

Among other representations, Defendants told the Court that all evidence relating to the existence of a conspiracy was developed in MDL I, and that there was no need to take any

additional discovery as to conspiracy in MDL II. ECF No. 110, 5/22/2020 Status Conf. Tr. 58:11-13 (Defendants' counsel telling this Court that MDL II Plaintiffs could not "serve any discovery targeted to the conspiracy itself; ***that's already been fully done and worked out in the first MDL***."). And Defendants have repeatedly acknowledged that the conspiracy alleged in MDL II is identical to that of MDL I. *E.g.* Ex. A, 2/14/2020 JPML Hearing Tr. 5:13-15 (When asked by the JPML whether "[t]here's no difference between" MDL I and the newly filed cases, Defendants' counsel responded: "There is no difference in terms of the claims or the Defendants in the two sets of cases. No, there isn't. To that, I think everyone agrees with that."); ECF No. 110, 5/22/2020 Status Conference Tr. 57:23-25 (Defendants' counsel noting they had "answered a lot of interrogatories about the alleged conspiracy itself [in MDL I], because it is the same conspiracy here."). This Court has likewise recognized that "discovery as to defendants' liability *which is not case-specific* was substantially completed in MDL I, and that any new discovery should presumably be limited to the issue of plaintiffs' damages claim." ECF No. 557, 3/26/2021 Tr. of Discovery Dispute 52:15-19 (emphasis added).

Moreover, Defendants apparently anticipated that their MDL I summary judgment motion as to the existence of a conspiracy would resolve issues in MDL II. Defendants told Judge Friedman that if he elected *not* to resolve certain issues in favor of deferring them to MDL II, that he should state so clearly because "[c]larity will avoid any later confusion regarding the scope of the Court's order *and Defendants' ability to raise this argument in MDL II*." MDL I, ECF No. 1061, 9/16/2021 Defs.' Reply Summ. J. Mem., at 97 (emphasis added). In other words, Defendants

recognized years ago that Judge Friedman's rulings would apply to MDL II, affecting their "ability to raise" the same summary judgment arguments here.[8]

Despite all of this, Defendants now want to refile the MDL I summary judgment briefing (amounting to nearly 420 collective pages of briefing and over 23,000 pages of exhibits) in this Court *and* file new briefs in support of those summary judgment motions addressing the exact same issue already before Judge Friedman—the existence of a conspiracy. Defendants propose more briefing on the existence of a conspiracy in MDL II (presumably in addition to thousands more exhibits), on top of what was already filed in MDL I. There is no need for that wasteful duplication.

When pressed on what they would include in these new, second round *Matsushita* motions, Defendants said they wanted to add "Plaintiff-specific" evidence to support Defendants' contention that there was no conspiracy among the Defendants. Defendants assert that they need to submit supplemental briefing regarding arguments and evidence that were purportedly "not available" to Defendants in MDL I. When pressed to explain what arguments and evidence regarding the existence of their *own* conspiracy they lacked until now, Defendants asserted that Plaintiffs have "long" contended that, as a result of the alleged conspiracy, Defendants' fuel surcharges became non-negotiable, and that Defendants now have Plaintiff-specific evidence to respond to that argument that was not previously available to them.

---

[8] Defendants also never objected when, prior to the creation of MDL II, nearly a dozen of the now-MDL II plaintiffs indicated in MDL I that they might file a supporting brief—in advance of any discovery in those newly filed cases—to oppose Defendants' summary judgment motion on the issue of conspiracy. MDL I, ECF No. 918, 12/19/2019 Order, at 2 (noting that the "related parties may wish to file briefs on the Section 10706 and liability issues but will endeavor to avoid duplicative briefing.").

As an initial matter, this is not a new argument; Defendants have been raising this argument for years:

- As Judge Friedman noted in 2017, "[D]efendants argue[d] that the transaction data indicate that defendants never achieved universal or near-universal coverage with respect to carload traffic, in part because shippers were able to negotiate discounts." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 106 (D.D.C. 2017) (finding Defendants' arguments on this point unpersuasive), *aff'd sub nom. In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619 (D.C. Cir. 2019).
- Defendants then went on to raise the argument in their MDL I summary judgment briefs that negotiations over or exceptions to their published fuel surcharges were inconsistent with the alleged conspiracy. *See, e.g.,* MDL I, ECF No. 1031, 5/14/2021 CSXT Summ. J. Mem., at 16-19 ("CSXT's Conduct After March 2003 Is Flatly Inconsistent With Plaintiffs' Conspiracy Theory . . . CSXT Continued To Significantly Discount Its Fuel Surcharge And Negotiation Alternatives As It Competed For Shippers' Business"); MDL I, ECF No. 1033, 5/14/2021 NS Summ. J. Mem., at 17-18 ("NS Created And Used Exceptions To Its Public Carload Fuel Surcharge Formula Throughout The Alleged Conspiracy Period"); MDL I, ECF No. 1034-1, 5/14/2021 Defs.' SUF, at 21-22 (Nos. 17.4, 17.5); MDL I, ECF No. 1061, 9/16/2021 Defs.' Reply, at 70-73.

Further, evidence supporting Defendants' arguments—transaction data and documents concerning negotiations over fuel surcharges, as well as internal documents about the success of Defendants' fuel surcharge programs—has always been in Defendants' possession and was requested by Plaintiffs in MDL I fact discovery. Defendants even cited evidence pertaining to

*MDL II plaintiffs* and other non-MDL I shippers in raising these arguments at summary judgment in MDL I. *See, e.g.*, MDL I, ECF No. 1031, 5/14/2021 CSXT Summ. J. Mem., at 16 n.20. Accordingly, what Defendants are describing is adding *more* of the *same types of argument and evidence* that are already part of the MDL I summary judgment motion briefing and supporting papers.

Even if Defendants were allowed to rebrief this same argument again here, those arguments would have only limited value for purposes of a motion regarding the *existence of a conspiracy*, because the arguments go at most to antitrust impact and damages, not whether there was a meeting of the minds amongst the Defendants. The *behavior* of MDL II plaintiffs—the victims of the alleged conspiracy—is not the same thing as the *collusive conduct* of the Defendants.[9]

As Judge Friedman recognized as far back as 2012, Defendants' own "executives admitted that the standard fuel surcharge program 'even if not accepted … was an effort to at least influence the discussion on ... fuel surcharge.' HD Ex. 88, Gehl Dep. at 55. In other words, the allegedly conspiratorial fuel surcharges were the starting point for negotiations." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 287 F.R.D. 1, 60–61 (D.D.C. 2012), *vacated on other grounds*, *In re Rail Freight Fuel Surcharge Antitrust Litig.* 725 F.3d 244 (D.C. Cir. 2013); *id.* at 50 ("[T]he evidence in the record makes plain, and the railroad executives themselves admitted, that during the class period defendants uniformly began their negotiations with their standard fuel surcharge program . . . .") (citing Defendant deposition testimony); *see also id.* at 58, 60.

---

9 This Court has said as much in denying the Defendants' downstream discovery request: "[P]laintiffs' activities are almost wholly irrelevant in proving or disproving the underlying charge of conspiracy against defendants, which claim must be substantiated by evidence of defendants' activities, not plaintiffs." ECF No. 557, 3/26/2021 Tr. of Discovery Dispute 69:1-6 (citing *In re Auto. Refinishing Paint Antitrust Litig.*, No. MDL 1426, 2006 WL 1479819, at *8 (E.D. Pa. May 26, 2006)).

Thus, that Defendants negotiated down from the standard fuel surcharge in some instances goes, at most, to the issue of impact and damages. *See, e.g.*, *In re High Fructose Corn Syrup Antitrust Litig*., 295 F.3d 651, 656 (7th Cir. 2002) ("The third trap is failing to distinguish between the existence of a conspiracy and its efficacy. The defendants point out that many of the actual sales of HFCS during the period of the alleged conspiracy were made at prices below the defendants' list prices, and they intimate, without quite saying outright, that therefore even a bald-faced agreement to fix list prices would not be illegal in this industry . . . . That is wrong. An agreement to fix list prices is, as the defendants' able counsel reluctantly conceded at the argument of the appeal, a per se violation of the Sherman Act even if most or for that matter all transactions occur at lower prices. Anyway sellers would not bother to fix list prices if they thought there would be no effect on transaction prices.").[10] This very issue has been briefed in MDL I. *See, e.g.,* MDL I, ECF No. 1050, 7/29/2021 Pls. Summ. J. Opp. Mem., at 118-19.

In sum, the conspiracy allegations in both MDL I and MDL II turn on *Defendants' conduct*, not Plaintiffs' conduct. At Defendants' insistence, the MDL II discovery record focused on antitrust impact and damages for the MDL II Plaintiffs, without new discovery into the existence of the conspiracy. It would make no sense to have MDL II-specific summary judgment briefing

---

[10] *See also In re Titanium Dioxide Antitrust Litig*., 959 F. Supp. 2d 799, 826 (D. Md. 2013) ("a higher list price artificially raises the starting point for negotiations, guiding actual prices higher" even where those prices diverge from the list price); *In re Industrial Diamonds Antitrust Litig.*, 167 F.R.D. 374, 383 (S.D.N.Y. 1996) ("The theory that underlies these decisions is . . . that the negotiated transaction prices would have been lower if the starting point for negotiations had been list prices set in a competitive market. Hence, if a plaintiff proves that the alleged conspiracy resulted in artificially inflated list prices, a jury could reasonably conclude that each purchaser who negotiated an individual price suffered some injury.").

on an issue already addressed in MDL I and the subject of pending summary judgment motions in that Court.

Defendants also contend that an unspecified number of other, non-*Matsushita* summary judgment motions they plan to file should remain without firm deadlines in the scheduling order until 60 days after Judge Friedman rules on the applicability of § 10706. But Defendants, even after being asked repeatedly, have been unable to provide any explanation as to how Judge Friedman's decision on § 10706 would have any impact on any of the other summary judgment motions Defendants have vaguely previewed, such as those motions regarding mileage-based fuel surcharges, CSXI liability, or "lingering effects" damages. There is no reason to think this is anything other than an effort at delay, because just two months ago Defendants told this Court they were ready to brief those motions in the absence of a decision from Judge Friedman, and asked this Court to set briefing deadlines for December 2023 through January 2024. ECF No. 933, 10/6/2023 Joint Status Report, at 7-8. Defendants' own conduct confirms that Judge Friedman's decision on § 10706 will have no bearing on these motions.

In contrast to Defendants' facially inefficient proposal, Plaintiffs propose that the parties adopt (and, if necessary for the parties' formal adoption on this docket, refile in MDL II) the MDL I summary judgment briefing and agree that any decision by Judge Friedman in MDL I extends to the MDL II cases.[11] This will prevent the parties from having to relitigate those issues and focus

---

[11] Some of this is already underway. For example, the MDL II Plaintiffs submitted standalone briefing and presented oral argument on Section 10706 before Judge Friedman, to which Defendants consented. And this Court has explained to the MDL II parties that discovery in MDL II was limited "in light of the extensive amount of discovery already produced in MDL I and the presumption that an action that stands on the shoulders of the former class American Pipe tolling will rely on the same evidence as the original suit." ECF No. 557, 3/26/2021 Hearing Tr., at 54:24-55:6.

their resources, and the Court's resources, on addressing any new summary judgment and *Daubert* motions. Those motions would be expected to address only limited issues.

Defendants claim that they need to file a *Matsushita* motion related to intermodal traffic, based on the parties' statements to Judge Friedman about whether he needed to decide if Defendants participated in a conspiracy regarding intermodal traffic in MDL I. For context, at a high level "carload" and "intermodal" are two broad categories of rail traffic, both of which Plaintiffs have alleged are subject to the same conspiracy. Defendants' MDL I summary judgment motion addressed whether there was a conspiracy affecting carload and intermodal shipments and urged Judge Friedman to rule there was not. *See*, *e.g.*, MDL I, ECF No. 1034, 5/14/2021 Defs.' Common Summ. J. Mem., at 74-80; MDL I, ECF No. 1030, 5/14/2021 BNSF Individual Summ. J. Mem., at 5-6, 14. The MDL I Plaintiffs (none of which are intermodal shippers) both argued that Judge Friedman need not resolve the issue *and* addressed the merits of Defendants' arguments. MDL I, Dkt. 1050, 7/29/2021 Pls. Opp. to Defs.' Mot. for Summ. J., at 5, 148-160. To the extent Judge Friedman does not reach the merits of Defendants' intermodal arguments in his summary judgment decision in MDL I, the MDL II Plaintiffs do not object to Defendants filing summary judgment briefing narrowly targeted to whether the alleged conspiracy reached *intermodal* traffic generally. If Judge Friedman reaches the merits of Defendants' intermodal arguments in the interim, this Court will not need to consider that limited briefing in MDL II.

Similarly, Defendants have inquired in the meet and confer process about Plaintiffs' position as to summary judgment briefing in MDL II regarding whether the alleged conspiracy extended to coal traffic. Those issues were likewise raised in the MDL I summary judgment briefs. *See, e.g.,* MDL I, ECF No. 1032, 5/14/2021 UP's Summ. J. Mem., at 13-14; MDL I, ECF No. 1050, 7/29/2021 Pls. Summ. J. Opp. Mem., at 131-133. Unless Judge Friedman expressly declines

to reach Defendants' coal-specific arguments, this Court will not need to consider that issue in MDL II. Defendants have also asked if MDL II plaintiffs would adopt summary judgment briefing as to Oxbow (a coal shipper that is not part of MDL I but that alleged the same essential conspiracy). The MDL II plaintiffs do not have access to the full Oxbow briefing and therefore could not agree to adopt it, but adopting the Oxbow briefs here is not necessary. Coal-specific arguments were already raised in the MDL I summary-judgment briefing.

**Manageability**: Plaintiffs propose a single set of summary judgment and *Daubert* deadlines, which is consistent with this Court's directive and will avoid piecemeal motion practice. Defendants ignore that just six weeks ago, this Court rejected Defendants' proposal of early summary judgment motions as to damages "in order to avoid piecemeal motion practice, conserve judicial resources, and allow the Court to evaluate all interrelated arguments contemporaneously." 10/17/2023 Minute Order. Under Plaintiffs' proposal, the Court can consider all common summary judgment and *Daubert* motions at once, before remanding individual cases for any individualized pre-trial issues in their transferor courts.[12] Plaintiffs' proposal has the added benefit of allowing the parties to ready a first wave of trials, with a select group of Plaintiffs, by the end of 2024 or early 2025.

---

[12] Defendants have indicated they plan to file Plaintiff-specific summary judgment motions regarding "legal bars to recovery," or relating to "injury, causation, or damages," but have declined to provide Plaintiffs with further detail regarding what Motions they are intending, or as to which Plaintiffs. While Plaintiffs believe *truly individualized* motions that impact only a single Plaintiff are appropriately left until later, it is difficult without more detail to assess those motions that Defendants intend to bring. In order to ensure that all common summary judgment motions are addressed within the MDL, and only individualized summary judgment motions are held over, Plaintiffs submit that the Court should require Defendants to identify all summary judgment motions they intend to file no later than January 15, 2024, identifying those that they view as common and those that are individualized. This will allow the Court and the parties to align on exactly which motions fall under each category and to avoid the possibility of holding over common summary judgment motions for post-remand disposition.

In contrast, Defendants are proposing three separate summary judgment cycles: first, relitigating summary judgment on conspiracy; second, litigating "other cross-case" summary judgment issues (some of which were identified in the parties' October 6, 2023 Joint Status Report, some of which are still undisclosed); and then third, yet-to-be specified briefing directed to individual shippers. That unnecessarily complicates and drags out the litigation, which began (in MDL I) in May 2007.

**Finality**: Plaintiffs propose a case management conference to be held next summer so the parties and the Court can discuss several important issues, including the transfer of MDL I actions to MDL II, the potential remand of cases filed outside of this District, and the selection of a first wave of cases for trial in this District.

**Defendants' Statement**

There is much on which Plaintiffs and Defendants agree. Both sides are committed to briefing summary judgment and expert-related motions in this MDL as expeditiously and efficiently as possible. And both sides have expressed a strong desire to avoid duplicative briefing by relying largely on materials filed in prior proceedings—*MDL I* for the Plaintiffs and *MDL I* and *Oxbow* for the Defendants—that are related to the existence of the conspiracy that Plaintiffs have alleged.

Nonetheless, a few important disagreements remain. Most notably, Plaintiffs have suggested that Defendants should be denied the ability to submit *any* additional briefing with respect to the central question of the existence of a price-fixing conspiracy in this MDL in light of the extant summary judgment briefing in *MDL I.* Plaintiffs advocate:

- no briefing to address how the rich record developed over the course of three years and more than 300 depositions in this MDL—a record filled with Plaintiff testimony and

documents that directly contradict their allegations in *MDL I* and this MDL—may affect their claim that a conspiracy occurred;

- no briefing to account for developments—including the *MDL I* court's anticipated ruling on 49 U.S.C. § 10706 ("Section 10706") (which may be informative to the parties and this Court in considering the evidence the MDL plaintiffs can rely upon when opposing summary judgment)—since the parties completed summary judgment briefing in *MDL I* in September of 2021; and
- potentially no briefing to account for the fact that Plaintiffs in this MDL have alleged hundreds of millions of dollars in damages for *intermodal* shipments. These intermodal shipments were subject to entirely different fuel surcharges from the carload and coal fuel surcharges at issue in *MDL I* and *Oxbow*, and which the *MDL I* plaintiffs—many of which are represented by the same counsel as Plaintiffs in this MDL—said "should be litigated in MDL II." *MDL I*, ECF No. 1050, Pls.' Opp. to Defs.' Joint and Ind. Mots. for SJ at 160 (July 29, 2021).

Plaintiffs' position is untenable and contrary to fundamental due process principles. Defendants have been accused by hundreds of individual plaintiffs in 106 separate cases in *this MDL* of conspiring to fix prices in violation of the Sherman Act. The summary judgment briefing in *MDL I* and *Oxbow* is a critical reference for those claims and a valuable way to avoid unnecessarily duplicative briefing. Indeed, it is because those briefs cover so much important ground that Defendants propose briefing summary judgment in this MDL within this District's default page limits for an ordinary motion despite the fact that this litigation involves claims brought by hundreds of individual plaintiffs, many of whom are alleging tens and even hundreds of millions of dollars in damages. But the fact that much of what this Court will have to consider

when ruling on Defendants' summary judgment motions has been addressed in the summary judgment briefing in *MDL I* and *Oxbow* does not mean that Defendants can or should be denied the right to be heard on the import of evidence developed and rulings issued after the *MDL I* briefing. Nor should Defendants be denied the opportunity to move for summary judgment on Plaintiffs' intermodal claims in this MDL in a case that, unlike *MDL I*, actually involves intermodal plaintiffs.

Consistent with that view, Defendants have proposed a schedule and briefing format which would permit the parties to efficiently address issues which lie at the heart of this MDL, informed by the important and relevant record developed in this MDL. Briefing would proceed in two phases, with overlapping briefing schedules to ensure that briefing can be completed in the most expeditious manner possible, given the breadth of the record and number of plaintiffs involved in this MDL. Defendants' proposed schedule is set forth below, as well as a discussion of the parties' respective positions on key areas of disagreement.

### A. Defendants' Scheduling Proposal

Defendants' proposed schedule is intended to ensure that the parties as quickly and efficiently as possible are able to join issue on the central question in this case: whether, as Plaintiffs allege, Defendants conspired to fix prices using rate-based fuel surcharges. This question is in many respects not a new one for the parties. In May 2021 in *MDL I*, an MDL involving claims brought exclusively by carload shippers which focused principally on Defendants' carload fuel surcharges, Defendants moved for summary judgment on claims that Defendants had engaged in a price-fixing conspiracy to impose standardized, more aggressive fuel surcharges on shippers. That same month, Defendants moved for summary judgment in *Oxbow*, a case involving claims that Defendants had conspired to fix prices through fuel surcharges brought by coal shippers,

which was principally focused on *coal* fuel surcharges—which differ in a number of material respects from carload fuel surcharges. This MDL, unlike either *MDL I* or *Oxbow*, involves claims brought by *both* coal and carload shippers, as well as intermodal shippers, which are addressed in more depth below.

Defendants' motions for summary judgment in *MDL I* and *Oxbow* rest, as they would in this case, on *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752 (1984), and *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). These landmark cases recognize that "mistaken inferences" of conspiracy from lawful conduct can harm the competitive process that antitrust law seeks to protect. *Monsanto* and *Matsushita* establish stringent standards that an antitrust conspiracy plaintiff's evidence must meet to create a triable issue of fact where (as here) an alleged conspiracy is based on circumstantial evidence and legitimate, vertical communications between or among the alleged conspirators. Under those exacting standards, Plaintiffs' claims—like the claims of the *MDL I* and *Oxbow* plaintiffs—simply cannot stand.

The first phase of Defendants' briefing schedule would principally focus on these *Monsanto/Matsushita* arguments, in order to ensure that issues which would entirely resolve all of Plaintiffs' claims are presented to the Court as quickly as possible. This portion of Defendants' proposed schedule would consist of two new motions for summary judgment, supported by limited new briefing by both sides to address matters relevant to Plaintiffs' conspiracy allegations that were not and could not be addressed in *MDL I* and *Oxbow*. *First*, is additional briefing by both sides (set to the default page limits in this District for opening, opposition, and reply briefs) that incorporates the *Monsanto/Matsushita* briefing in *MDL I* and *Oxbow* by reference and supplements those briefs to reflect new developments since they were submitted in those cases, including the significant record developed in this MDL and the MDL I court's anticipated decision on

Section 10706. *Second*, is shortened 30-page opening and opposition briefs and a 20-page reply brief addressing claims relating to intermodal shipments—shipments which were not at issue in either *MDL I* or *Oxbow* and which represent hundreds of millions of claimed damages in this MDL. Again, it is Defendants' view that these motions, if resolved in Defendants' favor, would entirely eliminate Plaintiffs' claims, thereby obviating the need for any further decisions by this Court.

The second phase of briefing would overlap the first, beginning 60 days after Defendants file their opening *Monsanto/Matsushita* briefs (and at the same time Plaintiffs file their opposition briefs concerning the *Monsanto/Matsushita* motions). It would consist of cross-case motions that would significantly narrow, but not eliminate altogether, Plaintiffs' claims in this MDL. These would include a summary judgment motion that would affect all cases and potentially pare back damages. The motion addresses an element of proof related to the scope of the alleged conspiracy that is dependent on Plaintiffs' expert testimony and analyses. The second phase also would include a motion related to the *American Pipe* issues raised in the parties' July 14 and October 6, 2023 joint status reports. Defendants would also propose both parties file any Rule 702/*Daubert* motions in this second phase of briefing.

Defendants propose deferring briefing on summary judgment motions specific to an individual shipper until the particular shipper's case is set for trial. Any such motions would seek summary judgment in part or in whole due to lack of evidence of antitrust injury or causation, or other legal impediment, based on the shipper's individualized circumstances. MDL II consists of 106 cases with hundreds of individual shippers, many seeking millions, and in some cases, several hundred millions of dollars in damages. Defendants are considering each case on its own merit, and one or more Defendants is likely to move for summary judgment against a number of individual shippers. Defendants have indicated to Plaintiffs that they are amenable to identifying

the Plaintiffs potentially subject to individual shipper motions sufficiently ahead of scheduling pre-trial activities. These individual motions may never have to be briefed, depending on how the Court rules on Defendants' *Monsanto*/*Matsushita* motions and other motions. Should they still need to be briefed following decisions on the broad motions, Defendants believe the most efficient time to do so is ahead of the specific Plaintiff's trial. Defendants therefore seek to defer filing these motions unless and until these cases are set for trial.

The below table sets forth Defendants' proposed schedule regarding the aforementioned motions:

| **Defendants' Scheduling Proposal for Dispositive Motions** | | |
|---|---|---|
| **Deadline** | **Event** | **Page Limits** |
| February 16, 2024 | Completion of depositions on Plaintiffs' expert reply reports | N/A |
| March 29, 2024 (sufficiently after expert discovery closes) or 60 days following the 10706 decision (whichever is later) | Defs.' opening *Matsushita* briefs addressing evidence and issues specific to *MDL II* | Non-intermodal brief: DDC default, i.e., 45 pages; intermodal: 30 pages |
| May 28, 2024 or 60 days after Defs.' *Matsushita* opening brief (whichever is later) | Pls.' opposition *Matsushita* brief addressing evidence and issues specific to *MDL II*<br>**<u>AND</u>**<br>Defs.' opening cross-case summary judgment, Rule 702/*Daubert*, and *American Pipe* motions<br>**<u>AND</u>**<br>Pls.' opening Rule 702/*Daubert* briefs | 45 pages for Plaintiffs' non-intermodal opposition/30 pages for Plaintiffs' intermodal opposition<br>**<u>AND</u>**<br>45 pages for each opening cross-case and Rule 702/*Daubert* motions (DDC default) |
| July 12, 2024 or 45 days after Pls.' *Matsushita* opposition brief (whichever is later) | Defs.' Reply *Matsushita* brief | 45 pages (25 non-intermodal/20 intermodal) |

| Defendants' Scheduling Proposal for Dispositive Motions | | |
|---|---|---|
| **Deadline** | **Event** | **Page Limits** |
| July 29, 2024 or 60 days after cross-case summary judgment, Rule 702/*Daubert*, and *American Pipe* opening briefs (whichever is later) | Pls.' case-cutting summary judgment, *American Pipe*, and Rule 702/*Daubert* opposition briefs<br>**AND**<br>Defs.' Rule 702/*Daubert* opposition briefs | 45 pages for each opposition |
| Early- to mid- August 2024 (at the Court's convenience) | Oral Argument re: *Matsushita* | N/A |
| September 12, 2024 or 45 days after cross-case summary judgment, *American Pipe* and Rule 702/*Daubert* opposition briefs (whichever is later) | Defs.' cross-case summary judgment, *American Pipe* and Rule 702/*Daubert* reply briefs<br>**AND**<br>Pls.' Rule 702/*Daubert* reply briefs | 25 pages for each reply |
| Early November 2024 (at the Court's convenience) | Oral Argument re: cross-case summary judgment motions and Rule 702/*Daubert* motions | N/A |
| *Defendants propose individual shipper-specific summary judgment briefing be deferred until the individual cases are scheduled for trial.* | | |

### B. The Parties' Disagreements Regarding Defendants' Proposal

#### 1. The Content of the First "Phase" of Briefing

Both Defendants and Plaintiffs agree that the briefing in *MDL I* should serve as a starting point for any briefing on Defendants' *Monsanto/Matsushita* motions in this MDL. But the parties part ways after that. Plaintiffs believe the briefing completed in *MDL I* more than two years ago should be the beginning and end of the parties' *Monsanto/Matsushita* submissions in this MDL. Defendants disagree.

a. *Briefing in MDL I and Oxbow Should Be Incorporated in this MDL.*

To start, Defendants believe both the briefing in *MDL I* and *Oxbow* should be incorporated in this MDL. Plaintiffs do not agree that the briefing in *Oxbow* should be incorporated in this MDL, for reasons not entirely clear. The parties' briefing in *MDL I* and *Oxbow* addressed different features of the same conspiracy alleged in this MDL. The *MDL I* summary judgment briefing focused principally on Defendants' carload fuel surcharges, because the *MDL I* complaints specify an agreement to fix prices using Defendants' published carload fuel surcharges and because the individual claims in *MDL I* were brought by carload shippers. The *Oxbow* briefing focused largely on UP's and BNSF's coal fuel surcharges,[13] which differ in material respects from their carload fuel surcharges, because the claims in *Oxbow* were brought by coal shippers. This MDL includes claims brought by both coal and carload shippers, so the incorporation of both sets of briefing is a sensible and economical approach that will allow Defendants to brief *Monsanto/Matsushita* motions expeditiously and efficiently while avoiding unnecessary duplication.

b. *Defendants' Summary Judgment Motions in This MDL Should be Decided Based on the Evidence Developed in This MDL.*

Defendants' summary judgment briefs in *MDL I* and *Oxbow* covered much of the necessary ground to resolve the central question in this MDL: whether Defendants conspired to fix prices via rate-based fuel surcharges on carload and coal traffic. They laid out the legal framework to be applied to Plaintiffs' purported evidence in an antitrust case like this one, which requires Plaintiffs to put forward evidence that "tends to exclude the possibility of independent action" to avoid summary judgment. *Monsanto*, 465 U.S. at 764. They also established that:

---

[13] Norfolk Southern and CSXT are not defendants in *Oxbow* and thus have not had an opportunity to address conspiracy-related issues specific to their coal shippers.

- Defendants each unilaterally adopted rate-based fuel surcharges before the alleged conspiracy, with formulas more parallel than the supposedly "conspiratorial" formulas they used after 2003 and 2004;
- Defendants each adopted default policies calling for the widespread application of fuel surcharges, and each experienced steady growth in the use of its respective fuel surcharges *before* the alleged conspiracy; and
- There is extensive, indisputable evidence of each railroad's internal and independent decision-making leading up to the allegedly conspiratorial 2003 and 2004 changes to their fuel surcharges.

*See MDL I*, ECF No. 1061, Defs' Joint Reply in Support of Defs.' Joint and Ind. Mots. for SJ (Sept. 16, 2021).

But the summary judgment briefing in those cases cannot suffice, as Plaintiffs would have this Court believe, to provide a complete presentation of Defendants' case in this MDL. That fact is entirely a function of developments which have taken place since the *MDL I* and *Oxbow* parties filed their summary judgment motions in 2021.[14]

First, and most notably, since Defendants filed their summary judgment briefs in *MDL I* and *Oxbow*, the parties in this MDL have conducted three years of fact and expert discovery. Plaintiffs suggest this fact should have no bearing on Defendants' *Monsanto/Matsushita* summary judgment motions and that the record in this MDL does not speak to the question of whether Defendants conspired to fix prices via their rate-based fuel surcharges. But a core aspect of Plaintiffs' argument that Defendants engaged in a conspiracy in *MDL I* was their allegation that there was a "sudden" change in the nature of the parties' fuel surcharge negotiations, from frequent waiver or reduction of fuel surcharges before the alleged conspiracy, *MDL I*, ECF No. 1050, Pls.' Opp. to Defs.' Joint and Ind. Mots. For SJ at 2, 17, 59, to inflexible, "now uniform" application

---

[14] For similar reasons, Plaintiffs' suggestion that any decision by the *MDL I* court should *bind* this Court is a nonstarter. *MDL I* and this MDL overlap in many important respects. But they ultimately are different MDLs, involving different shippers and different discovery records.

and "rare" negotiation of fuel surcharges during, *id.* at 39, 117; *see also id.* at 118 (claiming that, during the alleged conspiracy, "every Defendant . . . put an end to the negotiability and fierce competition over fuel surcharges that shippers previously enjoyed in 2000-2002"). Indeed, the supposed negotiation over fuel surcharges before Spring 2003, and the "end" of those negotiations afterward is a central component of *Plaintiffs*' case that a conspiracy existed.

To address this assertion, Defendants pointed to the evidence available in the *MDL I* record—including evidence concerning the five individual *MDL I* plaintiffs—about the extent of continued negotiation, discounting, and exceptions to Defendants' supposedly non-negotiable fuel surcharges during the alleged conspiracy. This included evidence, for example, that one of the *MDL I* plaintiffs was able to negotiate out of paying any fuel surcharge during that period in its master contract with CSXT in favor of an RCAF(u) escalation clause instead.

The *MDL I* plaintiffs' response was to minimize the significance of these facts, arguing that "exceptions were just that—exceptions." *Id.* at 117; *see also MDL I*, ECF No. 1050-2, Pls.' Objs. to Defs.' SOF at 280 (dismissing the *MDL I* plaintiff's master CSXT contract as just "one" contract, and a "temp[orary] eva[sion of] a conspiratorial fuel surcharge"). Now there are three additional years of discovery from 106 cases in this MDL, including roughly 350 depositions, production of tens of thousands of pages from the negotiation files, and thousands of contracts for those shippers—evidence concerning the Plaintiffs' own experiences and available only in this MDL—that speak further to that issue.[15] And the record developed in this MDL is flush with

---

[15] The parties and Court all agreed that discovery in *MDL I* should not duplicate the extensive discovery taken in *MDL I*—largely of defendants' decision- and policy-makers on issues concerning liability—and instead would focus on plaintiff-specific discovery (from both Plaintiffs and Defendants) with significance for individualized impact and damages determinations that had not occurred in *MDL I*. But that did not mean such plaintiff-specific *(cont'd)*

Plaintiffs' own testimonial admissions and documentary evidence of countless negotiations where Plaintiffs successfully negotiated contracts with no fuel surcharge or discounted fuel surcharges, among other things.[16] Plaintiffs in *MDL I* sought to minimize and downplay such evidence. Plaintiffs here ask this Court to endorse their effort to suppress any consideration of the full record of such evidence outright, shutting down Defendants' ability to subject Plaintiffs' purported conspiracy evidence to the *Monsanto/Matsushita* test that applies to their claims. This proposal is improper and fundamentally unfair. Plaintiffs' claims should and must be adjudicated based upon the entire record bearing on the central question of whether Defendants in fact conspired to impose uniform rate-based fuel surcharges.

Other developments that have occurred since the *MDL I* parties briefed their summary judgment motions in the summer of 2021, similarly warrant further explanation. For example, CSXT and NS are not parties in *Oxbow* and their conduct was not a focus of the *Oxbow* summary judgment briefing. Defendants would thus propose to address CSXT and NS's fuel surcharges on coal traffic in Defendants' proposed 45-page opening brief. The parties also anticipate that the *MDL I* court will shortly issue a decision regarding the admissibility under Section 10706 of certain evidence the *MDL I* plaintiffs relied on in their summary judgment papers that Plaintiffs in this MDL also rely on in their cases. While not binding on this Court, it may be informative, and

---

discovery could not be relevant to the question of liability; it plainly is for the reasons above, particularly given Plaintiffs' factual theory and arguments. And it certainly did not mean that where evidence developed in in this MDL is relevant to rebutting Plaintiffs' liability case, Defendants should be denied the opportunity to present that evidence.

[16] This massive record reflects, as one important example, that far from a rare and "temporary evasion" of supposedly conspiratorial fuel surcharges in a single contract, the experience of the MDL I plaintiff referred to above was shared by Plaintiffs in roughly *a third of the MDL II cases*, which negotiated major contracts with CSXT that included RCAF(u) and no fuel surcharges during the supposed conspiracy.

*Monsanto/Matsushita* briefing in this MDL would permit the parties to explain the import of that decision on the question of whether the record permits Plaintiffs' conspiracy allegations to survive summary judgment. Plaintiffs' proposal inexplicably fails to address how the *MDL I* court's forthcoming Section 10706 decision will have any bearing on summary judgment in *MDL I* or this MDL, even though that was the point of briefing the evidentiary issue at this stage.

c. *Defendants Should Be Permitted to Move for Summary Judgment on Intermodal Traffic in This MDL.*

Intermodal transportation—which involves transportation of cargo in special containers that can travel on rail, truck, barge, or ocean carrier—is distinct from the carload shipments at issue in *MDL I*. In keeping with that distinction, the *MDL I* court has noted that "[e]ach railroad [in this case] ha[d] a separate and different published fuel surcharge formula for carload and for intermodal traffic with, for example, different trigger points and different escalation points." *Rail Freight*, 292 F. Supp. 3d at 122-23. Each of those intermodal formulas was created during a period in which Plaintiffs concede no conspiracy existed. After the creation of those formulas, some of the railroads *never* changed their intermodal formulas at any point during the alleged conspiracy period, and other railroads modified their formulas at different times and in different ways from their competitors and supposed co-conspirators.

Despite these facts, and despite the fact that *MDL I includes no claims brought by intermodal shippers whatsoever*, the *MDL I* plaintiffs suggested that their alleged conspiracy reached intermodal traffic—even though such an allegation would have no impact on the *MDL I* plaintiffs themselves and even though at class certification the *MDL I* court found that the unique fuel surcharges applied to intermodal shippers were "competitively negotiated formulas established during the pre-class period." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 122-23 (D.D.C. 2017). To avoid any assertion that they had waived the argument,

Defendants in *MDL I* briefly described the undisputed evidence that showed intermodal traffic could not have been encompassed within the alleged conspiracy. At the same time, Defendants invited the *MDL I* court to leave consideration of whether the conspiracy alleged by the *MDL I* plaintiffs extended to intermodal shipments in this MDL, which *does* include claims by intermodal shippers, with damages claims potentially exceeding hundreds of millions of dollars.[17]

The *MDL I* plaintiffs were in agreement with Defendants' position, noting that there would be "ample opportunity in MDL II to address whether the conspiracy affected intermodal traffic generally" and emphasizing that "MDL II is the only appropriate forum in which to consider the conspiracy's impact on intermodal traffic." *MDL I*, ECF No. 1050, Pls. Opp. to Defs.' Joint and Ind. Mots. For SJ at 148-49 (July 29, 2021). The Plaintiffs in this MDL—many of which are represented by the same counsel as the *MDL I* plaintiffs—now take a very different position, asserting that, if the *MDL I* court decides the intermodal issue based on the parties' brief treatment of the question in *MDL I*, then Defendants should not be permitted to fully brief whether allegations that any agreement included intermodal traffic can survive the *Monsanto*/*Matsushita* test. The fact record in this MDL includes voluminous evidence directly relevant to this question that was not available in *MDL I* and, as with the more general question of conspiracy, Defendants have a right to present such evidence in a case in which the question of intermodal traffic's role in the purported conspiracy is clearly before the court.

---

[17] Intermodal plaintiffs in this MDL include: ABF Freight Systems, Inc., Central Transport International, Inc., Crowley Maritime Corp., Interdom (High Level Management), Kawasaki Kisen Kaisha, Ltd. and K Line America, Inc., Lotte Global Logistics (North America), Inc., Maersk (AP Moller), Mitsui O.S.K. Lines, Ltd., Nippon Yusen Kabushiki Kaisha and NYK Line (North America), Inc., United Parcel Service, Inc. and UPS Ground Freight, Inc., Yang Ming Marine Transport Corp. and Yang Ming (America). A number of other MDL II Plaintiffs are subject to partial summary judgment to the extent a portion of their shipments were intermodal.

* * * *

In short, Defendants seek only what fairness require, to subject allegations they have faced for more than 15 years to the scrutiny and test applicable in any such case, based on the full record of available evidence developed on those allegations. In this context, Defendants' request for limited and reasonably expeditious briefing that allows Plaintiffs' claims and request for extraordinary damages to be evaluated on that full record is surely a modest one.

**2. Timing, Sequencing and Length of Briefs**

a. *Commencement of Briefing*

Defendants' proposal contemplates that the briefing schedule in this MDL would be keyed off of a pending decision from the *MDL I* court on the Section 10706 evidentiary issue. The most efficient manner to brief summary judgment in this MDL would be to allow the parties the opportunity to address the *MDL I* court's decision when filing their *Monsanto/Matsushita* briefs before this Court.

By way of background, Plaintiffs' case is built on legitimate meetings and other communications between two Defendant railroads—predominantly one Eastern and one Western railroad—providing interline service. Interline communications are necessary (indeed, encouraged) to facilitate the efficient transportation and administration of interline railroad shipments. Congress was aware of the inherent risk that an antitrust plaintiff would take these legitimate communications and ask a factfinder to infer that there is a conspiracy. Faced with this ever-present risk, Congress enacted Section 10706 to protect interlining railroads and establish limitations on the use of interline communications in antitrust cases.

Until *MDL I*, Section 10706 had never been litigated in any court. But in 2020, Defendants moved under Section 10706 to exclude Plaintiffs' use of these legitimate interline communications to create an inference of a conspiracy. The *MDL I* court issued its first Section 10706 decision on

February 19, 2021. Given that Section 10706 can ultimately exclude Plaintiffs' chief evidence of conspiracy and the scant judicial history interpreting the statute, Defendants asked for an interlocutory appeal to the D.C. Circuit, which the *MDL I* court granted. In granting Defendants' request, the *MDL I* court recognized that "immediate appeal of these issues may materially advance the ultimate termination of this litigation" and Section 10706 "will have an impact on [n]early one hundred similar cases, with more than three hundred plaintiff entities, consolidated in *Rail Freight* MDL No. 1869 before the undersigned and in MDL No. 2952 before Chief Judge Howell . . . . ***The interpretation of Section 10706 will define the contents of the record for all these cases at the summary judgment stage, as well as at trial in those cases that proceed to trial, and it could result in vastly different possible outcomes.***" *MDL I*, ECF No. 1042 & 1043, Mem. and Order (June 15, 2021) (emphasis added; internal quotations omitted); *see also MDL I*, ECF No. 1063, Order (Oct. 20, 2021) (recognizing that ***"[a] ruling by the D.C. Circuit concerning the interpretation of 49 U.S.C. § 10706 could substantially alter the record available for summary judgment"*** and ordering the parties to retrieve from chambers the courtesy copies of the summary judgment briefs and exhibits (emphasis added)).

Before the D.C. Circuit heard Defendants' interlocutory appeal, the parties in *MDL I* and *Oxbow* completed summary judgment briefing on the question of conspiracy. Defendants' motion assumed that all of the *MDL I* plaintiffs' conspiracy evidence would be considered by the court rather than excluded under Section 10706. The *MDL I* plaintiffs' opposition did the same. Even so, Defendants' motions plainly show that the evidence relied upon by the plaintiffs in *MDL I* and *Oxbow* fails to satisfy the *Monsanto/Matsushita* test.

On May 17, 2022, the D.C. Circuit decided Defendants' appeal and remanded to the *MDL I* court for further consideration. Following remand, the *MDL I* court deferred any consideration

of Defendants' summary judgment motions until it resolves the admissibility of critical evidence under Section 10706 with the added guidance from the D.C. Circuit. *See MDL I*, ECF No. 1102, Mem. and Order (May 26, 2023) ("The Court has indicated that it will resolve the parties' dispute about which exhibits must be excluded or redacted under Title 49, Section 10706(a)(3)(B)(ii)(II) of the U.S. Code before the motions for summary judgment are addressed."); *see also MDL I*, ECF No. 1042 & 1043, Mem. and Order (June 15, 2021). If granted, even in part, Defendants' Section 10706 motion will exclude in *MDL I* the primary evidence that the MDL I and II plaintiffs have sought to use as building blocks for the alleged conspiracy. Exclusion of even a few of the documents at issue can erase what little supposed connectivity there is between Defendants' conduct and Plaintiffs' conspiracy theory, and thus further entitle Defendants to summary judgment on their *Monsanto/Matsushita* motions.

Plaintiffs have resisted Defendants' proposal of keying summary judgment briefing in this MDL off of the *MDL I* court's anticipated Section 10706 decision, expressing a desire for "dates certain" for briefing to commence in this case. But the *MDL I* court's Section 10706 decision is forthcoming, and failing to account for its timing, as Plaintiffs do, could result in a highly inefficient outcome—briefing summary judgment in this MDL and then re-briefing it once again after the *MDL I* court's Section 10706 decision is issued.

Further, even if the *MDL I* court were to issue a decision on Section 10706 tomorrow, summary judgment briefing would be premature until after expert discovery closes and Defendants are able to make use of the full fact and expert record in their arguments. Plaintiffs presumably understand this, because they moved their proposed start date for briefing from January 30, 2024 (as reflected in their October 6, 2023, filing) to March 1, 2024—though this deadline remains

unreasonable to permit Defendants to complete expert depositions and prepare their motions.[18] For these reasons, Defendants propose that their *Monsanto/Matsushita* opening briefs be due on March 29, 2024 (30-45 days after the anticipated end of expert depositions) or 60 days after the Section 10706 decision issues, whichever occurs later.

b. *Defendants Propose Motions Sequencing That is Logical and Efficient.*

Plaintiffs propose a single briefing schedule for any and all summary judgments motions brought by Defendants as well as all Rule 702/*Daubert* motions starting March 1, 2024. That schedule is inefficient and unrealistic.

*First*, as explained above, briefing should not commence until the *MDL I* court decides the Section 10706 motion in *MDL I* to avoid likely inefficiencies of getting ahead of that decision and sufficiently after the expert discovery record in this MDL has closed. *Second*, it is logical to present

---

[18] After waiting 15 years to address the lack of merit in Plaintiffs' claims, Defendants are eager to proceed and to be heard on their motions as promptly as reasonably possible. However, Plaintiffs' proposed March 1, 2024 deadline for all summary judgment and Rule 702/*Daubert* motions is unreasonable and prejudicial to Defendants given Defendants' need to depose Plaintiffs' five experts and the time required to prepare for these depositions, as well as the nature and number of the motions for which the complete expert discovery record may be implicated (including the *Matsushita/Monsanto* briefing and multiple Rule 702/*Daubert* motions). Defendants note that Plaintiffs' reply reports are not typical, narrowly focused reply reports, but instead are each similar or substantially greater in length as their opening reports. They also each include substantial additional econometric analyses, and Defendants did not receive the workpapers for those analyses until the day before Thanksgiving, such that they were unable to begin reviewing them in earnest until this week. For these reasons, Defendants have requested that Plaintiffs' experts be made available for two-day depositions. To date, Plaintiffs have declined to do so. Defendants are hopeful that this issue will be resolved without involving the Court.

Plaintiffs' recent objection to any proposal for *American Pipe* briefing that would have had them conducting expert discovery at the same time they were preparing opposition briefing only on that relatively straightforward issue stands in notable contrast to the unnecessarily abbreviated period they propose for Defendants to complete depositions of five experts and prepare several major motions. *See* 10/6/23 Joint Status Report, ECF 933 at 4.

the Court with the motions that Defendants anticipate ending these cases entirely, followed by motions that would substantially narrow many of these cases. Defendants cannot overstate the significance of their *Monsanto/Matsushita* arguments. Plaintiffs allege a convoluted theory of conspiracy built on lawful interline communications. Plaintiffs do not have evidence that "tends to exclude the possibility that" Defendants acted unilaterally. If this Court agrees, there is no need for decisions on any further motions. To get the full *Monsanto/Matsushita* briefing before the Court as quickly as possible, Defendants propose to file those briefs first, and then, 60 days later, file their additional cross-case motions.[19]

Defendants face hundreds of millions of dollars in damages on claims brought by hundreds of individual shippers in this MDL. Defendants have proposed an aggressive briefing schedule, which (i) concludes only a few months after the schedule contemplated by Plaintiffs and (ii) will permit Defendants to marshal the voluminous record in this MDL and file a number of motions that will significantly narrow the scope of this litigation.

c. *Defendants Propose Realistic Page Limits for an MDL Involving Hundreds of Individual Shippers.*

Despite the large number of cases, the scale of claimed damages, and voluminous record in this MDL, which includes lengthy reports by a significant number of experts, Defendants are prepared to expeditiously and efficiently brief their motions by utilizing joint submissions while, for each separate motion, remaining within this District's page limits for motions in individual

---

[19] To the extent that the Court agrees with Plaintiffs' proposal for a single briefing schedule, Defendants request opening briefs be due April 30, 2024, opposition briefs due July 31, 2024, and reply briefs due September 16, 2024. This schedule provides a reasonable amount of time following the close of expert discovery for the parties to prepare their opening briefs, and still concludes briefing well within 2024, and only two months after Plaintiffs' proposal. Under a single briefing schedule, Defendants still propose deferring briefing on individual shipper-specific summary judgment motions until the Plaintiff shipper's case is set for trial.

cases. But just yesterday, Plaintiffs informed Defendants they would propose special page limits across Defendants' motions, with no explanation why this District's default page limits were not appropriate or sufficient for each such motion. Plaintiffs' page limit proposal is similar to Plaintiffs' other proposals—briefing time, what part of the discovery record Defendants may rely on or not—which would improperly constrain Defendants' advocacy, now that this long-running litigation is finally at the stage where Defendants seek to test Plaintiffs' evidence (expert and otherwise) under the ordinary principles that apply in any such case. Plaintiffs' proposed limits are unnecessary and should be rejected.

d. *Defendants' Proposal for Post-Briefing Proceedings*

Given the likely significant impact of Defendants' motions and the time needed for their consideration, Defendants propose that, six weeks after oral argument on Defendants' second phase, case-cutting motions (if Defendants' *Monsanto/Matsushita* motions are denied), the parties submit a joint status report regarding (1) a plan for a sequence of initial trials to serve as Bellwethers for further proceedings and (2) a schedule for post-common issue briefing, pre-trial activities. The Plaintiffs seek to accelerate the discussion of post-briefing activities to commence on August 1, 2024, before this Court has an opportunity to assess Defendants' *Monsanto/Matsushita* briefing, or any of Defendants' other motions. Moreover, Plaintiffs seek a case management conference as the vehicle for discussion, rather than having the parties work together toward a joint proposal before involving the Court. Finally, Plaintiffs' proposed timing contemplates commencing the first trial(s) in late 2024 or early 2025 before this Court has time to give due consideration to, or rule on, Defendants' *Monsanto/Matsushita* motions. Determining which cases, if any, ought to be tried, however, necessarily depends on this Court's rulings on Defendants' summary judgment motions. Defendants respectfully submit that the most efficient and orderly process for post-common issue

motions would be to allow the parties to meet and confer and propose joint or competing proposals for how to move forward should any claims or cases survive summary judgment.

*[Signatures on following pages]*

Dated: December 1, 2023

*/s/ Tara L. Reinhart*
Tara L. Reinhart (D.C. Bar. No. 462106)
Thomas R. Gentry (D.C. Bar No. 1617060)
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005
Phone: (202) 371-7630
tara.reinhart@skadden.com
thomas.gentry@skadden.com

Ronald K. Wray II
GALLIVAN, WHITE & BOYD P.A.
55 Beattie Place, Suite 1200
Greenville, SC 29601
Phone: (864) 271-5362
rwray@GWBlawfirm.com

*Counsel for Defendant Norfolk Southern Railway Company pursuant to the Notices of Appearance entered in each case*

*/s/ Glenn D. Pomerantz*
Glenn D. Pomerantz
Kuruvilla J. Olasa
Anne K. Conley
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
Phone: (213) 683-9100
Glenn.Pomerantz@mto.com
Kuruvilla.Olasa@mto.com
Anne.Conley@mto.com

Benjamin J. Horwich
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
Phone: (415) 512-4000
Ben.Horwich@mto.com

Lauren E. Ross (D.C. Bar No. 1659620)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave., NW
Suite 500E
Washington, DC 20001-5369
Phone: (202) 220-1100
Lauren.Ross@mto.com

*/s/ Linda S. Stein*
Linda S. Stein (D.C. Bar No. 376217)
Molly Bruder Fox (D.C. Bar No. 981619)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Phone: (202) 429-3000
lstein@steptoe.com
mbfox@steptoe.com

*Counsel for Defendant BNSF Railway Company pursuant to the Notices of Appearance entered in each case*

Case 1:20-mc-00008-BAH Document 936 Filed 12/01/23 Page 38 of 50

*/s/ Juan A. Arteaga*
Kent A. Gardiner (D.C. Bar No. 432081)
Luke van Houwelingen (D.C. Bar No. 989950)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Phone: (202) 624-2500
Fax: (202) 628-5116
KGardiner@crowell.com
LvanHouwelingen@crowell.com

Juan A. Arteaga
CROWELL & MORING LLP
590 Madison Avenue, 20th Floor
New York, NY 10022
Phone: (212) 223-4000
Fax: (212) 223-4134
JArteaga@crowell.com

*/s/ Julia M.I. Holden Davis*
David M. Wells
Julia M.I. Holden Davis
Derek K. Mountford
GUNSTER, YOAKLEY & STEWART, P.A.
One Independent Drive, Suite 2300
Jacksonville, Florida 32202
Phone: (904) 354-1980
dwells@gunster.com
jholdendavis@gunster.com
dmountford@gunster.com

*Counsel for Defendant CSX Transportation, Inc. pursuant to the Notices of Appearance entered in each case*

*/s/ Tyrone R. Childress*
Tyrone R. Childress
Eric P. Enson
Kelsey S. Bryan (D.C. Bar #1034352)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071-2300
Telephone: (213) 489-3939
Facsimile: (213) 243-2589
E-mail: tchildress@jonesday.com
E-mail: epenson@jonesday.com
E-mail: kbryan@jonesday.com

John M. Majoras (D.C. Bar #474267)
JONES DAY
51 Louisiana Avenue, NW
Washington, D.C. 20001-2113
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
E-mail: jmmajoras@jonesday.com

*/s/ Timothy L. O'Mara*
Timothy L. O'Mara
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
E-mail: tim.o'mara@lw.com

Allyson M. Maltas (D.C. Bar No. 494566)
LATHAM & WATKINS, LLP
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004-1304
Telephone: (202) 637-2200
Email: allyson.maltas@lw.com

*/s/ Matthew M. Collette*
Matthew M. Collette (D.C. Bar
No. 427167)
Alethea A. Swift (D.C. Bar No. 1644929)
MASSEY & GAIL LLP
1000 Maine Ave. SW, Suite 450
Washington, DC 20024
Phone: (202) 795-3326
Fax: (312) 379-0467
mcollette@masseygail.com
aswift@masseygail.com

Leonard A. Gail
Suyash Agrawal
Christopher M. Walling
Illinois State Bar No. 6199745
Massey & Gail LLP
50 E. Washington Street, Suite 400
Chicago, IL 60602
Phone: (312) 283-1590
Fax: (312) 379-0467
lgail@masseygail.com
sagrawal@masseygail.com
cwalling@masseygail.com

*Counsel for Defendant Union Pacific Railroad Company pursuant to the Notices of Appearance entered in each case*

*/s/ Alden L. Atkins*
Craig P. Seebald (D.C. Bar No. 438968)
Alden L. Atkins (D.C. Bar No. 00393922)
Lindsey R. Vaala (D.C. Bar No. 974770)
VINSON & ELKINS LLP
2200 Pennsylvania Avenue, N.W.
Suite 500 West
Washington, DC 20037
(202) 639-6500
(202) 639-6604 (Facsimile)
cseebald@velaw.com
aatkins@velaw.com
lvaala@velaw.com

*/s/ John H. LeSeur*
John H. LeSeur (D.C. Bar No. 293357)
Frank J. Pergolizzi (D.C. Bar No. 405174)
Peter A. Pfohl (D.C. Bar No. 456854)
Daniel M. Jaffe (D.C. Bar No. 461185)
SLOVER & LOFTUS LLP
1224 Seventeenth Street NW
Washington, D.C. 20036
(202) 347-7170
(202) 347-3619 (Facsimile)
jhl@sloverandloftus.com
fjp@sloverandloftus.com
pap@sloverandloftus.com
dmj@sloverandloftus.com

*Attorneys for Plaintiffs AK Steel Corporation; Bel-Ray Company, LLC; Calumet Branded Products, LLC; Calumet Cotton Valley Refining, LLC; Calumet Dickinson Refining, LLC; Calumet Karns City Refining, LLC; Calumet Montana Refining, LLC; Calumet Operating, LLC; Calumet Princeton Refining; LLC; Calumet Refining, LLC; Calumet Shreveport Refining, LLC; Calumet Specialty Products Partners, L.P.; CF Industries, Inc.; Dairyland Power Cooperative; Dyno Nobel, Inc.; Entergy Arkansas, LLC; Entergy Louisiana, LLC; Exelon Generation Company, LLC; Kurlin Company, LLC; NorFalco LLC; NorFalco Sales; North Star*

*BlueScope Steel LLC; Steelscape, LLC; and Wisconsin Electric Power Company*


/s/ Michael D. Hausfeld
Michael D. Hausfeld
Brian A. Ratner
Sathya S. Gosselin
Melinda R. Coolidge
Swathi Bojedla
Theodore F. DiSalvo

HAUSFELD LLP
888 16th Street, NW, Suite 300
Washington, DC 20006
(202) 540-7200
mhausfeld@hausfeld.com
bratner@hausfeld.com
sgosselin@hausfeld.com
mcoolidge@hausfeld.com
sbojedla@hausfeld.com
tdisalvo@hausfeld.com


*Attorneys for American Honda Motor Co., Inc.; BMW Manufacturing Co., LLC and BMW of North America, LLC; Boise Cascade Company; Central Transport International, Inc., Central Transport, Inc., Logistics Insight Corp., and Transport Communications Systems II, L.L.C.; CONSOL Energy, Inc.; CRH Americas, Inc., Preferred Materials, Inc., Ash Grove Cement Company, The Shelly Company, Big River Industries, Inc., Oldcastle APG West, Inc., and Pennsy Supply Inc.; Crowley Maritime Corporation, Crowley Logistics, Inc., and Crowley Liner Services, Inc.; Grand River Dam Authority; J.R. Simplot Co.; Lansing Board of Water & Light; Linde AG; Praxair, Inc.; Lotte Global Logistics (North America), Inc.; Louisiana-Pacific Corporation; Lyondell Chemical Company; LyondellBasell Acetyls, LLC; Equistar Chemicals, LP; MillerCoors, LLC; Newell Recycling Southeast, LLC; Peabody Investments Corporation, Peabody Energy Corporation, Peabody Natural Resources Company, Peabody Midwest Mining LLC, Peabody Powder River Mining LLC,*


/s/ Sami H. Rashid
Sami H. Rashid
Richard I. Werder, Jr.
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
samirashid@quinnemanuel.com
rickwerder@quinnemanuel.com

Viola Trebicka
Jennifer English
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100
violatrebicka@quinnemanuel.com
jenniferenglish@quinnemanuel.com


*Attorneys for Plaintiffs Alcoa Corporation, Arconic, Inc.; Alcoa Fuels, Inc.; Alcoa Power Generating, Inc.; Eastalco Aluminum Company; Intalco Aluminum, LLC; Reynolds Metal Company; Alcoa World Alumina, LLC; Alumax Mill Products, Inc.; The Amalgamated Sugar Company, LLC; American Rock Salt Company LLC; AP Møller – Mærsk A/S; Mærsk Inc.; Maersk Line UK Limited; Axiall Corporation; Axiall, LLC; Westlake Styrene LLC; Westlake Petrochemicals LLC; Westlake Polymers LLC; Westlake Vinyls Inc.; Westlake Vinyls Company LP; WPT LLC; Westlake Longview Corporation; Westlake Management Services, Inc.; BASF Corporation; BASF Catalysts LLC; Cognis USA LLC; ProCat Testing LLC; California Steel Industries, Inc.; Campbell Soup Supply Company L.L.C.; Campbell Company of Canada; Campbell FoodService Company; Joseph*

*Peabody Coulterville Mining, LLC, Peabody Coalsales, LLC f/k/a Coalsales, LLC, Coalsales II, LLC f/k/a Peabody Coalsales Company, Peabody Coaltrade, LLC f/k/a Coaltrade, LLC and Peabody Coaltrade, Inc., Twentymile Coal, LLC f/k/a Twentymile Coal Company; American Land Holdings of Illinois, LLC; American Land Holdings of Indiana, LLC; Peabody Electricity, LLC; Roseburg Forest Products Co.; Sims Group USA Holdings Corporation (f/k/a Sims Hugo Neu Corporation), Metal Management, Inc., Simsmetal East LLC (f/k/a Sims Hugo Neu East LLC and Hugo Neu Schnitzer East), Metal Management Northeast, Inc., Metal Management Pittsburgh, Inc., SMM New England Corporation (f/k/a Metal Management Connecticut, Inc.), SMM Southeast LLC, Metal Management Midwest, Inc., Metal Management Indiana, Inc., Metal Management Ohio, Inc., Sims Southwest Corporation (f/k/a Proler Southwest LP and Proler Southwest Corporation), SMM South Corporation (f/k/a Metal Management Alabama, Inc.), Metal Management Memphis, L.L.C., Sims Group USA Corporation, Simsmetal West LLC (f/k/a Sims Hugo Neu West LLC), and Schiabo Larovo Corporation; Suzuki Motor of America, Inc., Suzuki Motor USA, LLC; TMS International, LLC; Total Petrochemicals & Refining USA, Inc.; Trammo, Inc.; Transrail, Inc.; Tropicana Products, Inc., Frito-Lay, Inc., and Bottling Group, LLC operating as Pepsi Beverages Company; U.S. Silica Co.*

<u>*/s/ William J. Blechman*</u>
Robert D. W. Landon, III
Richard Alan Arnold
William J. Blechman

*Campbell Company; CertainTeed LLC; Saint-Gobain Ceramics & Plastics, Inc.; Bird Incorporated' CertainTeed Canada, Inc.; CertainTeed Gypsum & Ceiling Manufacturing, Inc.; CertainTeed Gypsum Manufacturing, Inc.; CertainTeed Gypsum NC, Inc.; CertainTeed Gypsum West Virginia, Inc.; CertainTeed Gypsum, Inc.; CertainTeed Ceilings Corporation; CertainTeed Gypsum and Ceilings USA, Inc.; Coffeyville Resources Nitrogen Fertilizers, LLC; ConAgra Brands, Inc. f/k/a/ ConAgra Foods, Inc.; Virginia Electric and Power Company,; Dominion Energy Fuel Services, Inc.; Dominion Energy South Carolina, Inc.; Duke Energy Carolinas, LLC; Duke Energy Florida, LLC; Duke Energy Progress, LLC; Duke Energy Indiana, LLC; Duke Energy Kentucky, LLC; Duke Energy Ohio, LLC; Progress Fuels, LLC; DEGS of Narrows, LLC; Duke Energy Generation Services, Inc.; Eastman Chemical Company; Solutia Inc.; Taminco Corporation; Exxon Mobil Corporation; ExxonMobil Oil Corporation; ExxonMobil Global Services Company; Imperial Oil; Imperial Oil Limited; Canada Imperial Oil Limited; Grain Craft, Inc.; Southeastern Mills, Inc.; Hyundai Motor America, Inc.; IPSCO Tubulars Inc.; IPSCO Koppel Tubulars, LLC; IPSCO Tubulars (KY), LLC; TMK NSG, LLC; Keystone Fuels, LLC; Conemaugh Fuels, LLC; Kia Motors America, Inc.; Lafarge North America, Inc., Holcim (US) Inc.; Aggregate Industries Management, Inc.; Aggregate Industries - SWR, Inc.; Aggregate Industries Northeast Region, Inc.; Aggregate Industries - MWR, Inc.; Bardon, Inc. (dba Aggregate Industries Mid-Atlantic Region); Cement Transport, LTD; Geocycle LLC; Systech Environmental Corporation; Lafarge PNW, Inc.; Lattimore Materials Corp.; Mercedes-Benz USA, LLC; Motiva Enterprises LLC; NLMK USA, Inc.; NLMK Pennsylvania, LLC; Sharon Coating, LLC; NOVA Chemicals, Inc.; NOVA Chemicals Corporation; NOVA Chemicals (Canada) Ltd.; Old World Industries, LLC;*

Douglas H. Patton
Samuel J. Randall
Michael A. Ponzoli
Joshua B. Gray
KENNY NACHWALTER, P.A.
1441 Brickell Avenue
Suite 1100
Miami, Florida 33131
Tel: (305) 373-1000
E-mail: rlandon@knpa.com
raa@knpa.com
wblechman@knpa.com
dpatton@knpa.com
srandall@knpa.com
mponzoli@knpa.com
jgray@knpa.com

*Attorneys for Plaintiffs Cemex, Inc., Clearwater Paper Corporation, The Goodyear Tire & Rubber Company, Kraft Heinz Foods Company, Lehigh Hanson, Inc., PotlatchDeltic Corporation, Rayonier Advanced Materials Inc., Sterling Steel Company LLC., UPM-Kymmene, Inc., and Unilever ASCC AG*

*PCS Sales (USA), Inc.; Agrium (U.S.), Inc.; PCS Phosphate Company, Inc.; White Springs Agricultural Chemicals, Inc; PCS Nitrogen, Inc.; Phillips 66 Company; Shell Chemical LP, Shell Chemicals Canada (f/k/a Shell Chemicals Canada Ltd.) by its managing partner Shell Canada Ltd.; Pennzoil-Quaker State Company (formerly d/b/a SOPUS Products); Shell Trading (US) Company; Equilon Enterprises LLC (d/b/a Shell Oil Products US or SOPUS); Talen Energy Supply, LLC f/k/a PPL Energy Supply, LLC, on behalf of itself and its subsidiaries and affiliates; Talen Energy Marketing, LLC f/k/a PPL EnergyPlus, LLC; Talen Generation, LLC f/k/a PPL Generation, LLC (successor in interest to PPL Coal Supply, LLC); Talen Montana, LLC f/k/a PPL Montana, LLC; Martins Creek, LLC f/k/a PPL Martins Creek, LLC; Brunner Island, LLC f/k/a PPL Brunner Island, LLC; Montour, LLC f/k/a PPL Montour, LLC; United Parcel Service, Inc., an Ohio Corporation; UPS Ground Freight, Inc.; Vulcan Materials Company; Legacy Vulcan, LLC; Florida Rock Industries, Inc.; Atlantic Granite LLC; CalMat Co.; Vulcan Aggregates Company, LLC; Vulcan Construction Materials, LLC; Fulton Concrete Company, LLC; McCartney Construction Company, Inc.; Calhoun Asphalt Company, Inc.; Harper Brothers, LLC; Virginia Concrete Company, LLC; Azusa Rock, LLC; Triangle Rock Products, LLC; Aggregates USA, LLC; Chem-Marine Corporation of South Carolina; DMG Equipment Company, LLC; R. C. Smith Companies, LLC; Aggregates USA (Macon), LLC; Aggregates USA (Savannah), LLC; Aggregates USA (Sparta), LLC; WestRock Company; WestRock Coated Board, LLC; WestRock Virginia, LLC; WestRock Texas, L.P.; WestRock CP, LLC; WestRock Southeast, LLC; WestRock Northwest, LLC; WestRock Mill Company, LLC; WestRock – Solvay, LLC; WestRock Minnesota Corporation; WestRock Kraft Paper, LLC;*

*WestRock Container, LLC; WestRock Longview, LLC; Smurfit-Stone Container Canada Inc.; The J.M. Smucker Company; General Motors LLC; Kennecott Utah Copper LLC; and U.S. Borax Inc.*

*/s/ David C. Eddy*
David C. Eddy (DC Bar No. 250712)
Dennis J. Lynch (admitted *pro hac vice*)
Travis C. Wheeler (DC Bar No. 484023)
NEXSEN PRUET, LLC
1230 Main Street, Suite 700
Columbia, S.C. 29201
Tel: (803) 771-8900
deddy@nexsenpruet.com
dlynch@nexsenpruet.com
twheeler@nexsenpruet.com

*Attorneys for Plaintiffs Domtar Corporation; Ford Motor Company; South Carolina Public Service Authority; Anheuser-Busch, LLC; Anheuser-Busch Companies, LLC; Nestlé Purina PetCare Company; and Nestlé USA, Inc.*

*/s/ Joseph M. Vanek*
Joseph M. Vanek
David P. Germaine (admitted *pro hac vice*)
Martin Amaro (*pro hac vice* forthcoming)
SPERLING & SLATER, P.C.
55 West Monroe Street, 32nd Floor
Chicago, Illinois 60603
Tel: (312) 641-3200
Fax: (312) 641-6492
jvanek@sperling-law.com
dgermaine@sperling-law.com
mamaro@sperling-law.com

*Attorneys for Plaintiffs Kellogg Company and Mitsubishi Motors North America, Inc.*

*/s/ Adam Carlis*
Geoffrey L. Harrison
Shawn Raymond
Adam Carlis
Alexandra Foulkes Grafton
Scott T. Glass
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
(713) 651-9366
gharrison@susmangodfrey.com
sraymond@susmangodfrey.com
acarlis@susmangodfrey.com
afoulkesgrafton@susmangodfrey.com
sglass@susmangodfrey.com

Raj Mathur
SUSMAN GODFREY, L.L.P.
1301 Avenue of the Americas, 32nd Floor

*/s/ Sandra L. Brown*
Sandra L. Brown (D.C. Bar No. 452988)
David A. Wilson (D.C. Bar No. 430400)
David E. Benz (D.C. Bar No. 485868)
Joe Smith (D.C. Bar. No. 1010223)
THOMPSON HINE LLP
1919 M Street N.W. Suite 700
Washington, D.C. 20036
Tel: (202) 331-8800
Fax: (202) 331-8330
sandra.brown@thompsonhine.com
david.wilson@thompsonhine.com
david.benz@thompsonhine.com
joe.smith@thompsonhine.com

Robert F. Ware
Jennifer S. Roach
THOMPSON HINE LLP
127 Public Square, Suite 3900

New York, NY 10019
(212) 729-2051
rmathur@susmangodfrey.com

*Attorneys for Arkema Inc.; ArrMaz Products Inc.; Boise Cascade Company; CONSOL Energy, Inc.; CRH Americas, Inc., Preferred Materials, Inc., Ash Grove Cement Company, The Shelly Company, Big River Industries, Inc., Oldcastle APG West, Inc., and Pennsy Supply Inc.; Crowley Maritime Corporation, Crowley Logistics, Inc., and Crowley Liner Services, Inc.; Grand River Dam Authority; J.R. Simplot Co.; Lansing Board of Water & Light; Lotte Global Logistics (North America), Inc.; Lyondell Chemical Company; LyondellBasell Acetyls, LLC; Equistar Chemicals, LP; MillerCoors, LLC; Peabody Investments Corporation, Peabody Energy Corporation, Peabody Natural Resources Company, Peabody Midwest Mining LLC, Peabody Powder River Mining LLC, Peabody Coulterville Mining, LLC, Peabody Coalsales, LLC f/k/a Coalsales, LLC, Coalsales II, LLC f/k/a Peabody Coalsales Company, Peabody Coaltrade, LLC f/k/a Coaltrade, LLC and Peabody Coaltrade, Inc., Twentymile Coal, LLC f/k/a Twentymile Coal Company; American Land Holdings of Illinois, LLC; American Land Holdings of Indiana, LLC; Peabody Electricity, LLC; Roseburg Forest Products Co.; Sims Group USA Holdings Corporation (f/k/a Sims Hugo Neu Corporation), Metal Management, Inc., Simsmetal East LLC (f/k/a Sims Hugo Neu East LLC and Hugo Neu Schnitzer East), Metal Management Northeast, Inc., Metal Management Pittsburgh, Inc., SMM New England Corporation (f/k/a Metal Management Connecticut, Inc.), SMM Southeast LLC, Metal Management Midwest, Inc., Metal Management Indiana, Inc., Metal Management Ohio, Inc., Sims Southwest Corporation (f/k/a Proler Southwest LP and Proler Southwest Corporation), SMM South Corporation (f/k/a Metal Management Alabama, Inc.), Metal Management Memphis, L.L.C., Sims Group*

Cleveland, Ohio 44114
Tel: (216) 566-5500
Fax: (216) 566-5800
rob.ware@thompsonhine.com
jennifer.roach@thompsonhine.com

*Attorneys for Plaintiffs Alabama Power Company, Georgia Power Company and Mississippi Power Company; Northern Indiana Public Service Company LLC; and Union Electric Company d/b/a Ameren Missouri and Ameren Development Company*

*/s/ Kristopher S. Davis*______
Kristopher S. Davis (CA #193452)
George T. Caplan (CA #043821)
FAEGRE DRINKER BIDDLE & REATH LLP
1800 Century Park East, Suite 1500
Los Angeles, California 90067
Tel: (310) 203-4000
Fax: (310) 229-1285
kristopher.davis@faegredrinker.com
george.caplan@faegredrinker.com

William L. Roberts (MN # 0212763)
Jonathan W. Dettmann (MN # 0265032)
Craig S. Coleman (MN # 0325491)
FAEGRE DRINKER BIDDLE & REATH LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402
Tel: (612) 766-7000
Fax: (612) 766-1600
william.roberts@faegredrinker.com
jon.dettmann@faegredrinker.com
craig.coleman@faegredrinker.com

*Attorneys for Plaintiffs American Zinc Recycling Corp., Ascend Performance Materials Operations LLC, Ingredion Incorporated, The Heritage Group dba*

*USA Corporation, Simsmetal West LLC (f/k/a Sims Hugo Neu West LLC), and Schiabo Larovo Corporation; Suzuki Motor of America, Inc., Suzuki Motor USA, LLC; TMS International, LLC; Total Petrochemicals & Refining USA, Inc.; Trammo, Inc.; Transrail, Inc.; Tropicana Products, Inc., Frito-Lay, Inc., and Bottling Group, LLC operating as Pepsi Beverages Company; U.S. Silica Co.*

*/s/Kirk T. May*
Kirk T. May
William D. Beil
GM LAW PC
1201 Walnut, Suite 2000
Kansas City, Missouri 64106
PH: 816-471-7700
FX: 816-471-2221
Email: kirkm@ gmlawpc.com
Email: billb@ gmlawpc.com

David B. Helms
GM LAW PC
8000 Maryland Avenue, Suite 1060
Clayton, Missouri 63105
PH: 314-474-1750
FX: 816-471-2221
Email: davidh@gmlawpc.com

*Attorneys for Plaintiffs*
*Lansing Ethanol Services, LLC, et al.*

*/s/ Benjamin D. Brown*
Benjamin D. Brown (D.C. Bar. No. 495836)
Robert A. Braun (D.C. Bar No. 1023352)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue,
N.W. Fifth Floor
Washington, D.C. 20005
Tel: (202) 408-4600
bbrown@cohenmilstein.com
rbraun@cohenmilstein.com

*Attorneys for Plaintiffs Kawasaki Kisen Kaisha, Ltd., "K" Line America, Inc., Yang*

*Asphalt Refining Company, Asphalt Materials, Inc., Bituminous Materials and Supply, L.P., Emulsicoat, Inc., Laketon Refining Corporation, Heritage Environmental Services, LLC, Rineco Chemical Industries, LLC, Heritage Transport, LLC, Pizo Operating Company, LLC, and CHS Inc.*

*/s/ Eric S. Hochstadt*
David J. Lender (admitted *pro hac vice*)
Eric S. Hochstadt (admitted *pro hac vice*)
Luna Barrington (admitted *pro hac vice*)
Sarah Ryu (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Fax: (212) 310-8007
david.lender@weil.com
eric.hochstadt@weil.com
luna.barrington@weil.com
sarah.ryu@weil.com

*Attorneys for Plaintiffs Cleveland-Cliffs Steel LLC (f/k/a ArcelorMittal USA LLC) and ArcelorMittal Dofasco G.P.*

*/s/ Edward D. Hassi*
Edward D. Hassi (D.C. Bar No. 1026776)
Leah S. Martin (D.C. Bar No. 1029757)
DEBEVOISE & PLIMPTON LLP
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel: (202) 383-8000
Fax: (202) 383 8118
E-mail: thassi@debevoise.com
lmartin@debevoise.com

Michael Schaper, Esquire
DEBEVOISE & PLIMPTON LLP
919 Third Avenue

*Ming Marine Transport Corp., Yang Ming (America) Corp., Nippon Yusen Kabushiki Kaisha, NYK Line (North America) Inc., Mitsui O.S.K. Lines, Ltd., and MOLAM Legacy, Inc.*

/s/ James P. Denvir
James P. Denvir (D.C. Bar No. 284554)
Scott E. Gant (D.C. Bar No. 455392)
BOIES SCHILLER FLEXNER LLP
1401 New York Ave, NW
Washington, DC 20005
Phone 202 237 2727
Fax 202 237 6131
jdenvir@bsfllp.com
sgant@bsfllp.com

Stuart H. Singer (*pro hac vice*)
James Grippando (*pro hac vice*)
BOIES SCHILLER FLEXNER LLP
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301
Telephone: (954) 356-0011
ssinger@bsfllp.com
jgrippando@bsfllp.com

*Attorneys for Plaintiffs Domino Foods, Inc., E.I. du Pont de Nemours and Company, and The General Electric Company*

/s/ Frank M. Lowrey IV
Frank M. Lowrey IV (*pro hac vice*)
lowrey@bmelaw.com
Tiana S. Mykkeltvedt (*pro hac vice*)
mykkeltvedt@bmelaw.com
Matthew R. Sellers
sellers@bmelaw.com
BONDURANT MIXSON & ELMORE LLP
1201 West Peachtree Street, N.E., Suite 3900
Atlanta, Georgia 30309
Tel: (404) 881-4100
Fax: (404) 881-4111

New York, NY 10022
Tel: (212) 909 6000
Fax: (212) 909 6836
mschaper@debevoise.com

*Attorneys for Plaintiffs Toyota Motor Sales, U.S.A., Inc. and Toyota Canada Inc.*

/s/ Nathan P. Eimer
Nathan P. Eimer (*pro hac vice*)
Daniel D. Birk (*pro hac vice*)
Susan Razzano (*pro hac vice*)
Benjamin Waldin (D.D.C. Bar No. IL0061)
EIMER STAHL LLP
224 South Michigan Avenue
Suite 1100
Chicago, IL 60604
Telephone: (312) 660-7600
Fax: (312) 692-1718
neimer@eimerstahl.com
dbirk@eimerstahl.com
srazzano@eimerstahl.com
bwaldin@eimerstahl.com

Ryan J. Walsh (D.C. Bar No. 1029407)
EIMER STAHL LLP
10 East Doty Street
Suite 800
Madison, WI 53703
Telephone: (608) 441-5798
Fax: (608) 441-5707
Email: rwalsh@eimerstahl.com

*Attorneys for Plaintiffs The Dow Chemical Company, Union Carbide Corporation, Amerchol Corporation, Umetco Minerals Corporation, Gerdau Ameristeel Corporation, Gerdau Ameristeel US Inc., Gerdau Ameristeel Perth Amboy Inc., Gerdau Ameristeel Sayreville Inc., Chaparral Steel Company, Chaparral Steel Midlothian, LP, Chaparral (Virginia) Inc., Sheffield Steel Corporation, Gerdau Macsteel, Inc., International Paper Company, GenOn Energy Management,*

*Attorneys for Plaintiff The General Electric Company*

/s/ Michael C. Dell'Angelo
Michael C. Dell'Angelo
Michael J. Kane
H. Laddie Montague, Jr.
Michaela L. Wallin
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
mdellangelo@bm.net
mkane@bm.net
hlmontague@bm.net
mwallin@bm.net

Daniel J. Walker
BERGER MONTAGUE PC
2001 Pennsylvania Avenue, N.W., Suite 300
Washington, D.C. 20006
(202) 559-9745
dwalker@bm.net

Sophia Rios
BERGER MONTAGUE PC
401 B Street, Suite 2000
San Diego, CA 92101
Tel: (619) 489-0300
Fax: (215) 875-4604
srios@bm.net

*Attorneys for Plaintiffs High Level Management Venturers, Century Aluminum Company, Century Aluminum of Kentucky, GP, NSA, GP, Century Aluminum of West Virginia, Inc., Century Aluminum of South Carolina, Inc., Andre M. Toffel, Trustee, on behalf of New Wei, Inc., et al., jointly administered bankruptcy estates, and ABF Freight System Inc.*

*LLC, GenOn Power Midwest LP, and GenOn REMA, LLC*

/s/ Daniel B. Goldman
Daniel B. Goldman
Nathan Schwartzberg
Martin M. McSherry
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100
Fax: (212) 715-8000
dgoldman@kramerlevin.com
nschwartzberg@kramerlevin.com
mmcsherry@kramerlevin.com

*Attorneys for Plaintiffs The Procter & Gamble Company, The Procter & Gamble Distributing LLC, The Procter & Gamble Manufacturing Company, The Procter & Gamble Paper Products Company, Tronox Inc., and Tronox US Holdings Inc.*

*/s/ Leo D. Caseria*
Leo D. Caseria (DC Bar No. 1655936)
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
2099 Pennsylvania Ave., N.W., Suite 100
Washington, D.C. 20006-6801
Tel. (202) 747-1925
Fax (202) 747-1901
lcaseria@sheppardmullin.com

Helen C. Eckert
Joy O. Siu
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
Four Embarcadero Center, 17th Floor
San Francisco, CA 94111-4109
Telephone: (415) 434-9100
Facsimile: (415) 434-3947
heckert@sheppardmullin.com
jsiu@sheppardmullin.com

*Attorneys for Plaintiff CalPortland Company*

*/s/ Ronald J. Aranoff*
Ronald J. Aranoff
Fletcher W. Strong
William J. Hagan
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, NY 10110
Tel: (212) 382-3300
Fax: (212) 382-0050
raranoff@wmd-law.com
fstrong@wmd-law.com
whagan@wmd-law.com

*Attorneys for Plaintiff Air Products and Chemicals, Inc.*

*/s/ Conte C. Cicala*
Conte C. Cicala (CA Bar No. 173554)
Clyde & Co US LLP
Four Embarcadero Center, Suite 1350
San Francisco, California 94111
Telephone: (415) 365-9800
Facsimile: (415) 365-9801
conte.cicala@clydeco.us

*Attorneys for Plaintiff Mitsui O.S.K. Lines, Ltd. and MOLAM Legacy, Inc.*

Filings Results: 93 Filings

Return to Search

« ‹ 1-50 of 93 › »

| Official Filing Date | Docket Number | Filing ID | Filed For | Filing Type | Docket Title | Attachment |
|---|---|---|---|---|---|---|
| 10/6/2006 | EP_661_0 | 217761 | Agricultural Retailers Association | Comment | RAIL FUEL SURCHARGES | 217761.PDF |
| 10/4/2006 | EP_661_0 | 217748 | J B Hunt Transport Services Inc | Comment | RAIL FUEL SURCHARGES | 217748.PDF |
| 10/4/2006 | EP_661_0 | 217752 | Colorado Wheat Administrative Committee, National Association Of Wheat Growers, Washington Wheat Commission, Montana Wheat & Barley Committee, Oklahoma Wheat Commission, South Dakota Wheat Commission, Idaho Barley Commission, Nebraska Wheat Board, Texas Wheat Producers Board, Idaho Wheat Commission | Correction | RAIL FUEL SURCHARGES | 217752.pdf |
| 10/3/2006 | EP_661_0 | 217733 | Arkansas Electric Cooperative Corporation | Comment | RAIL FUEL SURCHARGES | 217733.pdf |
| 10/2/2006 | EP_661_0 | 217678 | Potlatch Forest Product Corporation | Comment | RAIL FUEL SURCHARGES | 217678.PDF |
| 10/2/2006 | EP_661_0 | 217679 | Ag Processing Inc | Comment | RAIL FUEL SURCHARGES | 217679.PDF |
| 10/2/2006 | EP_661_0 | 217680 | Occidental Chemical Corporation | Comment | RAIL FUEL SURCHARGES | 217680.PDF |
| 10/2/2006 | EP_661_0 | 217682 | Canadian National Railway Company | Comment | RAIL FUEL SURCHARGES | 217682.pdf |
| 10/2/2006 | EP_661_0 | 217684 | Escalation Consultants Inc | Comment | RAIL FUEL SURCHARGES | 217684.pdf |
| 10/2/2006 | EP_661_0 | 217685 | Cemex Inc | Comment | RAIL FUEL SURCHARGES | 217685.pdf |
| 10/2/2006 | EP_661_0 | 217686 | Idaho Power Company, Sierra Pacific Power Company, Nevada Power Company | Comment | RAIL FUEL SURCHARGES | 217686.pdf |
| 10/2/2006 | EP_661_0 | 217687 | South Carolina Electric & Gas Company | Comment | RAIL FUEL SURCHARGES | 217687.pdf |
| 10/2/2006 | EP_661_0 | 217688 | American Short Line And Regional Railroad Association | Comment | RAIL FUEL SURCHARGES | 217688.pdf |
| 10/2/2006 | EP_661_0 | 217690 | North Dakota Grain Dealers Association | Comment | RAIL FUEL SURCHARGES | 217690.pdf |
| 10/2/2006 | EP_661_0 | 217691 | Total Petrochemicals Usa, Inc. | Comment | RAIL FUEL SURCHARGES | 217691.PDF |
| 10/2/2006 | EP_661_0 | 217692 | Edison Electric Institute | Comment | RAIL FUEL SURCHARGES | 217692.PDF |
| 10/2/2006 | EP_661_0 | 217693 | American Chemistry Council | Comment | RAIL FUEL SURCHARGES | 217693.PDF |

| Official Filing Date | Docket Number | Filing ID | Filed For | Filing Type | Docket Title | Attachment |
|---|---|---|---|---|---|---|
| 10/2/2006 | EP_661_0 | 217694 | Transportation, Elevator, And Grain Merchants Association | Comment | RAIL FUEL SURCHARGES | 217694.PDF |
| 10/2/2006 | EP_661_0 | 217695 | Canadian Pacific Railway Company | Comment | RAIL FUEL SURCHARGES | 217695.PDF |
| 10/2/2006 | EP_661_0 | 217697 | U.S. Clay Producers Traffic Association, Inc. | Comment | RAIL FUEL SURCHARGES | 217697.pdf |
| 10/2/2006 | EP_661_0 | 217698 | Csx Transportation Inc | Comment | RAIL FUEL SURCHARGES | 217698.PDF |
| 10/2/2006 | EP_661_0 | 217701 | Ameren Energy Fuels And Services Company | Comment | RAIL FUEL SURCHARGES | 217701.pdf |
| 10/2/2006 | EP_661_0 | 217702 | Electric Power Supply Association | Comment | RAIL FUEL SURCHARGES | 217702.PDF |
| 10/2/2006 | EP_661_0 | 217703 | Dow Chemical Company | Comment | RAIL FUEL SURCHARGES | 217703.pdf |
| 10/2/2006 | EP_661_0 | 217704 | Cargill Incorporated | Comment | RAIL FUEL SURCHARGES | 217704.pdf |
| 10/2/2006 | EP_661_0 | 217705 | Entergy Corporation | Comment | RAIL FUEL SURCHARGES | 217705.pdf |
| 10/2/2006 | EP_661_0 | 217706 | Corn Products International, Inc. | Comment | RAIL FUEL SURCHARGES | 217706.PDF |
| 10/2/2006 | EP_661_0 | 217707 | Union Pacific Railroad Company | Comment | RAIL FUEL SURCHARGES | 217707.pdf |
| 10/2/2006 | EP_661_0 | 217708 | Aes Corporation | Comment | RAIL FUEL SURCHARGES | 217708.PDF |
| 10/2/2006 | EP_661_0 | 217709 | Bnsf Railway Company | Comment | RAIL FUEL SURCHARGES | 217709.PDF |
| 10/2/2006 | EP_661_0 | 217710 | Western Coal Traffic League | Comment | RAIL FUEL SURCHARGES | 217710.PDF |
| 10/2/2006 | EP_661_0 | 217711 | Concerned Captive Coal Shippers | Comment | RAIL FUEL SURCHARGES | 217711.PDF |
| 10/2/2006 | EP_661_0 | 217712 | Kennecott Utah Copper Corporation | Comment | RAIL FUEL SURCHARGES | 217712.PDF |
| 10/2/2006 | EP_661_0 | 217713 | National Industrial Transportation League | Comment | RAIL FUEL SURCHARGES | 217713.pdf |
| 10/2/2006 | EP_661_0 | 217714 | Association Of American Railroads | Comment | RAIL FUEL SURCHARGES | 217714.pdf |
| 10/2/2006 | EP_661_0 | 217715 | Argus Media Inc. | Comment | RAIL FUEL SURCHARGES | 217715.pdf |
| 10/2/2006 | EP_661_0 | 217716 | Fertilizer Institute | Comment | RAIL FUEL SURCHARGES | 217716.pdf |
| 10/2/2006 | EP_661_0 | 217717 | Ashta Chemicals Inc | Comment | RAIL FUEL SURCHARGES | 217717.pdf |

| Official Filing Date | Docket Number | Filing ID | Filed For | Filing Type | Docket Title | Attachment |
|---|---|---|---|---|---|---|
| 10/2/2006 | EP_661_0 | 217718 | E I Du Pont De Nemours And Company | Comment | RAIL FUEL SURCHARGES | 217718.pdf |
| 10/2/2006 | EP_661_0 | 217719 | U S Department Of Transportation | Comment | RAIL FUEL SURCHARGES | 217719.pdf |
| 10/2/2006 | EP_661_0 | 217720 | Kansas City Southern Railway Company | Comment | RAIL FUEL SURCHARGES | 217720.pdf |
| 10/2/2006 | EP_661_0 | 217721 | Norfolk Southern Railway Company | Comment | RAIL FUEL SURCHARGES | 217721.pdf |
| 10/2/2006 | EP_661_0 | 217722 | Bayer Maerialscience Llc | Support Statement | RAIL FUEL SURCHARGES | 217722.pdf |
| 10/2/2006 | EP_661_0 | 217736 | Agricultural Retailers Association | Comment | RAIL FUEL SURCHARGES | 217736.pdf |
| 9/29/2006 | EP_661_0 | 217666 | Compass Minerals | Comment | RAIL FUEL SURCHARGES | 217666.PDF |
| 9/29/2006 | EP_661_0 | 217667 | Diversified Cpc International Inc | Comment | RAIL FUEL SURCHARGES | 217667.PDF |
| 9/29/2006 | EP_661_0 | 217668 | Ups | Comment | RAIL FUEL SURCHARGES | 217668.PDF |
| 9/29/2006 | EP_661_0 | 217669 | Ioi Group-Loders Croklaan | Comment | RAIL FUEL SURCHARGES | 217669.PDF |
| 9/29/2006 | EP_661_0 | 217672 | National Grain And Feed Association | Comment | RAIL FUEL SURCHARGES | 217672.PDF |
| 9/29/2006 | EP_661_0 | 217673 | Alk Technologies, Inc. | Comment | RAIL FUEL SURCHARGES | 217673.pdf |

« ‹ 1-50 of 93 › »

Filings Results: 93 Filings

Return to Search

« ‹ 51-93 of 93 › »

| Official Filing Date | Docket Number | Filing ID | Filed For | Filing Type | Docket Title | Attachment |
|---|---|---|---|---|---|---|
| 9/29/2006 | EP_661_0 | 217674 | Westlake Chemical Corporation | Comment | RAIL FUEL SURCHARGES | 217674.pdf |
| 9/29/2006 | EP_661_0 | 217675 | Basf Corporation | Comment | RAIL FUEL SURCHARGES | 217675.pdf |
| 9/28/2006 | EP_661_0 | 217659 | Highroad Consulting, Ltd. | Comment | RAIL FUEL SURCHARGES | 217659.pdf |
| 9/28/2006 | EP_661_0 | 217661 | Illinois Brick Company | Comment | RAIL FUEL SURCHARGES | 217661.pdf |
| 9/28/2006 | EP_661_0 | 217662 | Barilla America, Inc. | Comment | RAIL FUEL SURCHARGES | 217662.pdf |
| 9/27/2006 | EP_661_0 | 217649 | Hub Group Inc | Comment | RAIL FUEL SURCHARGES | 217649.PDF |
| 9/27/2006 | EP_661_0 | 217652 | Cri/Criterion | Comment | RAIL FUEL SURCHARGES | 217652.PDF |
| 9/26/2006 | EP_661_0 | 217643 | Steel Manufacturers Association | Comment | RAIL FUEL SURCHARGES | 217643.pdf |
| 9/25/2006 | EP_661_0 | 217614 | Rosboro, Llc | Comment | RAIL FUEL SURCHARGES | 217614.PDF |
| 9/25/2006 | EP_661_0 | 217617 | Freight Resources Network, Llc | Comment | RAIL FUEL SURCHARGES | 217617.PDF |
| 9/25/2006 | EP_661_0 | 217619 | Shell Chemicals | Comment | RAIL FUEL SURCHARGES | 217619.PDF |
| 9/25/2006 | EP_661_0 | 217620 | , San Joaquin Refining Co Inc. | Comment | RAIL FUEL SURCHARGES | 217620.PDF |
| 9/25/2006 | EP_661_0 | 217621 | Goodyear Tire & Rubber Company | Comment | RAIL FUEL SURCHARGES | 217621.PDF |
| 9/25/2006 | EP_661_0 | 217622 | National Corn Growers Association | Comment | RAIL FUEL SURCHARGES | 217622.PDF |
| 9/25/2006 | EP_661_0 | 217629 | Idaho Barley Commission, Montana Wheat & Barley Committee, Oklahoma Wheat Commission, Colorado Wheat Administrative Committee, Nebraska Wheat Board, Idaho Wheat Commission, Texas Wheat Commission, National Association Of Wheat Growers, Washington Wheat Commission, South Dakota Wheat Commission | Comment | RAIL FUEL SURCHARGES | 217629.pdf |
| 9/25/2006 | EP_661_0 | 217630 | Stora Enso North America Corporation | Comment | RAIL FUEL SURCHARGES | 217630.pdf |
| 9/25/2006 | EP_661_0 | 217642 | Virginia Materials, Inc. | Comment | RAIL FUEL SURCHARGES | 217642.PDF |

| Official Filing Date | Docket Number | Filing ID | Filed For | Filing Type | Docket Title | Attachment |
|---|---|---|---|---|---|---|
| 9/22/2006 | EP_661_0 | 217605 | Roseburg Forest Products Company | Comment | RAIL FUEL SURCHARGES | 217605.pdf |
| 9/22/2006 | EP_661_0 | 217613 | Alliance Of Automobile Manufacturers | Comment | RAIL FUEL SURCHARGES | 217613.PDF |
| 9/21/2006 | EP_661_0 | 217596 | National Grain And Feed Association | Notice Of Intent To Participate (Without Comment) | RAIL FUEL SURCHARGES | 217596.PDF |
| 9/21/2006 | EP_661_0 | 217597 | Reagent Chemical & Research Inc | Comment | RAIL FUEL SURCHARGES | 217597.PDF |
| 9/20/2006 | EP_661_0 | 217586 | Csx Transportation Inc | Comment | RAIL FUEL SURCHARGES | 217586.PDF |
| 9/20/2006 | EP_661_0 | 217588 | Canadian Pacific Railway-Delaware And Hudson Railway Company-Soo Line Corp | Comment | RAIL FUEL SURCHARGES | 217588.PDF |
| 9/20/2006 | EP_661_0 | 217589 | Kansas City Southern Railway Company | Comment | RAIL FUEL SURCHARGES | 217589.PDF |
| 9/20/2006 | EP_661_0 | 217612 | North Dakota Department Of Agriculture | Comment | RAIL FUEL SURCHARGES | 217612.PDF |
| 9/19/2006 | EP_661_0 | 217572 | Afton Chemical Corporation | Comment | RAIL FUEL SURCHARGES | 217572.PDF |
| 9/11/2006 | EP_661_0 | 217532 | Huntsman Corporation | Comment | RAIL FUEL SURCHARGES | 217532.pdf |
| 9/7/2006 | EP_661_0 | 217509 | American Short Line And Regional Railroad Association | Request For Extension Of Time | RAIL FUEL SURCHARGES | 217509.pdf |
| 9/5/2006 | EP_661_0 | 217479 | Degussa Corporation | Comment | RAIL FUEL SURCHARGES | 217479.PDF |
| 9/5/2006 | EP_661_0 | 217480 | Small Railroad Business Owners Of America, Minnesota Commercial Railway Company | Comment | RAIL FUEL SURCHARGES | 217480.pdf |
| 8/31/2006 | EP_661_0 | 217417 | Canadian Wheat Board | Comment | RAIL FUEL SURCHARGES | 217417.PDF |
| 6/28/2006 | EP_661_0 | 216886 | Degussa Corporation | Comment | RAIL FUEL SURCHARGES | 216886.pdf |
| 6/21/2006 | EP_661_0 | 216823 | Arkansas Electric Cooperative Corporation | Reply | RAIL FUEL SURCHARGES | 216823.pdf |
| 6/12/2006 | EP_661_0 | 216748 | Ag Processing Inc | Letter/Telegram | RAIL FUEL SURCHARGES | 216748.pdf |
| 6/5/2006 | EP_661_0 | 216716 | Union Pacific Railroad Company | Motion For Protective Order | RAIL FUEL SURCHARGES | 216716.pdf |
| 6/5/2006 | EP_661_0 | 216717 | Union Pacific Railroad Company | Reply | RAIL FUEL SURCHARGES | 216717.pdf |
| 6/1/2006 | EP_661_0 | 216691 | National Industrial Transportation League | Letter/Telegram | RAIL FUEL SURCHARGES | 216691.pdf |
| 5/26/2006 | EP_661_0 | 216699 | North Dakota Farmers Union | Comment | RAIL FUEL SURCHARGES | 216699.pdf |

| Official Filing Date | Docket Number | Filing ID | Filed For | Filing Type | Docket Title | Attachment |
|---|---|---|---|---|---|---|
| 5/19/2006 | EP_661_0 | 216626 | North Dakota Grain Dealers Association | Comment | RAIL FUEL SURCHARGES | 216626.pdf |
| 5/15/2006 | EP_661_0 | 216548 | Arkansas Electric Cooperative Corporation | Status Report | RAIL FUEL SURCHARGES | 216548.pdf |
| 5/15/2006 | EP_661_0 | 216596 | Union Pacific Railroad Company | Oral Argument Exhibits | RAIL FUEL SURCHARGES | 216596.pdf |
| 5/10/2006 | EP_661_0 | 216525 | Consumers Energy Company | Comment | RAIL FUEL SURCHARGES | 216525.pdf |
| 5/8/2006 | EP_661_0 | 216523 | Honorable Conrad Burns | Comment | RAIL FUEL SURCHARGES | 216523.pdf |

« ‹ **51-93** of 93 › »

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE: VITAMINS ANTITRUST LITIGATION | M.D.L. No. 1285<br>Misc. No. 99-0197 (TFH) |

# EXPERT REPORT OF B. DOUGLAS BERNHEIM

**May 24, 2002**

does not raise the issues discussed in the context of the benchmark price model. Consequently, I estimated the transaction model using OLS.[156] Not surprisingly, Lasso estimates are virtually identical.

I used the estimated transaction price model in combination with the but-for benchmark price series to construct the prices that would have prevailed on individual transactions but for the cartel, and to determine the damage period for each vitamin family. The calculation of a but-for price for any given transaction proceeded in two steps. First, I computed a fitted price using the estimated coefficients of the transaction price model and the but-for benchmark prices. Second, I imputed a but-for residual to the transaction using the procedure described in the next two paragraphs. The but-for transaction price was set equal to the sum of the fitted price and the imputed but-for residual.

The estimated residual associated with each observation in the transaction price model, $\hat{\upsilon}_{ijkt}$, captures the effects on price of idiosyncratic factors associated with the transaction including (but not necessarily limited to) the identity of the customer and the nature of the relationship (and contract, if any) between the customer and the vendor at time $t$. Accordingly, one natural procedure is to use $\hat{\upsilon}_{ijkt}$ as the but-for residual.

When examining the scenario for which the cartel period coincides with the pertinent plea-era period listed in Table 2-1, the available data permitted me to improve upon the aforementioned method of estimating the but-for residual. Since transaction data are available both prior to and during the plea-era period, it is possible to evaluate the manner and extent to which the cartel may have altered the distribution of prices across transactions and customers, and to make an appropriate adjustment for these effects. Specifically, I take the distribution of residuals but for the cartel to be the same as that observed prior to the plea-era period.[157] For each observed transaction within the plea-era period and post-plea-era period, I computed the distribution of estimated residuals during the same month, as well as the position (percentile) of the residual for the observation in question within that distribution. I then found the value in the distribution

[156] Observations in the OLS regression are weighted using concentration-adjusted quantities.

[157] An examination of the transaction data reveals that there was typically a significant and persistent increase in price dispersion once prices declined upon the collapse of the cartel. As a result, it is inappropriate to infer the but-for distribution of residuals from post-conspiracy data.

For non-vitamin premix ingredients, I obtained actual transaction prices from the defendants' documents (such as the Roche ROVIS database and premix price quote worksheets).[167] For vitamin premix ingredients that are not included in the vitamin straights transaction model, I used one of the following imputation approaches. For each vitamin family and segment, I estimated a statistical relationship of the following form:

$$P_{hkt} = \tau_t + \pi_k + \varepsilon_{hkt}$$

where $P_{hkt}$ is the price for transaction $h$ involving product $k$ at time $t$, $\tau_t$ is an effect for time period $t$, $\pi_k$ is an effect for product $k$, and $\varepsilon_{hkt}$ captures all other variation. If transaction data were available for the ingredient in question, I used the estimates of the preceding equation to impute the price at each date. If no transaction data were available for the ingredient, but its concentration factor and product category were known, then I imputed its market price by adjusting the price of a comparable product based on relative concentration. In either case, I obtained the but-for ingredient price by assuming that the percent overcharge was the same as the average for comparable transactions.[168] If it is impossible to impute the missing price for some ingredient through one of these procedures, I treated the premix product as if the formula is missing.

#### *10.2.2.4 The construction of but-for premix prices*

The but-for price for each premix transaction was determined as follows. I computed a but-for par value by summing the product of physical units and corresponding but-for market prices over ingredients. Wherever possible, a vendor-and-ingredient-specific but-for market price was obtained from the vitamin straights transaction model. When the ingredient was a vitamin and the vitamin straights transaction model was inapplicable, I computed monthly but-for market prices by applying, in each month, the weighted average percentage overcharge for all products in the applicable vitamin category to the imputed actual price discussed in the previous

[167] For missing months, I imputed prices through linear interpolation between consecutive non-missing observations. After the final observation of an ingredient price and before the first observation, I assumed that the price was constant.

[168] I define comparable transactions as in Section 10.1.2.3.

section. For non-vitamin ingredients, but-for market prices were set equal to actual prices at all points in time.

Following the procedure described in Section 10.1.2, I used the estimated transaction discount model in combination with the but-for benchmark discount series to construct the discounts that would have prevailed on each individual premix transaction but for the conspiracy. The calculation of a but-for discount for any given transaction proceeded in two steps. First, I computed a fitted discount using the estimated coefficients of the transaction discount model and the but-for benchmark discounts. Second, I imputed a but-for residual to the transaction by adjusting the distribution of observed residuals during the conspiracy to match the distribution of residuals prevailing prior to the plea-era period. The but-for discount for the transaction was set equal to the sum of the fitted discount and the imputed but-for residual.

I assumed that the conspiracy first artificially reduced discounts on premix transactions no earlier than the beginning of the premix conspiracy period. I took the period of artificially reduced discounts to end when the weighted average of but-for discounts across premix products and manufacturers no longer exceeded the actual weighted average discount.

The transaction-specific but-for discount (discussed above) was applied to the but-for par value to yield a but-for price. The damage period for any particular premix product, therefore, includes all points in time at which the conspiracy either reduced the premix discount, increased the market price of an ingredient, or both. As an example, consider a premix product containing Vitamin E. Damages for this product began in January 1990 due to the artificial inflation of par value even though I assume that the conspiracy did not reduce premix discounts prior to January 1991. However, in 1990, any damages were solely attributable to the artificial inflation of par value. In 1991, damages resulted both from the inflation of par value and (potentially) from reduced discounts.

#### *10.2.2.5 Missing formulas*

When premix formulas were not available, I could not use the preceding approach to compute overcharges. Instead, I used the average overcharge in the same month for

May 23, 2002

B. Douglas Bernheim
Lewis and Virginia Eaton Professor in Economics
Stanford University

Date

**UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF KANSAS**

| | |
|---|---|
| IN RE URETHANE ANTITRUST LITIGATION | MDL 04-1616 (JWL/JPO) |
| THIS DOCUMENT RELATES TO: POLYETHER POLYOL CASES | Civil Action Nos. 08-2617, 09-2026, 10-2077 |

**REVISED EXPERT REPORT OF MATTHEW E. RAIFF, PH.D.**

**April 15, 2011**
**Revised May 13, 2011**

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE URETHANE ANTITRUST LITIGATION
MDL NO. 1616

expenses, breast cancer, prostate cancer prognosis, and crop yields.[322] It is also found in the "event study" literature,[323] the "treatment effects" literature,[324] and general counterfactual studies.[325]

(231) To calculate Plaintiffs' overcharges, I proceeded in two steps. First, I used the approach described above to construct econometric models of the prices of the three main commodity product categories purchased by Plaintiffs—i.e., TDI 80/20, polymeric MDI, and CFS polyols. Hereafter, I will refer to these three product categories collectively as "benchmark" product categories.

---

322 L. Breiman and J. H. Friedman, "Predicting Multivariate Responses in Multiple Linear Regression," *Journal of the Royal Statistical Society* 59, Series B (1997): 3–54; Philip Brown and Clive Payne, "Election Night Forecasting," *Journal of the Royal Statistical Society* 138, Series A (1975): 463–98 ; J. L. Callen, et al., "Neural Network Forecasting of Quarterly Accounting Earnings," *International Journal of Forecasting* 12, no. 4 (1996): 475–82; Bruce Cooil, Russell S.Winer, and David L. Rados, "Cross-Validation for Prediction," *Journal of Marketing Research* 24 (1987): 271–79; J.B. Copas, "Regression, Prediction and Shrinkage," *Journal of the Royal Statistical Society* 45, Series B (1983): 311; Stephen A. De Lurgio and Fred Hays, "Predicting Microloan Defaults Using Probabilistic Neural Networks," *The Credit and Financial Management Review* 8, no. 2 (2002); P. Hebel, et al., "Shrinkage Estimators Applied to Prediction of French Winter Wheat Yield," *Biometrics* 49 (1993): 281–93; J. P. Lesage and M. Magura, "Using Bayesian Techniques for Data Pooling in Regional Payroll Forecasting," *Journal of Business and Economic Statistic* 8, no. 2 (1990): 127–35; D. B. Lobell, K. N. Cahill and C. B. Field, "Weather-based Yield Forecasts Developed for 12 California Crops," *California Agriculture*, 2006, 211–15; A.W. Partin, et al., "Combination of Prostate-specific Antigen, Clinical Stage, and Gleason Score to Predict Pathological Stage of Localized Prostate Cancer: A Multi-institutional Update," *Journal of the American Medical Association* 277, no. 18 (1997): 1445–51; P. Sharma, et al., "Early Detection of Breast Cancer Based on Gene Expression Patterns in Peripheral Blood Cells," *Breast Cancer Research* 7, no. 5 (2005): R634–44; Joel H. Steckel and Wilfried R. Vanhonacker, "12 Cross-Validating Regression Models in Marketing Research," *Marketing Science*, 1993, 415–27.

323 The event study literature evaluates the effect that some given economic event has on an item of interest. For example, the difference between an actual and an estimated stock price could provide an estimate of the impact of an important news release on a stock price. For early contributions in the event study literature, see James Clay Dolley, "Characteristics and Procedure of Common Stock Split-Ups," *Harvard Business Review* 11, no. 3 (1933): 316–27; E. Fama, L. Fisher, M. Jensen, and R. Roll, "The Adjustment of Stock Prices to New Information," *International Economic Review* 10, no. 1 (1969): 1–21; Ray Ball and Philip Brown, "An Empirical Evaluation of Accounting Income Numbers," *Journal of Accounting Research*, Autumn 1968, 159–78. For a survey, see A. Craig MacKinlay, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35, no. 1 (1997): 13–39.

324 The treatment effects literature evaluates the effect that some given social policy, action, or intervention has on an item of interest. For example, randomness in military draft lottery outcomes could be used to estimate the impact of military service on post-military earnings. For a survey of treatment effect studies in labor markets, see J. Heckman, R. LaLonde, and J. Smith, "The Economics and Econometrics of Active Labor Market Programs," in *Handbook of Labor Economics* 3, ch. 31, 1865–2097 (Amsterdam: Elsevier, 1999); and J. Angrist, and Krueger, "Empirical Strategies in Labor Economics," in *Handbook of Labor Economics* 3, ch. 23, 1277–1366 (Amsterdam: Elsevier, 1999).

325 See, e.g., Alberto Abadie, and Javier Gardeazabal, "The Economic Costs of Conflict: A Case-Control Study for the Basque Country," *The American Economic Review* 93, no. 1 (2003): 113–32 (effect of terrorism on GDP), William J. Collins, "Race, Roosevelt, and Wartime Production: Fair Employment in World War II Labor Markets," *The American Economic Review* 91, no. 1. (2001): 272–86 (effect of discrimination on unemployment rates).

(232) Second, I employed regression analysis to determine the relationship between the prices of each individual product and the prices of the appropriate benchmark product category. More precisely, for each product purchased by Plaintiffs I regressed the individual transaction prices of the product on the prices of the corresponding benchmark product category—i.e., I regressed prices of TDI products on TDI 80/20 prices, the prices of MDI products on polymeric MDI prices, and the prices of polyol products on CFS polyols prices. For products whose prices exhibited a systematic relationship over time to the prices of the associated benchmark product category, I calculated overcharges by using the regression equation to estimate a but-for price for every transaction. For products whose prices did not exhibit a systematic relationship to the prices of the associated benchmark product category, I calculated overcharges based upon overcharges in comparable transactions.

(233) I relied on a two-step approach because this allows me to systematically account for the variety of products purchased and purchasing arrangements across Plaintiffs and Defendants. My two-step approach allows for the possibility that different products' prices were raised by different amounts, while at the same time making use of the common factors driving prices. The use of two-step estimation procedures is well known in the scientific literature, and it has been accepted by the federal courts.[326]

(234) The remainder of this section is organized as follows. Section 6.2 addresses my choice of the benchmark period used to estimate my model. Section 6.3 describes the supply and demand variables accounted for in my model. Section 6.4 discusses limitations of the available sales data. Section 6.5 describes how I estimated but-for prices for the benchmark product categories. Section 6.6 describes how I estimated the but-for prices for individual TDI, MDI, and polyol products. Section 6.7 presents the overcharges that I calculated.

## 6.2. Selection of the benchmark period

(235) When a benchmark period is used to estimate what prices would have prevailed in the absence of a conspiracy, careful consideration should be given to selecting a benchmark

[326] Two-step approaches like the one I adopted here were employed in *In Re Vitamins Antitrust Litigation*, in *In Re Linerboard Antitrust Litigation*, and in *In Re DRAM Antitrust Litigation*, and they were, in all cases, accepted by the courts as reliable methods. See, e.g., Expert Report of D. Bernheim at 169, 170, 180, 182, submitted on May 24, 2002, in the matter of *In Re Vitamins Antitrust Litigation*; see also *In Re DRAM Antitrust Litigation,* 608 F.Supp.2d 1166 (N. D. Cal. 2009), where Judge P.J. Hamilton ruled that "[a] two step forecasting method has been used to predict international countries' growth rates, real interest rates, GDP rates, as well as other economic factors. [. . .]. Dr. White's use of the second step, far from being undertaken in some unscientific manner, is explained as a means of *increasing* reliability." (emphasis in original)

## 6.6. Transaction-level models

(283) The second step of my analysis was to model the prices charged on individual transactions for each product at issue. The approach to calculating overcharges for a specific product depended upon whether the prices of the product exhibited a systematic relationship over time to the prices of a benchmark product.

(284) To determine whether the prices of a particular product exhibited a systematic relationship to the prices of a benchmark product category, I employed a standard regression model of the product prices' on the prices of the benchmark product category.[350] For TDI products, the price of TDI 80/20 was used as a benchmark. Similarly, the price of polymeric MDI was used as a benchmark for MDI products, and the price of CFS polyols was used as a benchmark for polyol products. For TDI/MDI blends, I selected either the TDI 80/20 price or the polymeric MDI price, as appropriate.[351]

(285) I estimated the transaction-level regression over the entire time-span, including both the conspiracy and benchmark periods, because my focus in this step was whether there was a systematic relationship between the transaction prices of a product and the prices of the relevant benchmark product category. Furthermore, because some products were only purchased over a limited period of time, I only included products with at least 20 transactions.[352]

(286) For products for which, based upon the transaction-level model, the benchmark category price accounted for at least 60% of the variation in the product prices, I employed the

---

[350] I included an additional variable for polyols that were sold by Lyondell and then by Bayer after its acquisition of Lyondell in 2000. The prices of some of these polyols fell immediately following the acquisition. I allowed the model to account for these changes in prices by including a dummy variable for the change in supplier.

[351] There were only four TDI/MDI blends at issue. For TDI/MDI blends, I used the TDI benchmark price if the blend contained mostly TDI, and the polymeric MDI benchmark price if the product contained mostly MDI. To determine the composition of each blend, I used technical data sheets and other information. As an example, according to a Huntsman internal document, HC001146268, Rubinate 9030 was obtained by mixing together 25 parts of MDI and 75 parts of TDI. As a result, I used TDI 80/20 as the benchmark price for Rubinate 9030.

[352] Prior to estimating these regressions, I first removed certain transactions from the sample set. The removed transactions included "outliers" defined as a transaction whose price does not meet both of the following conditions: (1) the unit price (per pound) must lie between 10¢ and $10, and (2) the unit price (per pound) must not be more than 25¢ apart from the corresponding product weighted median price. The exclusion of outliers is standard practice. I also excluded transactions whose reported dollar amount or quantity were either missing or not positive (indicating a return or rebate rather than a purchase) and transactions for which I could not discern the unit of measurement (e.g., pounds versus kilograms), the date of the transaction, or the identity of the purchaser. Collectively, approximately 2% of sales to Plaintiffs were excluded as a result of these criteria.

transaction-level model to calculate transaction-level overcharges. This criterion was satisfied by 93% of TDI sales, 86% of MDI sales, and 80% of polyols sales.

(287) For each product that satisfied this criterion, I used the estimated transaction-level model in combination with the but-for prices for the associated benchmark product category to construct the prices that would have prevailed on any individual transaction but for the conspiracy. The but-for price for any given transaction was obtained as the sum of two components. The first component was a fitted price, which was determined by the relationship with the benchmark product category price and the but-for benchmark product category price. The second component was an estimated residual. This was equal to the part of the individual transaction's actual price that the transaction-level model could not account for. This second part accounted for any effects not explicitly accounted for by the model, such as idiosyncratic factors' effect on price.[353] Such factors include (but are not necessarily limited to) the identity of the customer and the nature of the relationship (and contract, if any) between the customer and the vendor.

(288) For products that did not satisfy the criterion, I estimated overcharges for each transaction by identifying comparable transactions and applying their average weighted overcharges.[354] Comparable transactions were identified by matching as many as possible of the following characteristics: product category (e.g., polymeric MDI; HR flexible polyols), product family (i.e., TDI, MDI, or polyols), supplier; customer, year, and month.[355]

---

[353] See, e.g., Expert Report of D. Bernheim at 182, submitted on May 24, 2002, in the matter of *In Re Vitamins Antitrust Litigation*.

[354] I also use this approach for products that had fewer than 20 transactions, for transactions whose reported price or quantity were not positive (indicating a return or rebate rather than a purchase), and for transactions with a nonstandard unit of measurement. I did not calculate overcharges on "outlier" purchases (as defined in footnote 352), purchases missing an invoice date, and purchases with a missing purchaser.

[355] A similar approach was used to estimate overcharges for polyol sales by Lyondell in 1994, 1996, and 1997, as described in Appendix E. For these sales, Lyondell only provided data showing the quantities purchased, with no indication of the associated price or dollar amount. Adjustments also were made for certain purchases by Lubrizol of Huntsman's Rubinate 44, to account for a long-term supply contract between Lubrizol and Huntsman that apparently was in effect from January 1996 through December 2001. Because the contractual pricing terms appeared to limit the ability of the product prices to adjust with other prices, overcharges were calculated applying the average overcharge percentage from the first month of the contract, January 1996, to all purchases made from January 1996 through December 2001. This method was not used in January 2002 and after, because starting in January 2002, price adjustments corresponding to movements in other prices appear to have occurred.

May 13, 2011

Date

# Exhibit "F"

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE TFT-LCD (FLAT PANEL) ANTITRUST LITIGATION | |
| THIS DOCUMENT RELATES TO: Individual Case No. 10-cv-4945-SI<br><br>Target Corp., Sears Roebuck and Co., Kmart Corp., Old Comp Inc., Good Guys, Inc., RadioShack Corp., Newegg Inc.,<br><br>Plaintiffs,<br><br>vs.<br><br>AU Optronics Corporation, et al.,<br><br>Defendants | Master File No. 07-m-1827 SI<br><br>MDL No. 1827 |

**EXPERT REPORT OF LESLIE M. MARX, PHD, CONCERNING TARGET CORP., SEARS, ROEBUCK AND CO., KMART CORP., OLD COMP INC., GOOD GUYS, INC., RADIOSHACK CORP. AND NEWEGG INC.**

**December 15, 2011**

CONTAINS HIGHLY CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER IN IN RE TFT LCD (FLAT PANEL) ANTITRUST LITIGATION
MDL NO. 1827

**Figure 3: Overcharges and full consideration damages for the Conspiracy Period Scenario**

| Plaintiff | Preferred estimate | | | | Alternative estimate | | | |
|---|---|---|---|---|---|---|---|---|
| | Conspiracy Period Purchases | Overcharges | Full Consideration | Total Damages | Conspiracy Period Purchases | Overcharges | Full Consideration | Total Damages |
| COMPUSA | $ 4,998,500,000 | $ 174,810,000 | $ 9,200,000 | $ 184,000,000 | $ 4,976,990,000 | $ 186,830,000 | $ 9,480,000 | $ 196,310,000 |
| KMART | $ 260,830,000 | $ 6,480,000 | $ 15,110,000 | $ 21,580,000 | $ 260,830,000 | $ 6,980,000 | $ 16,880,000 | $ 23,850,000 |
| NEWEGG | $ 501,320,000 | $ 35,120,000 | $ 58,550,000 | $ 93,680,000 | $ 501,320,000 | $ 39,240,000 | $ 66,010,000 | $ 105,240,000 |
| RADIOSHACK | $ 2,865,730,000 | $ 105,100,000 | $ - | $ 105,100,000 | $ 2,865,730,000 | $ 104,400,000 | $ - | $ 104,400,000 |
| SEARS | $ 1,924,500,000 | $ 53,920,000 | $ 22,630,000 | $ 76,540,000 | $ 1,924,500,000 | $ 53,900,000 | $ 23,090,000 | $ 77,000,000 |
| TARGET | $ 1,664,610,000 | $ 87,700,000 | $ - | $ 87,700,000 | $ 1,664,610,000 | $ 83,850,000 | $ - | $ 83,850,000 |
| Total | $12,215,500,000 | $ 463,130,000 | $ 105,480,000 | $ 568,610,000 | $12,193,990,000 | $ 475,200,000 | $ 115,460,000 | $ 590,650,000 |

**Figure 4: Overcharges and full consideration damages for the Plea Period Scenario**

| Plaintiff | Preferred estimate | | | | Alternative estimate | | | |
|---|---|---|---|---|---|---|---|---|
| | Plea Period Purchases | Overcharges | Full Consideration | Total Damages | Plea Period Purchases | Overcharges | Full Consideration | Total Damages |
| COMPUSA | $ 3,643,910,000 | $ 127,050,000 | $ 3,360,000 | $ 130,410,000 | $ 3,584,000,000 | $ 137,760,000 | $ 3,890,000 | $ 141,650,000 |
| KMART | $ 261,150,000 | $ 4,860,000 | $ 14,900,000 | $ 19,760,000 | $ 261,150,000 | $ 5,270,000 | $ 16,850,000 | $ 22,130,000 |
| NEWEGG | $ 500,940,000 | $ 31,180,000 | $ 58,560,000 | $ 89,750,000 | $ 500,900,000 | $ 34,860,000 | $ 66,020,000 | $ 100,880,000 |
| RADIOSHACK | $ 2,861,930,000 | $ 80,290,000 | $ - | $ 80,290,000 | $ 2,858,030,000 | $ 79,090,000 | $ - | $ 79,090,000 |
| SEARS | $ 1,847,920,000 | $ 41,810,000 | $ 21,990,000 | $ 63,810,000 | $ 1,853,190,000 | $ 41,920,000 | $ 22,450,000 | $ 64,370,000 |
| TARGET | $ 1,668,310,000 | $ 67,410,000 | $ - | $ 67,410,000 | $ 1,668,310,000 | $ 64,250,000 | $ - | $ 64,250,000 |
| Total | $10,784,170,000 | $ 352,610,000 | $ 98,820,000 | $ 451,430,000 | $10,725,590,000 | $ 363,160,000 | $ 109,210,000 | $ 472,370,000 |

(8) Additional summaries of damages are set forth in Appendix E.

(9) The remainder of this report is organized as follows. Section II provides an overview of my qualifications. Section III sets forth the scope of my charge and the assumptions and instructions given to me by counsel. Section IV describes the materials on which I relied. Section V provides background information. Sections VI through IX describe my damage calculations.

- Sharp Corporation and Sharp Electronics Corporation (collectively, "Sharp")
- Toshiba Corporation, Toshiba America Electronic Components, Inc., Toshiba America Information Systems, Inc. and Toshiba Mobile Display Co., Ltd. (f/k/a Toshiba Matsushita Display Technology Co., Ltd. (collectively, "Toshiba")

(19) Counsel asked me to perform several calculations. First, counsel asked me to calculate the overcharges on Plaintiffs' purchases from the suppliers of LCD products listed in Appendix C, where the overcharge on any particular transaction equals the amount purchased times the difference between the price actually paid and the estimated price that would have been paid but for the alleged conspiracy.[3]

(20) Second, for purchases of LCD products in Kansas, Tennessee, and Wisconsin for which I determine that an overcharge was suffered, counsel asked me to calculate full consideration damages, which equals the cost of the LCD panels in the products.

(21) Third, counsel asked me to set forth separately the following companies' panel market shares of Plaintiffs' estimated damages: Acer Display; Advanced Display Inc. (ADI), Alps Electric Co., Ltd.; AUO; Chi Mei; Chunghwa; Epson; HannStar; Hitachi; Hydis Technologies Co., Ltd. f/k/a BOE Hydis Technology Co., Ltd.; ID Tech; Innolux Display Corporation; IPS Alpha Technology, Ltd.; Koninklijke Philips Electronics N.V. (a/k/a Royal Philips Electronics N.V.); LG Display; LG Electronics; LG Innotek; Matsushita Electric Industry; Mitsubishi Electronics Corporation; Mitsui & Co., Ltd.; Mitsui & Co. (Taiwan) Ltd.; Mitsui & Co. (U.S.A.), Inc.; NEC Corporation; NEC Corporation of America; NEC Display Solutions of America, Inc.; NEC Electronics America, Inc.; NEC LCD Technologies, Ltd.; Optrex Corporation; Panasonic Corporation and Panasonic Corporation of North America (f/k/a Matsushita Electric Corporation of America); Philips Electronics North America Corporation; Quanta Display, Inc.; Samsung SEC; Samsung SDI Co., Ltd. and Samsung SDI America, Inc.; Sanyo Consumer Electronics Co., Ltd. (f/k/a Tottori Sanyo Electric Co.); Seiko Epson Corporation; Sharp; Toppoly Optoelectronics Corp.; Toshiba; and Unipac Optoelectronics. It is my understanding that these suppliers are alleged to have participated in the alleged conspiracy, and that the Court has not yet determined the extent of Defendants' liability for damages arising from purchases of LCD products containing LCD panels manufactured by other suppliers.

(22) Fourth, counsel asked me to set forth separately Samsung SEC's panel market share of Plaintiffs' estimated damages.

[3] Plaintiffs allege violations of the antitrust laws of 17 states: Arizona, California, Florida, Illinois, Iowa, Kansas, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, Tennessee, and Wisconsin. It is my understanding that the Court has not yet determined the extent to which Plaintiffs' purchases are actionable under these state laws. Once a determination is made, it will be straightforward to summarize my calculations of Plaintiffs' damages for purchases determined to be relevant.

**Figure 6. Summary of pass-through results: variation within products across time**




Source: Motorola cost data and plaintiff purchase data.

## VI.C. Overcharge calculations

(64) The starting points for my overcharge calculation are: (1) Professor Bernheim's estimate of monthly dollar overcharges for LCD panels of different sizes and applications; and (2) a 100% pass-through rate to Plaintiffs. I calculate overcharges using two methods.

(65) In the first method, I account for the fact that prices paid for LCD products sometimes are observed to be constant for significant periods of time. In such cases, there is the possibility that the price was set, explicitly or implicitly, in the first month, and therefore that the overcharge in the first month is the more appropriate choice to apply in subsequent months in which the price did not change. In these cases, I apply the monthly overcharge applicable in the first month to all subsequent months in which the price of the LCD product remains constant. When the price of the LCD product moves, I calculate a new overcharge. Given that contracts potentially fix the price for transactions that took place over multiple months, this approach implicitly incorporates certain lags of panel prices. As an example, suppose that a Plaintiff purchased a total of 1,000 15" LCD monitors from a particular supplier in June, July, and August 2004, where the price paid was the same in each month, and suppose that the per-panel overcharge on 15" LCD monitor panels in June 2004 was $50. The overcharge is calculated as:

$50 (the per-panel overcharge in June 2004)

times 100% (the pass-through rate)

times 1,000 (the number of monitors purchased in June, July, and August 2004)

equals $50,000

(66) In the second method, I calculate overcharges on a month-by-month basis, applying a two-month lag between the time that an LCD panel was purchased by a manufacturer of an LCD product, and the corresponding sale of the LCD product to a Plaintiff.[7] To accomplish this, I multiply the number of units of an LCD product purchased in a given month by the corresponding average monthly overcharge two months prior for the LCD panel contained in the LCD product. As an example, suppose that a Plaintiff purchased 1,000 15" LCD monitors in June 2004, and the per-panel overcharge on 15" LCD monitor panels in April 2004 was $50. The overcharge is calculated as:

$50 (the per-panel overcharge in April 2004)

times 100% (the pass-through rate)

times 1,000 (the number of monitors purchased in June 2004)

equals $50,000

(67) These calculations are straightforward in the vast majority of cases. In some cases, though, the data is incomplete, as is routine. For LCD products with a known panel size where the data do not contain a market price for the pertinent LCD panel in the pertinent month, I use prices for the adjacent time periods or adjacent panel sizes (in both instances selecting the more conservative alternative). For LCD products where the size of the panel used in the LCD product is not reported, I use the price of the least expensive panel purchased by the buyer at that time.

[7] *See* Deposition of J. Pan (Mar. 9, 2009) at 131–2 (two to three month lag between the time that AUO ships a panel and the time that a customer purchases an LCD product containing the panel, with a possibly longer lag for TVs); Deposition of M. Yokota (Mar. 11, 2009) at 152 (one to two month lag between the time acquisition of an LCD panel by Sharp and the time of sale); SS-LCD Meeting (Feb. 24, 2003), GRNE0250957, 957–63 (panel price changes affect retail prices two to three months later).

(68) My estimates are summarized in Figure 1 and Figure 2 above. Additional, Plaintiff-specific estimates are available in Appendix E.

## VII. Full consideration damages

(69) Counsel asked me to calculate full consideration damages for purchases of LCD products in Kansas, Tennessee, and Wisconsin for which I determine that an overcharge was suffered, where the full consideration paid equals the cost of the LCD panels in the LCD products. To identify purchases made in Kansas, Tennessee, or Wisconsin, I use the shipped-to and billed-to fields in the transactional databases which I was provided.[8] To determine whether an overcharge was suffered on a particular transaction, I relied upon my overcharge calculations, described above.

(70) I measure the full consideration paid for a LCD product in a given month using Professor Bernheim's estimate of the average sales price for the LCD panel contained in the product, lagged two months. My estimates are summarized in Figures 3 and 4 above.

[8] It is my understanding that the Court has not yet determined the extent to which such purchases are actionable under these state laws. Once a determination is made, it will be straightforward to summarize my calculations of Plaintiffs' damages for purchases determined to be relevant.

# VIII. Adjustment for panels supplied by alleged conspirators

(71) Counsel asked me to set forth separately panel market shares of estimated damages on Plaintiffs' purchases for the alleged conspirators listed in paragraph 21 above.

(72) To calculate panel market shares, I use data from DisplaySearch, an authoritative source of data for the LCD industry.[9] This database contains panel maker sales revenues and quantities by application, technology, size, year, and quarter from the fourth quarter of 1999 through the second quarter of 2011. For TVs, notebooks, and monitors, the data are available for the entire time period. For several of the small panel applications, the data are available beginning at some later point during the Conspiracy Period.

(73) I calculate the alleged conspirators' market shares for each application, quarter, and year in the DisplaySearch data. For any applications where I observe a purchase of an LCD product but no panel sales in the DisplaySearch data, I apply the alleged conspirators' market share in the closest succeeding period. For example, if no data are available in the DisplaySearch database for mobile phones in 2000 Q1, I use the 2000 Q2 data. If 2000 Q2 data also is not available, I use the 2000 Q3 data and so forth. The results of my calculations are shown on Figure 7 and Figure 8.

**Figure 7: Alleged conspirators' panel market share of overcharges in the Conspiracy Period Scenario**

| Plaintiff | Preferred estimate | | | Alternative estimate | | |
|---|---|---|---|---|---|---|
| | Conspiracy Period Purchases | Overcharges | % | Conspiracy Period Purchases | Overcharges | % |
| COMPUSA | $ 4,577,500,000 | $ 167,420,000 | 3.7% | $ 4,557,240,000 | $ 179,280,000 | 4.0% |
| KMART | $ 187,940,000 | $ 8,420,000 | 4.5% | $ 188,850,000 | $ 9,110,000 | 5.0% |
| NEWEGG | $ 490,560,000 | $ 49,750,000 | 10.1% | $ 490,340,000 | $ 56,020,000 | 11.0% |
| RADIOSHACK | $ 2,612,750,000 | $ 97,910,000 | 3.7% | $ 2,606,330,000 | $ 97,080,000 | 4.0% |
| SEARS | $ 1,364,680,000 | $ 47,130,000 | 3.5% | $ 1,374,120,000 | $ 47,920,000 | 3.0% |
| TARGET | $ 1,152,350,000 | $ 65,990,000 | 5.7% | $ 1,153,670,000 | $ 63,570,000 | 6.0% |
| **Total** | **$ 10,385,770,000** | **$ 436,620,000** | **4.2%** | **$ 10,370,550,000** | **$ 452,970,000** | **4.4%** |

[9] Disp_LCD-000001. The data available to me generally did not identify the manufacturers of LCD panels contained in specific LCD products. It appears that, at least during the Conspiracy Period, only a few suppliers or buyers of LCD products maintained this kind of information in the ordinary course of business. *See*, e.g., Declaration of Chris White, Senior Director of Product Marketing, US for Acer America Corporation; Declaration of William Brinkerhoff, Manager, CS&S, for Gateway, Inc.; Declaration of Antoine Simonnet, Vice President of Notebook Global Business Unit Supply Chain for Hewlett-Packard Company; Declaration of Arthur B. Moore, Vice President, Chief Counsel for Westinghouse Digital, LLC.

**Figure 8: Alleged conspirators' panel market share of overcharges in the Plea Period Scenario**

| Plaintiff | Preferred estimate | | | Alternative estimate | | |
|---|---|---|---|---|---|---|
| | Plea Period Purchases | Overcharges | % | Plea Period Purchases | Overcharges | % |
| COMPUSA | $ 3,355,040,000 | $ 122,860,000 | 3.7% | $ 3,298,750,000 | $ 133,540,000 | 4.0% |
| KMART | $ 188,000,000 | $ 6,510,000 | 3.5% | $ 188,920,000 | $ 7,100,000 | 4.0% |
| NEWEGG | $ 490,190,000 | $ 44,600,000 | 9.1% | $ 489,930,000 | $ 50,250,000 | 10.0% |
| RADIOSHACK | $ 2,609,110,000 | $ 74,920,000 | 2.9% | $ 2,599,010,000 | $ 73,680,000 | 3.0% |
| SEARS | $ 1,316,060,000 | $ 37,410,000 | 2.8% | $ 1,327,900,000 | $ 38,110,000 | 3.0% |
| TARGET | $ 1,154,130,000 | $ 50,700,000 | 4.4% | $ 1,155,450,000 | $ 48,690,000 | 4.0% |
| **Total** | **$ 9,112,540,000** | **$ 337,000,000** | **3.7%** | **$ 9,059,970,000** | **$ 351,380,000** | **3.9%** |

# Gross Domestic Product

The value of the final goods and services produced in the United States is the gross domestic product. The percentage that GDP grew (or shrank) from one period to another is an important way for Americans to gauge how their economy is doing. The United States' GDP is also watched around the world as an economic barometer.

GDP is the signature piece of BEA's National Income and Product Accounts, which measure the value and makeup of the nation's output, the types of income generated, and how that income is used.

BEA also estimates GDP for states, metropolitan areas, counties, and U.S. territories. We publish GDP by industry, as well.

## What can you do with GDP numbers?

Answer questions like:

- How fast is the U.S. economy growing?
- How does my state's economy stack up against others?
- Which industries are growing? Which are slowing?

The White House and Congress use GDP numbers to plan spending and tax policy. The Federal Reserve uses them when setting monetary policy. State and local governments rely on GDP numbers, too. Business people use these stats when making decisions about jobs, expansion, investments, and more.

## Where do you find GDP data?

See the latest numbers in the news release for:

### Gross Domestic Product

BEA estimates the nation's GDP for each year and each quarter. But new GDP statistics are released every month. Why? Because for each quarter, BEA estimates GDP three times. The **advance estimate**, coming about a month after the quarter's end, is an early look based on the best information available at that time. The **second estimate** and **third estimate** each incorporate additional source data that weren't available the month before, improving accuracy.

### More to know

The nation's gross domestic product totals trillions of dollars. Most often, the number you'll hear people refer to as "GDP" is a percentage. That's the **rate of change** in real GDP from the previous quarter or year. **"Real" or "chained"** GDP numbers have been adjusted to remove the effects of inflation over time, so different periods can be compared.

**"Current-dollar" or "nominal" GDP** estimates are based on market prices during the period being measured.

- Table showing percent change in GDP dating back to 1930.
- Table showing dollar amounts for GDP dating back to 1929.

GDP data are **seasonally adjusted** to remove the effects of yearly patterns, such as winter weather, holidays, or factory production schedules. This ensures that the remaining movements in GDP better reflect true patterns in economic activity. BEA also releases GDP data that are **not seasonally adjusted.**

Quarterly GDP data are reported at **annual rates**, for ease of comparison, unless otherwise specified.

Check the current news release schedule for release dates.

More data and historical trends are available in BEA's Interactive Data.

## Learn more:

- What is GDP? A printable explainer
- Quick Guide: GDP Releases
- BEA in Brief: The Making of GDP

- Video: Why Do Old GDP Numbers Change?

- Measuring the Economy: A Primer on GDP and the National Income and Product Accounts

## GDP by State

BEA estimates the value of the goods and services produced in each state and the District of Columbia quarterly and annually. The data include breakdowns of industries' contributions to each of these economies.

## GDP by County, Metro, and Other Areas

GDP statistics for counties, metropolitan areas, and some other statistical areas are released annually. They include 34 industries' contributions to the local economies. BEA's first official GDP statistics for the nation's 3,113 counties and county equivalents were produced in December 2019.

## GDP for U.S. Territories

GDP reports for American Samoa, the Commonwealth of the Northern Mariana Islands, Guam, Puerto Rico, and the U.S. Virgin Islands, including industry statistics, are released annually.

## GDP by Industry

Produced quarterly and annually, these statistics measure each industry's performance and its contributions to the overall economy, also known as its "value added." The data also include industries' gross output, compensation of employees, gross operating surplus, and taxes.

# In The Matter Of:

*In Re: Rail Freight Fuel Surcharge Antitrust Litigation*

---

*JOHN LANIGAN*
*June 22, 2010*

---

## *HIGHLY CONFIDENTIAL*

MERRILL CORPORATION
LegaLink, Inc.
225 Varick Street
10th Floor
New York, NY 10014
Phone: 212.557.7400
Fax: 212.692.9171

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

In re RAIL FREIGHT FUEL )
SURCHARGE ANTITRUST )
LITIGATION )
) MDL No. 1869
) Misc. No. 07-489
This Document Relates To: ) (PLF/AK/JMF)
)
ALL DIRECT PURCHASER )
CASES )

*****************************************************

"HIGHLY CONFIDENTIAL"
ORAL AND VIDEOTAPED DEPOSITION OF
JOHN LANIGAN
JUNE 22, 2010

*****************************************************

ORAL AND VIDEOTAPED DEPOSITION OF JOHN LANIGAN, produced as a witness at the instance of the Plaintiffs, and duly sworn, was taken in the above-styled and numbered cause June 22, 2010, from 8:31 a.m. to 4:38 p.m., before Julie C. Brandt, RMR, CRR, and CSR in and for the State of Texas, reported by machine shorthand, at the offices of Haynes and Boone, 201 Main Street, Suite 2200, Fort Worth, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Page 2

A P P E A R A N C E S

FOR THE PLAINTIFFS:

Daniel L. Brockett
Sami H. Rashid
Kyle R. Taylor
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
212.849-7345
212.849.7100 (fax)
danbrockett@quinnemanuel.com
samirashid@quinnemanuel.com
kyletaylor@quinnemanuel.com

-and-

Paul M. Donovan
LaROE, WINN, MOERMAN & DONOVAN
1250 Connecticut Ave., N.W.
Suite 200
Washington, D.C. 20036
202.298.8100
202.298.8200 (fax)
paul.donovan@laroelaw.com

FOR THE DEFENDANT BNSF RAILWAY COMPANY:

Richard J. Favretto
MAYER BROWN LLP
1999 K Street, N.W.
Washington, D.C. 20006-1101
202.263.3250
202.263.5250 (fax)
rfavretto@mayerbrown.com

FOR THE DEFENDANT CSX TRANSPORTATION, INC.:
David D. Cross
CROWELL MORING
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595
202.624.2774
202.628.5116 (fax)
dcross@crowell.com

Page 3

A P P E A R A N C E S
(CONTINUED)

FOR THE DEFENDANT NORFOLK SOUTHERN RAILWAY COMPANY:
Tara L. Reinhart
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
202.371.7630
202.661.0540 (fax)
tara.reinhart@skadden.com

FOR THE DEFENDANT UNION PACIFIC:

David G. Meyer
HOWREY LLP
550 South Hope Street
Suite 1100
Los Angeles, California 90071
213.892.1928
213.892.2300 (fax)
meyerd@howrey.com

ALSO PRESENT:

David M. Pryor - BNSF Senior General Attorney
Richard E. Weicher - BNSF Vice President and General Counsel - Regulatory

VIDEOGRAPHER:
Carlos Garcia, CLVS - Merrill Corp.

Page 4

INDEX


| | PAGE |
|---|---|
| Appearances.................................... | 2 |
| Proceedings.................................... | 9 |
| Stipulations.................................. | 287 |
| JOHN LANIGAN | |
| Examination by MR. BROCKETT............... | 10 |
| Signature and Changes.......................... | 289 |
| Reporter's Certificate.......................... | 291 |

| DEPOSITION EXHIBITS | | IDENTIFIED |
|---|---|---|
| Exhibit 1 | Jan. 15, 2003 Memo to Matt Rose from Chuck Schultz, Subject: Fuel Surcharge Questions, BNSF-0328855 to BNSF-0328873.... | 27 |
| Exhibit 2 | 02/06/2003 John Lanigan 2003 Draft Goals, BNSF-0387501 to BNSF-0387503.................... | 33 |
| Exhibit 3 | Fuel Surcharge Team, March 14, 2003 Meeting, BNSF-0328761 to BNSF-0328764.................... | 39 |
| Exhibit 4 | BNSF-NS Senior Team Meeting Agenda, March 18, 2003, BNSF-FSC 000643 to 000645....... | 42 |
| Exhibit 5 | E-mail and attachment from Sam Kyei, March 18, 2003, Subject: Updated: Fuel Surcharge Review Team, BNSF-0330793 to 0330833... | 56 |
| Exhibit 6 | E-mail string, March 2003, Subject: Your Call, NS 001000225 | 59 |
| Exhibit 7 | NFTA Spring Business Meeting Flyer NS_015000208 - 015000211.. | 64 |
| Exhibit 8 | E-mail from Richard Stroot, March 27, 2003, Subject: CSX agenda for April 1, 2003 & background news releases, BNSF-0557167 to BNSF-0557181.... | 65 |






DA26297

Page 209

Q. Zero exceptions, right, that was the goal?
**A. Absolutely.**
Q. Let's mark as our next exhibit BNSF 0319605.
(Exhibit 24 marked.)
Q. Okay. Mr. Lanigan, this document is entitled, Fuel Surcharge Adherence, November 10, 2004. Correct?
**A. Correct.**
Q. And it appears to refer to a meeting. Do you see that?
**A. Yes.**
Q. Attendees, Sam Kyei and others. Correct?
**A. Yes.**
Q. And the second paragraph says, Lanigan requested quarterly fuel surcharge adherence reports ongoing. Do you see that?
**A. I do.**
Q. Okay. Now does that refresh your recollection that you requested something called an adherence report every quarter?
**A. I don't know if that's what I called it or if that was their interpretation, but apparently I did request that.**
Q. And these are reports that would show what percentage of customer contracts had a fuel surcharge provision and which percentage did not. Correct?

Page 210

**A. I believe so.**
Q. And you were keeping very close tabs on this information, were you not, sir?
MR. FAVRETTO: Objection to the form.
**A. Well, as I previously stated, we were working very hard to improve the fuel surcharge participation rate of our customers, so this was -- this had been an ongoing emphasis point.**
Q. All right. Let's mark as an Exhibit 25 an e-mail chain produced by CSX. It bears Bates 000627 through 628.
(Exhibit 25 marked.)
Q. Now I want to direct your attention to the e-mail in the chain at the bottom of the page from John Couch to others dated October 6th of 2003. Do you see that?
**A. I do.**
Q. Okay. Now do you know who John Couch is?
**A. No, I don't.**
Q. This -- it states in the text of the e-mail, Clarence, Ward and Giftos met with BNSF last week. The BNSF stated that 82 percent of their carload and intermodal business either had a fuel surcharge or an escalator on the revenue. Clarence asked what the CSXT percent was. If I were to estimate, I would say with a

Page 211

reasonable degree of confidence that the CSXT originated (local and forwarded - 62 percent of merchandise) that 15 percent had an escalator, that 10 percent had neither, and that 75 percent has a fuel surcharge. Do you see that?
**A. I do.**
Q. Okay. Now this e-mail suggests that at a meeting between the BNSF and the Norfolk Southern, you shared with the Norfolk Southern your fuel surcharge coverage percentages.
MR. FAVRETTO: Objection to form, lack of foundation.
MR. CROSS: Objection. Form.
Q. Do you see that, sir?
**A. And it's CSX, not Norfolk Southern.**
Q. Sorry. Yeah, CSX. I'm sorry. Strike that. Let me -- let me ask the question again.
This e-mail suggests that at a meeting between your company and CSX, you shared with the CSX your fuel surcharge participation coverage statistics. Correct?
MR. CROSS: Objection to form.
MR. FAVRETTO: Objection to the form, lack of foundation. Go ahead.
**A. I don't remember a meeting around this time frame with CSX or whether I was involved in the meeting**

Page 212

**or who was at the meeting or -- but -- so I don't know. I don't know what the context was, and it's very likely that this would have been the public data that we make available to Wall Street and investors, but I don't recall it.**
Q. Can you give me any business reason why you would be sharing with CSX your internal coverage participation ratios for your fuel surcharge program?
**A. It's public data.**
MR. MEYER: Objection. Form.
MR. FAVRETTO: It's public data.
Q. Can you give me any business reason why the BNSF would share nonpublic fuel surcharge participation coverage statistics with one of your competitors?
MR. FAVRETTO: Objection to the form. You can answer, as best you can.
**A. Well, certainly on an interline basis we would have had discussions with our interline partners relative to fuel surcharge as it related to the business that we did with them.**
Q. Okay. Can you give me a business reason why you would have shared noninterline fuel surcharge coverage statistics with another railroad?
MR. CROSS: Objection to form.
**A. Noninterline nonpublic or --**

Page 213

Q. Yes, noninterline nonpublic --
MR. FAVRETTO: Nonpublic.
Q. -- coverage participation percentages --
**A. I believe we would have --**
Q. -- with another railroad.
**A. I believe we would have only shared public information.**
Q. Okay. Well, if I asked you to assume that that occurred -- no, strike that.
Can you say -- can you articulate any business reason why your company would do that, namely share nonpublic, noninterline fuel surcharge percentage statistics with another railroad?
MR. FAVRETTO: Object to the form, hypothetical question, an incomplete hypothetical. You may answer as best you can, John. I think you already have answered, but go ahead.
**A. The only information I can imagine us sharing would be interline information with our partner on the business that we conduct with them.**
Q. Okay. So is the answer to my question you can't articulate a business reason for sharing nonpublic, noninterline data?
MR. FAVRETTO: Lack of foundation. Objection to the question.

Page 214

**A. I can't articulate it.**
Q. Okay. I'll mark as the next exhibit a document produced by the Norfolk Southern. It's Bates stamped 000717 through 000742. This was a document produced, I believe, to the New Jersey Attorney General.
(Exhibit 26 marked.)
Q. All right, sir. I would like you to turn to the attachment in this. It's on page -- well, it's Bates stamp page NS 001000738. It's titled, BNSF/NS Jointline Meeting.
MR. FAVRETTO: What's the reference again?
MR. BROCKETT: 738.
Q. Are you with me, sir?
**A. Yes, I am.**
Q. Okay. So this refers to a jointline meeting of your company and the NS on September 29th of 2004. Do you see that?
**A. Yes, I do.**
Q. Okay. Now down towards the bottom of the page, there's a paragraph that begins, It was agreed by both carriers. Do you see that?
**A. I'm sorry. Where is that?**
Q. Still on item -- under item 2, last full paragraph in item 2. It was agreed by both carriers.

Page 215

Do you see it?
**A. Maybe I'm on the wrong page. What -- 738?**
Q. Yeah. 738 right here.
**A. I'm missing it.**
MR. FAVRETTO: There are double numbers. Yeah, it's two pages back.
THE WITNESS: Okay. 736 and this --
MR. FAVRETTO: Yeah. It's this number.
THE WITNESS: Oh, that number. I'm sorry.
**A. Now where are we again? I'm sorry.**
Q. Now do you recognize this as reflecting a BNSF/NS Jointline Meeting on September 29, 2004?
**A. I don't believe I was part of this meeting, so I don't -- I'm not familiar with this document.**
Q. All right. Well, you see this is called a project list?
**A. I see that.**
Q. And then the lead in states that the following is the list of joint progress that arose from the September meeting in Fort Worth. Do you see that?
**A. I see that.**
Q. Okay. Now if you go down towards the bottom of the page, there's a paragraph that begins, It was agreed. Are you with me?

Page 216

**A. I am with you.**
Q. Okay. And this paragraph reads, It was agreed by both carriers that the exchange of information, the level of detail involved has been beneficial and will result in better processes to monitor REN, send and receive between BNSF and NS. Correct?
**A. Correct.**
Q. And then it states that it has been suggested that it may be beneficial to exchange a few standard reports on a quarterly basis. Do you see that?
**A. I see that.**
Q. And one of the reports referred to here is fuel surcharge coverage stats.
**A. I see that.**
Q. Correct?
And does that refresh your recollection that you shared with the Norfolk Southern your fuel surcharge coverage stats on a quarterly basis?
MR. FAVRETTO: Objection to the form of that question.
MS. REINHART: Objection to form.
MR. FAVRETTO: No foundation.
**A. No, it doesn't refresh my memory because I didn't have knowledge of this document.**
Q. Okay.

# In The Matter Of:

*IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION*

*v.*

---

*ROSE, MATTHEW K. - Vol. 1*

*July 16, 2010*

---

***HIGHLY CONFIDENTIAL***

MERRILL CORPORATION
LegaLink, Inc.
25 West 45th Street
9th Floor
New York, NY 10036
Phone: 212.557.7400
Fax: 212.692.9171

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN RE: RAIL FREIGHT FUEL )
SURCHARGE ANTITRUST ) MDL NO. 1869
LITIGATION )
)
--------------------------) MISC. NO. 07-489
) (PLF/AK/JMF)
This Document Relates To: )
)
DIRECT PURCHASE CASES )

-----------------------------------------

*** HIGHLY CONFIDENTIAL ***

ORAL AND VIDEOTAPED DEPOSITION OF

MICHAEL K. ROSE

JULY 16, 2010

-----------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF MICHAEL K. ROSE, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on the 16th day of July, 2010, from 8:06 a.m. to 3:21 p.m., before Kimberly Byrns Buchanan, CSR in and for the State of Texas, reported by machine shorthand at the Hilton Southlake Town Square, 1400 Plaza Place, Southlake, Texas 76092, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Page 2

A P P E A R A N C E S

FOR THE PLAINTIFFS:
Mr. Richard I. Werder, Jr.
Mr. Joseph D. Hammond
QUINN EMANUEL URQUHART OLIVER & HEDGES LLP
51 Madison Avenue
22nd Floor
New York, New York 10010
Tel: (212) 849-7000
Fax: (212) 849-7100
E-mail: rickwerder@quinnemanuel.com
josephhammond@quinnemanuel.com

-- AND --

Mr. Paul M. Donovan
LAROE, WINN, MOERMAN & DONOVAN
1250 Connecticut Avenue NW
Suite 200
Washington, D.C. 20036
Tel: (202) 298-8100
Fax: (202) 298-8200
E-mail: paul.donovan@laroelaw.com

FOR THE DEFENDANT,
BNSF RAILWAY COMPANY AND THE WITNESS:

Mr. Richard J. Favretto
MAYER BROWN LLP
1999 K Street, N.W.
Washington, D.C. 20006-1101
Tel: (202) 263-3250
Fax: (202) 263-5250
E-mail: rfavretto@mayerbrown.com

Page 3

A P P E A R A N C E S
(CONTINUED)

FOR THE DEFENDANT, UNION PACIFIC:
Mr. Tyrone R. Childress
HOWREY LLP
550 South Hope Street
Suite 1100
Los Angeles, California 90071
Tel: (213) 892-1806
Fax: (213) 892-2300
E-mail: childresst@howrey.com

FOR THE DEFENDANT, NORFOLK SOUTHERN CORPORATION:

Ms. Krisha A. Cerilli
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
Tel: (202) 371-7839
Fax: (202) 661-8294
E-mail: krisha.cerilli@skadden.com

FOR THE DEFENDANT, CSX CORPORATION, INC.:

Mr. John L. Cuddihy
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, D.C. 20004-2595
Tel: (202) 624-2779
Fax: (202) 628-5116
E-mail: jcuddihy@crowell.com

ALSO PRESENT:
Mr. Gary Bentley - Videographer
Mr. Roger Nober - BNSF - Executive VP Law & Secretary
Mr. David M. Pryor - BNSF - Senior General Attorney
Mr. Richard E. Weicher - BNSF - VP and General Counsel - Regulatory

Page 4

INDEX


| | PAGE |
|---|---|
| Appearances.................................. | 08 |
| Stipulations................................. | 09 |
| MICHAEL K. ROSE | |
| Examination by Mr. Werder.................. | 09 |
| Examination by Mr. Favretto................ | 277 |
| Further Examination by Mr. Werder.......... | 279 |
| Further Examination by Mr. Favretto........ | 282 |
| Signature and Changes........................ | 283 |
| Reporter's Certificate....................... | 285 |


* * *

EXHIBITS


| EXHIBIT NO. | DESCRIPTION | MARKED |
|---|---|---|
| 1 | MINUTES - SURFACE TRANSPORTATION BOARD PUBLIC HEARING, MAY 11, 2006 | 58 |
| 2 | MEMO DATED JANUARY 15, 2003, SUBJECT: FUEL SURCHARGE QUESTIONS WITH RELATED TABLES ATTACHED | 108 |
| 3 | BNSF - NS SENIOR TEAM MEETING AGENDA, MARCH 18, 2003 - ACTION ITEMS RESULTING FROM MEETING | 137 |
| 4 | E-MAIL DATED MARCH 27, 2003, SUBJECT: CSX AGENDA FOR APRIL 1, 2003, & BACKGROUND NEWS RELEASES | 163 |
| 5 | E-MAIL DATED APRIL 23, 2003, SUBJECT: BNSF/CSX MTG - BOARD ROOM - BUSINESS CASUAL | 171 |

Page 213

**to the industry. I thought it was something that BNSF needed to more adequately reflect the increase in cost of fuel.**
Q. Do you recall when it was that you spoke to Mr. Hamberger?
**A. I do not.**
Q. Do you recall what it was that you said to Mr. Hamberger?
**A. I -- I just said that. I -- I simply asked Ed to have the AAR to tell us what it would take to publish this RCAF without the fuel component and what the process would be.**
Q. And -- and after it was decided that you wouldn't send a letter, did your team provide you with a list of talking points that could be used for discussion with Mr. Hamberger?
**A. Yes, I did.**
Q. And let me --
MR. WERDER: Why don't we have -- give me -- give me 35, Joe. Never mind. 36.
Q. (By Mr. Werder) I'm going to hand you what's been previously marked as Kyei Exhibit 20. There's a couple of different e-mails in the chain here. I want to focus your attention on the November 19, 2003, e-mail from Mr. Hund to -- to you.

Page 214

**A. Uh-huh.**
Q. You see that?
**A. Uh-huh.**
Q. Is that -- is that an e-mail that you received on or about November 19th of 2003?
**A. I assume I did.**
Q. And it sets out -- Mr. Hund is your CFO, correct?
**A. Correct.**
Q. And this e-mail sets out what Mr. Hund says are items surrounding RCAF that you could bring up with Ed Hamberger. Do you see that?
**A. Yes.**
Q. And then --
**A. Possible talking points.**
Q. So these -- these are the -- these are the talking points. And did you, in fact, use these talking points?
**A. I did not.**
Q. Did you use any of the talking points?
**A. I did not.**
Q. Did you use any other talking points besides these talking points?
**A. I -- no. I didn't use these talking points.**
Q. Did you use any talking points?

Page 215

**A. No.**
Q. And so, in any event, you made a request to Mr. Hamberger in a telephone conversation that the AAR begin publishing an RCAF without fuel?
**A. I made a -- I made a request for -- my recollection is that I made a request for Ed Hamberger to tell me if it's possible and what -- what would have to happen for him to publish this additional index.**
Q. And did he come back and tell you -- what -- what did he -- how did he respond?
**A. He said he would look into it. And he called me back at another time, according to my recollection, and told me it would not be any big deal and that his -- he would have someone in his shop -- I think it was Craig Rockey, to get with somebody in our shop to make sure that we understood exactly -- and that they would understand exactly what we were asking for. That was the last I heard of it until the AAR board meeting when it was brought up in a committee report.**
Q. Did you discuss it with any executives of any other railroads prior to the AAR board meeting?
**A. I did not.**
Q. Do you know whether Mr. Hamberger did so?
**A. I do not know.**
Q. Do you know whether anyone on your team had any

Page 216

discussions concerning the -- the potential new index with representatives of any other railroad before the -- between the time of your conversation with Mr. Hamberger and the time of the AAR board meeting?
**A. I do not know.**
Q. Was there in fact communication, to your knowledge, between BNSF and the AAR between the time that you made the request to Mr. Hamberger and the time that the board meeting was held?
**A. I don't know. The last thing I heard about it -- the -- the next time I heard about it was the AAR board -- at the AAR board meeting itself.**
MR. WERDER: No. I want -- isn't this 141, Kyei 21? Oh, 37 is what I want. Sorry. And then 42, Joe.
Q. (By Mr. Werder) Let me hand you what's been previously marked as Kyei Exhibit 21. Have you seen this document before?
**A. I do not believe I saw this yesterday. I had not seen it before yesterday if I have, but I don't -- I don't remember seeing it yesterday.**
Q. Did anyone in discussing the -- withdrawn.
I want to direct your attention to the numbered paragraph 1. And you can see at the end of the sentence there, there's a reference to the railroad

Page 217

industry publishing a -- and this is in quotes -- "renegade" RCAF index. Do you see that?
MR. FAVRETTO: Objection to the -- I -- go ahead.
01:33 **A. Yes, I see the sentence.**
Q. (By Mr. Werder) Okay. Have you heard that phrase -- seen that phrase or heard that phrase used in connection with the AII-LF index at any point in time?
**A. Not until yesterday.**
01:33 Q. Did you become aware at any point in time between your call with Mr. Hamberger and the board meeting that was there was a dialogue that was going on between Mr. Rockey of the AAR and Mr. Kyei or others within your organization?
01:33 **A. No.**
MR. FAVRETTO: Objection to the form.
Q. (By Mr. Werder) No?
**A. I -- I said a little while ago the -- the next time I heard about it after my conversation with Ed**
01:33 **Hamberger was at the board meeting.**
Q. Okay.
(Exhibit 7 marked)
Q. Handing you what's been marked as Rose Exhibit 7. Can you identify that document?
01:34 **A. I don't -- I don't -- it looks like a -- it**

Page 218

**says at the top: Nick Murray Staff Meeting.**
Q. You haven't seen the document before?
**A. No.**
Q. And Nick Murray I think you previously
01:34 identified as?
**A. Would have been like an Assistant Vice President of Price Management, something within the marketing business unit.**
Q. All right. And are -- MKR are your initials,
01:34 are they not?
**A. Yes.**
Q. And under the -- an agenda item on this document that's labeled "MKR," there's a -- an item that says: Core RCAF Update - Proposed Answers to Craig
01:34 Rockey's Memo. Do you see that?
**A. Yes.**
Q. And -- and I take it that you -- you were not aware that there was any discussion going on at BNSF concerning the fact that Mr. Rockey had made some
01:35 inquiries or the fact that BNSF was providing responses to them; is that right?
**A. Correct.**
Q. And the -- the -- the -- the board -- the -- were you the Chairman of the AAR at the time -- at -- in
01:35 December of 2003?

Page 219

**A. I'm not sure I was that -- Chairman that year. I'm Chairman every four -- you -- you -- you become Chairman every four years. So I was either Chairman that year or the year before or the year after.**
Q. Does that rotate --
**A. Yes.**
Q. -- among the CEO of BNSF, the CEO of CSX, the CEO of Norfolk Southern, and the CEO of Union Pacific?
**A. Correct.**
Q. So every four years, one of you is the Chairman?
**A. Every year one of us is the Chairman. Every four years, I'm the Chairman.**
Q. Sorry. Thank you.
(Exhibit 8 marked)
Q. Handing you what's been marked as Rose Exhibit 8. Ask you whether you can identify that as the minutes of the December 11, 2003, AAR board meeting?
**A. That's -- that's what it reads.**
Q. Okay. And can you -- have you seen this -- this document before?
**A. I saw it yesterday in preparation for this deposition.**
Q. Can you tell me where in this document the -- the discussion such as you said it was of the AA --

Page 220

AII-LF index is referenced?
**A. I don't see it as an agenda item or -- or in the notes.**
Q. All right. Let me direct your attention to the page that bears the last three Bates numbers 169.
**A. Yes.**
Q. Is that a report of the Policy and Advocacy Management Committee? Do you see that?
**A. Yes.**
Q. Is that where it was discussed?
**A. That's my --**
MR. FAVRETTO: Objection to the form of the question --
MR. WERDER: Withdrawn.
MR. FAVRETTO: -- as to the word "discussion."
MR. WERDER: Well --
Q. (By Mr. Werder) Go ahead.
**A. I think that's where -- and I think it was Craig Rockey that mentioned that -- what the AAR would be publishing, but I'm not sure.**
Q. You're aware, are you not, that the AAR considered the publication of this index to be a significant accomplishment of the AAR in 2003?
MR. FAVRETTO: Objection to the form.

In the Matter of:

*IN RE: RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION*

*CLYDE V. McINTYRE, JR.*
*February 18, 2010*

***HIGHLY CONFIDENTIAL***
***ATTORNEYS' EYES ONLY***
***MERRILL CORPORATION***
*25 West 45th Street - Suite 900*
*New York, NY 10036*
*PH: 212-557-7400 / FAX: 212-692-9171*

McINTYRE, JR. CLYDE V.





UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

In Re:
RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION — MDL No. 1869, Misc No. 07-489(PLF/AK/JMF)

------------------------------/

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

VIDEOTAPED DEPOSITION OF

CLYDE V. McINTYRE, JR.

Taken on behalf of the Plaintiffs

DATE TAKEN: Thursday, February 18, 2010
TIME: 9:09 a.m. - 6:24 p.m.
PLACE: 50 North Laura Street, Suite 3900, Jacksonville, Florida

Examination of the witness taken before:

Luan G. Wilson, Registered Professional Reporter
Florida Professional Reporter







APPEARANCES:

For the Plaintiffs:

ERIC L. CRAMER, Esquire

Berger, Montague
1622 Locust Street
Philadelphia, Pennsylvania 19103
215.875.3009
ecramer@bm.net

PAUL M. DONOVAN, Esquire

LaRoe, Winn Moerman & Donovan
1250 Connecticut Avenue NW, Suite 200
Washington, D.C.
202.298.8100
paul.donovan@laroelaw.com

DANIEL BROCKETT, Esquire

Quinn, Emanuel, Urquhart, Oliver & Hedges, LLP
51 Madison Avenue, 22nd floor
New York, New York 10010
212.849.7000
stephenneuwirth@quinnemanuel.com

For the Defendant CSXT:

KENT GARDINER, Esquire and
JOHN L. CRUDITY, Esquire
Crowell & Moring, P.A.
1001 Pennsylvania Avenue, NW
Washington, D.C. 20004
202.624.2779
jcuddihy@crowell.com
ERIN O'BRIEN, Esquire
Senior Counsel
CSX Transportation, Inc.
500 Water Street J-150
Jacksonville, Florida 32202
904.359.3101







APPEARANCES (Continued):

For the Defendant BNSF Railway Company:

GARY A. WINTERS, Esquire

Mayer Brown, LLP
1999 K Street, NW
Washington, D.C. 20006
202.263.3273
gwinters@mayerbrown.com

DAVID PRYOR, Esquire

BNSF Railway Company
2650 Lou Menk Drive, AOB-3
Fort Worth, Texas 76131
817.352.2286
david.pryor@bnsf.com

For the Defendant Norfolk Southern Railway Company:

SEAN M. TEPE, Esquire

Skadden, Arps, Slate, Meagher & Flam, LLP

Four Times Square
New York, New York 10036
212.735.2718
sean.tepe@skadden.com

For the Defendant Union Pacific Railway Company:

ALAN M. WISEMAN, Esquire

Howrey
1299 Pennsylvania Avenue, NW
Washington, D.C. 20004
202.383.6638
WisemanA@howrey.com

ALSO PRESENT: Ashley Holt, Video

\- - -

down in theory, but in the real world, it was impossible to do it under the current regulations that we have.
BY MR. CRAMER:
Q But in theory -- let's just talk about theory. In theory, if all of the railroads switched simultaneously from a policy of RCAF(u) to a policy of this new index that didn't have a fuel escalator plus applying a fuel surcharge, at least in theory it would be easier for CSX to implement the new program, would it not?
MR. GARDINER: Objection; calls for speculation.
THE WITNESS: It depends on the base rates. It depends on a lot of things. A fuel surcharge is only part of the whole deal. There is nothing easy -- some of the changes that CSX made caused me to have to mass-adjust 15 million prices.
BY MR. CRAMER:
Q At the top of the e-mail chain, you send a e-mail to Mr. Eliasson and Mr. Jackson and Couch on Monday November 1, 2004, at 9:32 a.m.; correct?
A Yes.
Q Could you read that into the record what you said?



HIGHLY CONFIDENTIAL - FOR ATTORNEY'S EYES ONLY
CLYDE V. McINTYRE, JR.



A "Fuel surcharge programs are independently initiated by individual carriers. As such, I believe it would likely be an antitrust violation to discuss/suggest setting an AII Less Fuel industry fuel surcharge formula program at NEMC. The most we can discuss is the best practices for interline accounting/settlement of fuel surcharges. Today, CSXT could move forward independently with using an AIILF fuel surcharge formula without the agreement of connecting carriers."
Q Why did you send that e-mail?
A I sent it because, looking at the agenda item, I saw absolutely no issue with -- with posting something that was already available in paper format on a website. However, at an industry meeting discussing programs and using it was not the appropriate thing to do.
Q You thought it would be an antitrust violation at the industry meeting?
MR. GARDINER: Object to form.
THE WITNESS: It may lead to one.
BY MR. CRAMER:
Q In what sense? How is it your understanding that a discussion regarding the industry moving from RCAF to AIILF plus a fuel surcharge would lead to an

MERRILL LEGAL SOLUTIONS
(800) 325-3376 www.MerrillCorp.com

HIGHLY CONFIDENTIAL - FOR ATTORNEY'S EYES ONLY
CLYDE V. McINTYRE, JR.



antitrust violation?
MR. GARDINER: Object to the form.
MR. WINTERS: Objection to the form.
THE WITNESS: It was my view that any discussion about any type of fuel surcharge program would create problems.
BY MR. CRAMER:
Q Do you know whether this agenda item remained on the NEMC agenda meeting that went forward?
A No.
Q You don't know?
A Don't know.
Q In response to this e-mail, did somebody call you and ask you about it?
A No.
Q Did you receive a responsive e-mail from anybody?
A No.
Q Other than yesterday, did you ever have a discussion with anyone about this e-mail?
A New Jersey.
Q The New Jersey Attorney General asked you about it?
A Yes.
Q What did you tell the New Jersey Attorney

MERRILL LEGAL SOLUTIONS
(800) 325-3376 www.MerrillCorp.com

HIGHLY CONFIDENTIAL - FOR ATTORNEY'S EYES ONLY
CLYDE V. McINTYRE, JR.



General?
A The same thing I told you.
Q Other than that interview with the New Jersey Attorney General and conversations with counsel, did you ever talk to anybody else about this e-mail?
A No.
MR. CRAMER: All right. Put the document aside.
MR. DONOVAN: 43.
MR. CRAMER: I am marking the next document as Plaintiffs' Exhibit 43.
(Plaintiffs' Exhibit No. 43 was marked for identification.)
MR. CRAMER: We are getting near the end.
THE WITNESS: Good.
BY MR. CRAMER:
Q This is a two-page document bearing the Bates range CSXFSC 1071 to 1072. It's from Mr. McIntyre dated March 4, 2007 entitled Industry Meeting, Cary, North Carolina regarding the STB ruling March 19 to 21, 2007.
Did you send this e-mail?
A Yes.
Q Why?
A To advise the CSXT fuel surcharge committee

MERRILL LEGAL SOLUTIONS
(800) 325-3376 www.MerrillCorp.com

of the meeting.
Q And what was this meeting about?
A It was about developing -- I believe it was about developing a mileage database -- wait a minute.
Q Mileage, I think he said.
A A mileage database, an industry mileage database, to comply with an STB ruling.
Q And what is your understanding of the STB ruling that's referred to there?
A The STB ruling required the railroads to do a mileage-based fuel surcharge.
Q There is a listing of what you call legal guidelines for discussion are being set for the meeting, and then you list the guidelines. Do you see that?
A Yes.
Q Where do you get that from?
A I do not recall. I think. Well, I -- no, I do not recall.
Q Did you attend this meeting?
A Yes, with legal counsel.
Q What was determined at the meeting?
A We had a review at the meeting with Rand McNally on their mileage files that they had had in place for research purposes, and we had an all-day







review to determine whether or not it could be used as a basis for miles to be used for a fuel surcharge program so that miles could be calculated between railroads.
No such file existed, and we wanted to know if it was up to date, how it could be added, changed, or, you know, fixed, if a carrier identified that miles weren't -- were not accurate.
MR. CRAMER: All right. You can put that document aside. Let's take a break and then I will have a few questions after the break.
MR. GARDINER: Okay.
THE VIDEOGRAPHER: Off the record at 5:36.
(Brief recess from 5:36 p.m. to 5:44 p.m.)
MR. CRAMER: Okay. Let's go back on the record.
THE VIDEOGRAPHER: Back on the record at 5:44.
MR. CRAMER: I show you Plaintiffs' Exhibit 44. With respect to the next few documents, I'm basically just going to ask you to identify them and let me know whether you received them.
(Plaintiffs' Exhibit No. 44 was marked for identification.)







BY MR. CRAMER:
Q This is an e-mail and an attachment CSXFSC 243235 through 236. Do you see that?
A Yes.
Q Did you receive this document in the regular course of your business?
A Yes.
Q And it relates to industry interline surcharge issues.
A Yes.
MR. CRAMER: Put that document aside. Mark the next document -- sorry. What are we up to, 45.
MR. DONOVAN: 45.
MR. GARDINER: 45 is next.
MR. CRAMER: Plaintiffs' Exhibit 45.
(Plaintiffs' Exhibit No. 45 was marked for identification.)
BY MR. CRAMER:
Q This is an e-mail from Juanita Henderson to Mr. McIntyre, CSXFSC 62 -- I'm sorry -- 254626 through 627.
A Do we have the same document?
Q No. Sorry about that one.
This is an e-mail from Mr. Jacobowski dated,







November 29, 2000; is that right?
A Yes.
Q And it has the Bates number on the cover e-mail as CSXFSC 254652 through 657; is that right?
A Wait a minute. Let me see what you are looking at.
Q Yeah.
A Where are you looking?
Q It's the same document.
MR. GARDINER: Take a minute to look at it.
BY MR. CRAMER:
Q Just take a minute. Take your time.
They are draft minutes dated November 16, 2000, Fuel Surcharge IRM TAG Industry Meeting, Fort Worth, Texas, and you're listed as participant.
A Yes.
Q What was this meeting about?
A Developing EDI standards for communicating fuel surcharge data elements.
Q Did you receive this document?
A Yes.
MR. CRAMER: You can put the document aside. Make the next document as Plaintiffs' Exhibit 46.
(Plaintiffs' Exhibit No. 46 was marked for identification.)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

In Re: RAIL FREIGHT FUEL
SURCHARGE ANTITRUST LITIGATION

MDL No. 1869

Misc. No. 07-489-(PLF/AK/JMF)

This Document Relates To:

ALL DIRECT PURCHASER CASES

* * * * * * * * * * * * * * * * * * * * * * * * * *

DESIGNATED AS
HIGHLY CONFIDENTIAL

VIDEOTAPED
DEPOSITION OF: MICHAEL WARD

DATE TAKEN: THURSDAY, FEBRUARY 10, 2011

TIME: 8:47 A.M.

PLACE: 50 NORTH LAURA STREET, SUITE 3300
JACKSONVILLE, FLORIDA

REPORTED BY: CARMEN THOMAS, REGISTERED
PROFESSIONAL REPORTER AND
NOTARY PUBLIC

* * * * * * * * * * * * * * * * * * * * * * * * * *



APPEARANCES:

Appearing on Behalf of the Plaintiff:
DANIEL L. BROCKETT, ESQUIRE
Quinn Emanuel Urquhart Oliver & Hedges
51 Madison Avenue, 22nd Floor
New York, New York 10010

Appearing on Behalf of the Plaintiff:
KYLE R. TAYLOR, ESQUIRE
Quinn Emanuel Urquhart Oliver & Hedges
51 Madison Avenue, 22nd Floor
New York, New York 10010

Appearing on Behalf of the Defendant,
Union Pacific:
CAROLYN WOODSON, ESQUIRE
Howrey, LLP
55- South Hope Street, Suite 1100
Los Angeles, California 90071-2627

Appearing on Behalf of the Defendant,
CSX and the Witness:
DAVID D. CROSS, ESQUIRE
Crowell Moring
1001 Pennsylvania Avenue NW
Washington, DC 20004-2595

Appearing on Behalf of the Defendant,
CSX and the Witness:
KENT A. GARDINER, ESQUIRE
Crowell Moring
1001 Pennsylvania Avenue NW
Washington, DC 20004-2595

Appearing on Behalf of the Defendant,
CSX:
ERIN O. O'BRIEN, ESQUIRE
500 Water Street, J150
Jacksonville, Florida 32202



Appearing on Behalf of the Defendant,
Norfolk Southern:
TARA L. REINHART, ESQUIRE
Skadden Arps Slate Meagher & Flom
1440 New York Avenue, N.W.
Washington, DC 20005

Appearing on Behalf of the Defendant,
BNSF Railway:
LINDA S. STEIN, ESQUIRE
Steptoe & Johnson
1330 Connecticut Avenue, NW
Washington, DC 20036-1795

KHALID EL-MUSRATI, VIDEOGRAPHER



I N D E X


| | |
|---|---|
| TESTIMONY OF MICHAEL WARD | |
| Direct Examination by Mr. Brockett | 6 |
| Cross Examination by Mr. Gardiner | 220 |
| Redirect Examination by Mr. Brockett | 224 |
| CERTIFICATE OF OATH | 226 |
| CERTIFICATE OF REPORTER | 227 |


E X H I B I T S


| Exhibit Number | Page Marked |
|---|---|
| Exhibit 1 | 35 |
| Exhibit 2 | 91 |
| Exhibit 3 | 95 |
| Exhibit 4 | 96 |
| Exhibit 5 | 97 |
| Exhibit 6 | 97 |
| Exhibit 7 | 97 |
| Exhibit 8 | 97 |
| Exhibit 9 | 97 |
| Exhibit 10 | 97 |
| Exhibit 11 | 108 |
| Exhibit 12 | 111 |
| Exhibit 13 | 178 |
| Exhibit 14 | 183 |
| Exhibit 15 | 185 |
| Exhibit 16 | 198 |
| Exhibit 17 | 207 |
| Exhibit 18 | 212 |

industry was in dire financial straights. So we wanted to do everything we could as an industry to become more effective. So we regularly benchmarked for best practices with one another.

Q And you don't consider fuel hedging strategies to be competitive information?

A I don't see it any different than locomotive maintenance strategies, rail maintenance strategies, auxiliary power units. They're all basically operating efficiency techniques.

Q Show you what we've previously marked as Goode Exhibit 10.

A Okay.

Q Okay. Now, this looks to be a draft of a letter for your signature to David Goode, the chairman of Norfolk Southern, in -- on April 8th of 2003; is that correct?

A That's what it appears to be.

Q Okay. Do you know if this letter was ever sent?

A I do not.

Q Do you recall either drafting this letter yourself or having someone else draft it for you?

A I would not have drafted this letter. So obviously someone drafted it for me.



Q Okay. And this letter is a CEO to CEO letter, correct?

A That's correct.

Q And it refers to discussions that you've apparently had with Mr. Goode regarding a number of potential alliance projects; is that fair?

A That's correct.

Q Okay. And do you recall those discussions?

A Not specifically.

Q But is it fair to say that you would have had a number of discussions with Mr. Goode about a number of these projects for a letter of this kind to have been prepared?

MR. GARDINER: Object to the form.

THE WITNESS: No, it would not. It would be fair to say we had a discussion. Whether we had a number of them is uncertain. And if I recall the document you showed me earlier of this meeting, basically these are the same broad topics that were the more detailed agenda items. So there were projects, some of which were progressing but slowly, some of which were new initiatives, to improve either operations or administration of things like our Conrail joint ownership of the shared areas.



BY MR. BROCKETT:

Q The second sentence you state that we have a number of outstanding opportunities to work together to improve service and reduce our costs and long term capital requirements.

Do you see that?

A Yes, I do.

Q Okay. Now, isn't -- improving service and ways to improve service, isn't that something that companies normally compete on, sir?

A We also then work together on this. We have interline movement with the Norfolk Southern. Sometimes we have the access and sole service of the customer that's going to a destination perhaps that they serve. So the service to the customer -- while there's much less with the Norfolk Southern than the western roads on interline movements, we do have interline movements and we would want the service for those customers to -- to be better.

Q And am I correct that ways to reduce costs are also things that companies normally compete with each other on?

A No. In our industry, as we just talked about a moment ago, we were constantly benchmarking to find ways for us both to become more efficient and effective



to be able to compete against trucks and in the larger marketplace.

Q So in your industry, you -- you share with your competitors ways to improve service and also reduce costs; is that fair?

MR. GARDINER: Object to form.

THE WITNESS: We do work together to improve service on joint line movements and to improve our efficiency of our operations, yes.

BY MR. BROCKETT:

Q This letter doesn't say anything about joint line movements, does it?

A It says to improve service, yes.

Q It doesn't say anything about joint line movements, does it?

A No, it doesn't.

Q In fact, the title of it is called, alliance initiatives, right?

A Yes.

Q Okay. You conclude in that sentence -- in that paragraph by saying, to achieve these benefits it would be important that each of our organizations remain focused and have their priorities aligned.

Were you referring there, sir, for the NS and the CSX to have their respective priorities aligned?

MR. GARDINER: Objection. Lack of foundation.

THE WITNESS: What I was suggesting, if you look at the next page, the kind of projects we're working on. As I told you earlier, there's some distrust between the two organizations and we thought there was some opportunities that we could both become more cost effective and provide better service if we could work together. So we needed to make sure that we were having the organizations understand this is something we wanted to happen. Unfortunately my recollection is even with that downward pressure, very few, if any, of these came to fruition.

BY MR. BROCKETT:

Q Okay. But so I understand what you meant by the phrase, priorities aligned, you were referring to the fact that your company and NS should have their priorities aligned with respect to the projects that are mentioned in the letter?

A That's correct.

MR. BROCKETT: Let's mark as our next exhibit, which is, what, 13, just a one page document reflecting a meeting between the BNSF and CSX.



(Exhibit 13 was marked for identification.)

BY MR. BROCKETT:

Q Does this -- do you recognize this as a -- a document reflecting a meeting between the BNSF and the CSX in a board room on or about April 23, 2003?

A I don't recognize --

MS. STEIN: Objection. Mischaracterizes the date. It's the date that the Outlook -- was entered into Outlook, not the date of the meeting.

MR. BROCKETT: Is that right?

MS. STEIN: Yeah.

MR. BROCKETT: You know that for a fact?

MS. STEIN: I do. We produced the documents --

MR. BROCKETT: I'm glad you can supplement the record with those facts because I don't draw those facts.

MS. STEIN: We produced the documents that allow you to supplement the record.

THE WITNESS: I don't recognize --

MR. BROCKETT: I don't know how lawyers can supplement records.

MR. GARDINER: Well, if it's a fact, we might as well use the right ones.

MR. BROCKETT: So, counsel, what's the date



of the meeting then?

MS. STEIN: The date of the meeting based on the native we produced to you is October 1, 2003.

MR. BROCKETT: Okay.

THE WITNESS: Do you want to ask a question of me?

BY MR. BROCKETT:

Q Yeah. My question is, does this reflect that there was a meeting between BNSF and CSX?

A All it reflects to me is that Ms. Turner said something to I guess BNSF people -- because I've never seen this document before -- about some meeting. That's all I gather from this.

Q Okay. Now, after CSX implemented its new fuel surcharge in March of 2003, did -- was the intention of the company to try to apply that fuel surcharge to as much of its traffic as possible?

A Our goal would have been, yes, to apply it. I think we even had some internal requirements that if someone wanted to enter into a contract that did not have that, it had to escalate up levels in the organization. So the intention was to apply it broadly.

Q Right. And I'll show you some documents about that in a minute.

Did CSX keep track -- keep stats of how well



you were doing in applying the fuel surcharge to as much of your traffic as possible?

A I don't know that, but I would not be surprised if that's one of their targets.

Q Is that something that you would ask for from time to time, would be a report of what percentage of our traffic is being covered by the fuel surcharge?

A No. I would spec -- either Mr. Giftos or Mr. Gooden to be tracking that.

Q Okay. You would ask -- right. That's my point.

You'd be asking your chief marketing officer, how we doing --

A No.

Q -- right?

A No. I would expect them to be discharging their duties. I'm not a micro-manager.

Q Well, is -- that's not information that you would want reported to you from time to time, a report about how you're doing?

A I don't recall receiving reports on that.

Q All right. But is there any doubt in your mind as you sit here today that Gooden and Giftos and the marketing people would keep track of -- of what percentage of your traffic the fuel surcharge is being

applied to?

A I cannot say that it would be no doubt in my mind. I said that would be my expectation that they would.

Q Now, can you think of any business reason why CSX would share its coverage statistics with another railroad?

A I think we actually shared those coverage statistics with the public because when we would reduce -- or do our analyst calls, we would get questions as to how much of revenue was covered by the fuel surcharge program.

So the investment community was very aware of that and was publicly available data due to that questioning of how much was out there.

Q Well, my question's a little bit different.

What business reason would there be for CSX to share that information with another railroad?

A In conjunction with the interline movements, it could be acceptable to talk about the market acceptance overall of the program.

Q So you would have no issue with CSX sharing its coverage statistics with the BNSF?

A Shared it with the public.

Q But I'm asking about the BNSF.



A All they had to do was listen to a conference call.

Q That's not my question. Can you answer my question?

A Yeah. I'll answer it as I did before.

If it was in conjunction with talking about the acceptance in the marketplace on interline movements, it would -- could be appropriate or would be appropriate.

Q Can you think of any business reason why CSX would share its coverage statistics on local traffic with another railroad?

A Yes, to share market acceptance of the program.

Q And how would that show market acceptance of the program?

A If many of our customers are willing to accept the program, then when we're having our discussion of interline rates that will be a program that would be likely to be accepted by the marketplace.

Q Well, I was asking about local rates.

A I know it. I was answering your question.

If it's being accepted on a local basis at a high level, it would be more likely to be accepted at a high level on an interline basis as well. It's showing



market acceptance.

Q I'm going to show you --

MR. BROCKETT: Let's mark as our next exhibit a thick document produced by CSX as Bate stamp 346837 through 346896.

BY MR. BROCKETT:

Q And, sir, I'm only going to ask you about the first page and third page of this document. Okay.

(Exhibit 14 was marked for identification.)

THE WITNESS: I understand that, but I want to glance at the rest to get the context of the -- which pages were you going to ask about?

BY MR. BROCKETT:

Q The first page and the third page.

A (Pause.) Okay.

Q Okay. Does this document reflect that there was a meeting between BNSF and CSX on October 1, 2003 in Fort Worth?

A It would suggest that one was scheduled, yes.

Q And the third page shows you were in attendance?

A No. The third page shows who was supposed to be in attendance.

Q Okay. Fair enough.

And do you have a -- a memory of attending



this meeting?

A I do not.

Q Do you have any facts to suggest that you didn't attend?

A I do not.

Q Was it your practice to attend alliance meetings between CSX and BNSF?

A Yes.

Q Do you have a recollection at this meeting of BNSF sharing with CSX BNSF's coverage statistics relative to fuel surcharges on its local traffic?

A I have no recollection of this meeting.

Q Do you have a recollection at this meeting of CSX sharing with the BNSF your coverage statistics on your local traffic?

A I have no recollection of this meeting.

Q And if those -- if that sharing occurred, in your view that was perfectly legitimate?

MR. GARDINER: Asked and answered.

THE WITNESS: Answer again?

MR. GARDINER: You can answer.

THE WITNESS: In conjunction with discussing our interline rates and market acceptance of various fuel surcharge programs, it would be appropriate to discuss the acceptance in the

# In The Matter Of:

*In re: RAIL FREIGHT SURCHARGE ANTITRUST LITIGATION*

---

*CRAWFORD, MIKE - Vol. 1*
*July 27, 2011*

---

## *HIGHLY CONFIDENTIAL*

MERRILL CORPORATION
LegaLink, Inc.
225 Varick Street
10th Floor
New York, NY 10014
Phone: 212.557.7400
Fax: 212.692.9171

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

In re RAIL FREIGHT SURCHARGE ANTITRUST LITIGATION

MDL No. 1869

Misc. No. 07-489 (PLF/AK/JMF)

This Document Relates To:

ALL DIRECT PURCHASER CASES

---

VIDEOTAPED DEPOSITION OF CSX TRANSPORTATION, INC., by and through its designated corporate representative, MIKE CRAWFORD

Taken on behalf of Plaintiffs

DATE TAKEN: July 27, 2011
TIME: 3:43 p.m.
PLACE: McGuireWoods LLP
50 North Laura Street, Suite 3300
Jacksonville, Florida 32202

Examination of the witness taken before:

Bobbie A. Umstead
Registered Professional Reporter
Florida Professional Reporter

\- - -

"HIGHLY CONFIDENTIAL"

A P P E A R A N C E S

ERIC L. CRAMER, Esquire
-and-
MATTHEW P. McCAHILL, Esquire

BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, Pennsylvania 19103
ecramer@bm.net
mmccahill@bm.net
215-875-3000

-and-

STEIG D. OLSON, Esquire

QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
steigolson@quinnemanuel.com
212-849-7000

Appearing on behalf of Plaintiffs.

DAVID D. CROSS, Esquire
-and-
LUKE van HOUWELINGEN, Esquire

CROWELL & MORING LLP
1001 Pennsylvania Avenue N.W.
Washington, D.C. 20004-2595
202-624-2500
dcross@crowell.com
lvanhouwelingen@crowell.com

Appearing on behalf of
Defendant CSX Transportation, Inc.,
and the witness.

A P P E A R A N C E S (C O N T I N U E D)

TARA L. REINHART, Esquire

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Avenue N.W.
Washington, D.C. 20005
202-371-7630
tara.reinhart@skadden.com

Appearing on behalf of
Defendant Norfolk Southern.

ALSO PRESENT:

ERIN O'BRIEN, Esquire, CSX Transportation

KHALID EL-MUSRATI, Videographer, Legalink Manhattan

I N D E X


| Deposition of MIKE CRAWFORD | Page No. |
|---|---|
| Direct Examination By Mr. Cramer............... | 7 |
| Cross-Examination By Mr. Cross................. | 54 |
| Redirect Examination By Mr. Cramer............. | 55 |
| Reporter's Certificate......................... | 57 |
| Certificate of Oath............................ | 58 |
| Errata Sheet (to Be Forwarded Upon Execution).. | 59 |


CSX EXHIBITS INDEX


| No. | | Page No. |
|---|---|---|
| Exhibit 8 | "CSX Intermodal Fuel Surcharge Chronology (from 2000 to May 14, 2007)" | 17 |
| Exhibit 9 | E-mail dated 2/21/05 from John Hart to Mike Crawford plus preceding e-mails | 27 |
| Exhibit 10 | E-mail dated 2/14/07 from Jim Glover to Kim Sherman and Mike Crawford plus preceding e-mails | 30 |
| Exhibit 11 | E-mail dated 7/28/04 from Jim Hertwig to John Hart plus preceding e-mail | 41 |

CSX EXHIBITS (CONTINUED)

| No. | | Page No. |
|---|---|---|
| Exhibit 12 | E-mail dated 6/1/07 from Amy Zahra to John Hart and Frank Carbone plus attachment | 48 |
| Exhibit 13 | E-mail dated 10/4/05 from Fredrik Eliasson to Oscar Munoz plus preceding e-mails | 50 |

VIDEOGRAPHER: We're now on the record in the matter of In re Rail Freight Fuel Surcharge Antitrust Litigation. Today's date is July 27th, 2011. The time is 3:43 p.m. This is the videotaped deposition of CSX Transportation, Incorporated, being taken at 50 North Laura Street, Suite 3300, Jacksonville, Florida.

My name is Khalid El-Musrati. I'm the camera operator, representing Legalink Manhattan, located at 225 Varick Street, 10th floor, New York, New York. The court reporter is Bobbie Umstead with Legalink Manhattan.

Will counsel please introduce themselves.

MR. CRAMER: My name is Eric Cramer with Berger & Montague in Philadelphia representing the plaintiffs.

MR. McCAHILL: Matt McCahill, Berger & Montague, representing the plaintiffs.

MR. OLSON: Steig Olson, representing the plaintiffs.

MR. CROSS: David Cross from Crowell & Moring on behalf of CSX Transportation and the witness, and with me is Luke van Houwelingen and also in-house counsel Erin O'Brien, who should return shortly.

MS. REINHART: Tara Reinhart from Skadden Arps for Norfolk Southern Railway Company.

VIDEOGRAPHER: Will the court reporter please swear in the witness.

\- - -

MIKE CRAWFORD,

having been produced and first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. CRAMER:

Q Good afternoon, Mr. Crawford. How are you?

A I'm fine. Good afternoon.

Q Could you state your full name and address for the record, please?

A My full name is Mike Crawford. My home address is 13883 Oakwood Park Lane, Jacksonville, Florida, ZIP code 32224.

Q Who is your current employer?

A CSX Transportation.

Q Did you ever work for CSX Intermodal?

A Yes.

Q When was that?

A I joined CSX Intermodal in August of 1988. I worked for them through early in 2004. For a time period in 2004 supporting CSX Intermodal I worked in a

shared services organization, and then afterwards I -- as that operation ended and as responsibilities were moved back within the business unit or within CSX Intermodal, I moved back within that company.

Q Back to CSXI?

A Yes.

Q All right. We'll come back to that in a minute.

Have you been deposed before, Mr. Crawford?

A One time.

Q What was that occasion?

A There was an occasion when we were working on resolving some charges with a particular customer, and we were actually able to resolve it but we went ahead with the deposition just in case.

Q Approximately when was the deposition?

A It was a few years ago, and I would -- I'm not quite sure. It was after I had moved down here, so somewhere between -- probably early 2000, somewhere in that range.

Q Okay. Why don't we go over the ground rules, then, very briefly.

I'm going to be asking questions today. It's your job today to answer as truthfully and completely as possible. Is that fair?

BY MR. CRAMER:

Q You can answer.

A Do you mind --

Q The only fuel surcharge formula that was applied and announced regularly to CSXI customers other than the exceptions that you identified was the standard CSXI fuel surcharge formula that you have identified in CSX Exhibit 8?

A That would go out on our Fast Facts and website, yes.

Q And you would follow the formula?

A The -- a determination of that fuel came from that formula as stated, yes.

MR. CRAMER: Let's take a two-minute break. I'm almost done.

VIDEOGRAPHER: The time is 4:48 p.m. We're off the record.

(Brief recess.)

VIDEOGRAPHER: The time is 4:49 p.m. We're back on the record.

BY MR. CRAMER:

Q Mr. Crawford, were there any changes to CSX's standard fuel -- CSXI's standard fuel surcharge formula that you didn't talk about -- during the relevant period that you didn't testify about today, that you haven't

mentioned earlier?
A Not that I'm recalling, no.
MR. CRAMER: That's all the questions I have.
MR. CROSS: Just one quick topic just for clarity.

CROSS-EXAMINATION

BY MR. CROSS:
Q Mr. Crawford, you referred today to the door-to-door segment of the intermodal business?
A Uh-huh (affirmative).
Q And I believe you testified, and correct me if I'm wrong, the pricing on the door-to-door business was done on a daily all-in rate. Is that right?
A Correct.
Q Okay. So on the door-to-door business is there a separately identified fee that's designated or intended as a fuel surcharge on the invoicing for the door-to-door business?
A No. In our communication with the customer, they look in -- they would know what it cost them to move. It would be an all-inclusive rate.
(Brief interruption by court reporter.)
THE WITNESS: Yeah, it would be an all-inclusive rate. They would communicate they were looking for an all-inclusive rate and that's

what we would convey to them.

MR. CROSS: Nothing further.

REDIRECT EXAMINATION

BY MR. CRAMER:

Q What percentage of CSXI's business was this door-to-door business?

MR. CROSS: Beyond the scope. You can answer if you know.

THE WITNESS: And it's an estimate, but I'm thinking around five percent or -- it's not a large percent.

MR. CRAMER: Okay. That's all the questions I have.

MR. CROSS: Thank you.

Thank you, Mr. Crawford.

VIDEOGRAPHER: The time is 4:51 p.m. This ends Tape 1, the end of the deposition, and we're off the record.

(Off-the-record discussion.)

COURT REPORTER: Please state if you would like to order this and when you would like to receive it.

MR. OLSON: We want a rough.

MR. CROSS: CSX will take a rough.

(Off-the-record discussion.)

MR. CRAMER: We need it within three days.
MR. CROSS: We don't need anything rush.
One other thing while we're still on the record. We need to designate the transcript highly confidential. And that's also for Mr. Jenkins.
And I don't think we got on the stipulation that an objection for one is available to all. It's been standing. Can we just get that on the record? Is that okay?
MR. CRAMER: I don't have a problem with that.
MR. CROSS: Thank you.
(Off-the-record discussion.)
MS. REINHART: No rough and regular delivery.
(Witness excused.)
(Thereupon, the deposition was concluded at 4:54 p.m.)
- - -

# Redacted in Full

# DA26324 - DA26348

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ***IN RE RAIL FREIGHT FUEL SURCHARGE ANTITRUST LITIGATION (NO. II)*** | ***MDL Docket No. 2925*** <br> ***Misc. No. 20-008 (BAH)*** |

**EXPERT REPORT OF KEVIN M. MURPHY**

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

**August 15, 2023**

**REVISED PURSUANT TO OCTOBER 6, 2023 ERRATA**

# Exhibit 52

## Difference Between UP and BNSF Published Coal FSC Rates

Rate-Based Fuel Surcharges




Notes:
[1] Difference calculated as UP FSC rate minus BNSF FSC rate.
[2] Shading represents July 2003 through December 2008.

Source: Backup materials to the expert reports of Professors Bernheim and Marx.

# Exhibit 53

## Difference Between UP and BNSF Published Intermodal FSC Rates

Rate-Based Fuel Surcharges




Notes:
[1] In each month there are several concurrent intermodal FSC formulas for both UP and BNSF. In each month the smallest absolute difference between any UP and BNSF intermodal formula is displayed. Difference is calculated as UP minus BNSF.
[2] Shading represents July 2003 through December 2008.

Source: Backup materials to the expert reports of Professors Bernheim and Marx.

## VI. CONCLUSION

265. For the reasons that I have explained in this report, neither economic theory nor the empirical evidence I have examined supports claims by the MDL 2 Plaintiffs and the opinions of the economic experts retained on their behalf that Plaintiffs were overcharged by BNSF and other Defendants as a result of the alleged conspiracy. Rather, my analysis supports my opinion that BNSF's conduct during the period of the alleged conspiracy is consistent with its unilateral interest independent of any agreement with the other railroads.

Kevin M. Murphy

August 15, 2023

Date

**From:** Pacocha, George
**Sent:** Tuesday, September 13, 2005 4:45 PM
**To:** Washburn, Sherrie L; Darrow, Jan
**Subject:** FW: FSC for Period 09/14/2005 - 09/20/2005

-----Original Message-----
**From:** Brice, Deanna B
**Sent:** Tuesday, September 13, 2005 8:46 AM
**To:** Heard, Meldee; Wood, Michael G; Williamson, Mike D; Kinne, Patrick K; White, Paul E; Harvell, Randy; Lee, Renita L; Williams, Sherry L; True, Thomas W; Gergen, Tom M; Selbitschka, Tom; Williams, Tom G; Fleenor, Vicki L; Pacocha, George; Miller, Jolene C; Milton, Herb; Williams, Terry P; Stacey, Sean M; Rossi, Kimberly A; Lanigan, John P; Piggott, Julie A; Nair, Deepak; Pasket, Craig D; Jones, Belinda ; Johnson, Ted; Pope, Sandra L; Washburn, Sherrie L; Clark, Jim L; Martin, Lori D; Chavez, Steven A; Origer, Lee W; Hitz, Daniel L
**Subject:** FSC for Period 09/14/2005 - 09/20/2005

As shown below, the HDF price/gallon decreased 1.76% from last week. Thus, the BNSF intermodal fuel surcharge for 09/14/2005 - 09/20/2005 will decrease to 21.0%.

| | This Week | Last Week | Change |
|---|---|---|---|
| **U.S. Retail HDF Price/Gal** | **$2.847** | **$2.898** | **-$0.051** |
| **BNSF Fuel Surcharge** | **21.0%** | **21.5%** | **-0.50%** |

**Competitive fuel surcharge programs**

| | Current FSC | Base | Effective Period | Update Frequency | Comments |
|---|---|---|---|---|---|
| **BNSF Carload** | 11.50% | HDF | September | Monthly | Carload will be 13.0% in Oct-05. |
| **ABF, Roadway, Yellow** | 19.30% | HDF | 9/14 - 9/20/05 | Weekly | Triggers at $1.13 per gallon. |
| **CN** | 14.00% | WTI | Jul - Sep | Quarterly | Based on WTI for prior quarter. Triggers at $24/barrel. Transitioning to monthly update effective Apr-06. |
| **CP** | 16.40% | WTI | September | Monthly | Based on WTI 2 months prior. Triggers at $24/barrel. |
| **CSXI** | 17.50% | HDF | September | Monthly | Table mirrors BNSF's, except adjusted monthly instead of weekly. |
| **NS** | 14.40% | WTI | September | Monthly | 0.4% of the linehaul freight charge for every $1.00 per barrel by which the WTI monthly average price exceeds $23.00. |
| **Pacer Stacktrain** | 17.50% | HDF | effective September 5 | Monthly | Adjusted on the 1st Monday of month based on previous Monday HDF. |
| **UP** | 17.50% | HDF | September | Monthly | Triggers at $1.35 per gallon for the average HDF 2 months prior. |

**Summary:**

**"This Week in Petroleum" Released on September 8, 2005**

**What to Expect for the U.S. Gasoline Market**

According to EIA's weekly survey of retail gasoline prices, the U.S. average for regular gasoline rose 46 cents from the previous week to $3.07 per gallon on Labor Day, September 5, just a nickel shy of the inflation-adjusted record of $3.12 averaged over March 1981, and by far the highest price ever if not adjusted for inflation. But besides the largest ever weekly hike in prices, another issue that concerned many motorists over the past weekend was the number of gasoline stations that were out of gasoline. Some motorists found themselves doing something they hadn't done since the late 1970s or early 1980s: waiting in long lines to fill up their cars. How did this happen, and where do we go from here?

Retail gasoline prices have been trending higher throughout 2005. From January 3 through August 29, the average price of regular gasoline across the United States rose from $1.78 to $2.61. Even prior to Hurricane Katrina, EIA was forecasting that the average retail price would remain above $2 per gallon through all of 2006. (This would make March 7, 2005, when the average price was $1.999 per gallon, the last time the average price was below $2 per gallon for a long time.) Against this backdrop, Hurricane Katrina dealt a devastating blow to the U.S. gasoline market. Over 25 percent of U.S. crude oil production was initially affected and between 10 and 15 percent of refinery capacity was shut down for the first few days, reducing gasoline production by about 10 percent. In addition, two major pipelines that carry gasoline from the Gulf Coast to the East Coast (Plantation, which ends in Virginia, and Colonial, which ends in New Jersey) were also shut down for the first few days and have only very recently had their capacity fully restored. Also, the Capline, a major crude oil pipeline that feeds crude oil from the Gulf Coast to some Midwest refineries, saw its flow severely curtailed for several days, causing some Midwest refineries to reduce the amount of their production due to a lack of supply of crude oil. All of this added up to a dramatic drop in the supply of gasoline at a time when demand typically peaks, as well as having the distribution system dramatically affected. The result was very high prices for many stations which had gasoline, particularly along the eastern portion of the country, and some stations that had no gasoline available temporarily. This was a definite shock to many motorists, and gasoline prices quickly became one of the major issues for the country. But what might happen over the next few weeks?

Retail gasoline prices are likely to remain very high for some time to come, with as much as 5 percent of refinery capacity possibly being out of commission for a few months. In addition, while crude oil production from the Gulf of Mexico continues to improve, it may be some time before production is back to pre-hurricane levels. But there are some indications that retail gasoline prices may have peaked, or if not, are very close to the peak. While gasoline imports were down during the week ending September 2, this is expected to change over the next couple of weeks. It generally takes about 2 weeks for gasoline imports to arrive from Europe and other sources and get incorporated into the U.S. gasoline supply chain. And with the price jump seen over the last week, there are reports that gasoline shipments are on their way and should begin arriving possibly as early as late this week. Also, an announcement by the International Energy Agency (IEA) that over 30 million barrels of relief was coming from IEA countries outside the United States, some in the form of gasoline volumes drawn from their government-owned and controlled stockpiles, should also aid in adding supply and putting immediate downward pressure on prices. The sale of up to 30 million barrels of crude oil from the U.S. Strategic Petroleum Reserve, in addition to the 12.6 million barrels of crude loaned to refiners earlier to meet more immediate concerns, should also alleviate any concerns refiners might have in terms of crude oil supply over the next several weeks. News that the Plantation and Colonial pipelines are back at full capacity, along with news that some refineries are returning to full capacity this week, should also help supply issues and lower prices. However, it may be awhile before retail prices return to pre-hurricane levels as there appears to be four refineries (ChevronTexaco located in Pascagoula, MS; ConocoPhillips located in Belle Chasse, LA; ExxonMobil located in Chalmette, LA; and Murphy located in Meraux, LA) that are likely to be down for an extended period. These refineries help supply the Plantation and Colonial pipelines and it is unclear how easily and efficiently increased gasoline imports will be able to be inserted into the distribution system. But EIA expects prices to be lower by the end of September than they are now, and they should continue to fall throughout most of the next couple of months, absent any disruptions to supply from other hurricane activity or other factors.

Highway Diesel Fuel Trend (2004 - 2005)

2004-2005 HDF Trend.xls (53 KB...

BNSF Intermodal Fuel Surcharge by Segment (for internal use only. Privileged information)

FSC 2005.zip (448 KB)

If you have any questions please let me know.

*Deanna Brice*
*Consumer Products*
*Marketing Support*
*BNSF Railway*
*phone 817-867-6404*